

250 Vesey Street
27th Floor
New York, NY 10281

wmhlaw.com
T: 212-335-2030
F: 212-335-2040

1650 Market Street
Suite 3600
Philadelphia, PA 19103

T: 267-516-0780

July 21, 2021

**VIA ECF**

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:     __*United States v. Dave Minter*, No. 20-cr-389 (JGK)__

Dear Judge Koeltl:

      We respectfully submit this letter on behalf of defendant Dave Minter in advance of his sentencing scheduled for August 11, 2021 at 10:30 A.M.

      Mr. Minter was arrested in the instant case on April 26, 2020.  The Indictment charged Mr. Minter with one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(e), to which Mr. Minter pled guilty without a plea agreement on April 28, 2021. As this Court is aware, the reason that Mr. Minter declined a plea agreement is that the government continues to insist that he is subject to the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(2)(A), despite the clear weight of the law to the contrary.  The resolution of this legal question is critical given the fifteen-year mandatory minimum sentence that would be required if the ACCA were applied.  Without the application of the ACCA, the parties agree that the otherwise applicable offense level would be 21 – resulting in a guideline range of 70-87 months or less than half of the 180 months for which the government now advocates.

      As discussed in detail below, we respectfully submit that the appropriate offense level is 21 and a below-guideline sentence is appropriate.

## I.     THE ARMED CAREER CRIMINAL ACT IS INAPPLICABLE HERE.

      The guideline range as calculated in the Presentence Report ("PSR") is based on an erroneous application of the ACCA.  Specifically, the PSR's characterization of Mr. Minter's 2014 conviction under NYPL § 220.39 as an ACCA predicate offense is contrary to prevailing law,



which dictates that this conviction is not a "serious drug offense" under the ACCA because of differences between the New York and federal controlled substances statutes.

**A.    Mr. Minter's 2014 Conviction Under NYPL § 220.39 is Not a "Serious Drug Offense" Under the ACCA.**

The ACCA defines a "serious drug offense" as including "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance," as defined in the Controlled Substances Act ("CSA").  18 U.S.C. § 924(e)(2)(A)(ii).  Consequently, unless a state drug offense involves substances controlled by the CSA, it does not constitute a "serious drug offense" predicate under the ACCA.  *See United States v. Ojeda*, 951 F.3d 66, 73 (2d Cir. 2020) (providing that the state offense must involve a "federally recognized" controlled substance); *see also United States v. Townsend*, 897 F.3d 66, 68 (2d Cir. 2018) (holding that "'controlled substance' under U.S.S.G. § 4B1.2(b) refers exclusively to substances controlled by the CSA").

Mr. Minter's 2014 conviction was under NYPL § 220.39(1), which provides: "A person is guilty of criminal sale of a controlled substance in the third degree when he knowingly and unlawfully sells . . . a narcotic drug."  NYPL § 220.39(1).  Section 220.39(1) is an indivisible statute and, consequently, the categorical approach applies in determining whether the offense is an ACCA predicate.  *See United States v. Swinton*, 495 F. Supp. 3d 197, 205 (W.D.N.Y. 2020) ("NYPL § 220.39(1) is indivisible and thus, applying *Townsend*, the categorical approach must be used and the inquiry is limited to whether a 'narcotic drug' under NYPL § 220.39(1) is a categorical match with the CSA's definition"); Ex. A, Sent'g Tr. at 6-12, *United States v. Baez-Medina*, No. 20-CR-24 (S.D.N.Y. July 1, 2021) (Koeltl, J.) (applying the categorical approach in determining whether a conviction under NYPL § 220.39(1) is a predicate "controlled substance offense" under the Guidelines); *see also Pascual v. Holder*, 707 F.3d 403, 405 (2d Cir. 2013), *adhered to on reh'g*, 723 F.3d 156 (2d Cir. 2013) (using the categorical approach to determine whether a conviction under NYPL § 220.39(1) constituted a drug trafficking crime under the CSA).  Under the categorical approach, a state offense is not a "serious drug offense" under the ACCA if the state statute criminalizes ***any substance*** that is not federally scheduled.  *See Townsend*, 897 F.3d at 74 (under the categorical approach, "the state law must criminalize ***only*** those substances that are criminalized under federal law") (emphasis added).

Consequently, to determine whether Mr. Minter's 2014 conviction is an ACCA predicate, the Court must compare the definition of "narcotic drug" in NYPL § 220.39(1) with the CSA schedules to determine whether there is overbreadth with respect to any controlled substance.  As discussed in detail below, the prevailing law is to compare the schedules at the time of sentencing, rather than at the time of the prior conviction.  There is no dispute that if this Court applied the "time of sentencing" analysis, the ACCA would be inapplicable because the current CSA schedules are different from the New York schedules.  Thus, the government urges this Court to compare the schedules at the time of conviction and argues that the CSA schedules and New York schedules at that time were aligned.  As this Court recently found, however, that argument also



fails.  *See* Ex. A, Sent'g Tr. at 6-12, *United States v. Baez-Medina*, No. 20-CR-24 (S.D.N.Y. July 1, 2021) (Koeltl, J.) (holding that the New York schedules were categorically broader than the federal schedules at the time of defendant's conviction, in controlling certain cocaine isomers which the federal schedules did not).  In short, there can be no question that the ACCA is inapplicable here.

### 1.    The Relevant Controlled Substance Schedules Were Inconsistent in 2014.

Even if this Court compares the New York and federal schedules at the time of Mr. Minter's 2014 conviction, there was an inconsistency which would render the ACCA inapplicable.  As this Court recently held in *Baez-Medina*, there was overbreadth between the New York and federal schedules of controlled substances in 2011 (and still today) because New York then, and now, defined "narcotic drug" to include certain isomers of cocaine that were different from those controlled by the CSA.  Ex. A, Sent'g Tr. at 6-12, *United States v. Baez-Medina*, No. 20-CR-24. (S.D.N.Y. July 1, 2021) (Koeltl, J.).

In *Baez-Medina*, this Court determined that New York's definition of "narcotic drug" in place in 2011 included a broader range of cocaine isomers than the CSA.  *Id.* at 9 ("The New York state statute controls cocaine and all isomers of cocaine; while the federal statute controls only the optical and geometric isomers of cocaine.").  The Court analyzed whether a 2011 conviction under NYPL § 220.39(1) was a "controlled substance offense" to determine whether the conviction was a predicate offense for an enhancement under Section 2K2.1(a)(2) of the Sentencing Guidelines. *Id.* at 6-11.  Under a categorical approach, the court compared New York's definition of "narcotic drug" with the CSA schedules in both 2011 and 2021 to identify overbreadth.  The Court noted that "under a plain reading of the New York statute, and when considering the legislative history and intent of the provision, the New York statute controlled all isomers of cocaine, while federal law only controls geometric and optical isomers of cocaine."  *Id.* at 10 (citing *United States v. Fernandez-Taveras*, No. 18-CR-455 (NGG), 2021 WL 66485, at *5 (E.D.N.Y. Jan. 7, 2021)). Thus, the Court held that a 2011 conviction under NYPL § 220.39(1) "cannot be considered a controlled substance offense pursuant to Sentencing Guideline Section 2K2.1(a)(2)."  *Id.* at 11. The Court found that it was "unnecessary to answer" whether the time-of-conviction or time-of-sentencing approach applied "because the broader inclusion of isomers of cocaine render the New York statute broader than its federal counterpart at the time of the defendant's 2011 conviction and today."  *Id.*

As this Court recognized in *Baez-Medina*, a recent Eastern District of New York decision also held that New York's definition of "narcotic drug" in place in 1998 included a broader range of cocaine isomers than the CSA.  *See Fernandez-Taveras*, 2021 WL 66485, at *6 (holding that a conviction under NYPL § 220.18 failed the categorical analysis because "the New York statute applies on its face to cocaine isomers to which the CSA does not"); *see also United States v. Holliday*, No. 20-30048, 2021 WL 1511274, at *2 (9th Cir. Apr. 16, 2021) (holding that a Montana drug offense was not a "controlled substance offense" predicate under U.S.S.G. § 4B1.2(b), since



"the Montana drug schedules are facially overbroad because they include more varieties of cocaine than the federal schedules").[1]

The holdings in *Baez-Medina* and *Fernandez-Taveras* squarely apply here and render the ACCA inapplicable. The definition of "narcotic drug" applicable to NYPL § 220.39(1) on the date of Mr. Minter's 2014 conviction (and also today) included certain non-federally-scheduled isomers of cocaine and is thus categorically broader than the CSA. Consequently, just as in *Baez-Medina* and *Fernandez-Taveras*, Mr. Minter's 2014 conviction fails the categorical approach and, therefore, is not a predicate offense under the ACCA. Thus, Mr. Minter maintains that, under either the time-of-sentencing analysis that he proposes or the time-of-conviction analysis that the government advances, the ACCA is inapplicable.

### 2. It is Undisputed That ACCA Would Be Inapplicable Under a "Time of Sentencing" Analysis.

The government has previously conceded in both the Southern and Eastern Districts of New York that a 2015 modification in federal law rendered the applicable definition of "narcotic drug" under New York law categorically broader than the federal schedule of controlled substances, such that a NYPL § 220.39(1) conviction could no longer serve as a predicate to the Sentencing Guidelines' career offender enhancement, which would accordingly also bar application under the ACCA. *See* Ex. B, Gov't Sent'g Letter at 3, *United States v. Devane*, 19-CR-244 (FB) (E.D.N.Y. Nov. 30, 2020), ECF No. 25 (the government joining in an objection to the PSR because "[u]nder controlling Circuit precedent, this drug offense is not a 'controlled substance offense' under the Guidelines because the New York drug statute currently criminalizes the sale of certain substances that are <u>not</u> criminalized under federal law"); Ex. C, Gov't Sent'g Letter at 4, *United States v. Disla*, 20-CR-222 (AKH) (S.D.N.Y. Nov. 30, 2020), ECF No. 23 (the government agreeing that the defendant's prior narcotics conviction did not constitute a "controlled substance offense" and accordingly agreed a lower Guidelines range was proper).

Specifically, it is undisputed that New York's current definition of "narcotic drug" is overbroad because it includes Naloxegol, which was removed from the CSA schedules in 2015, thus precluding the classification of Mr. Minter's 2014 conviction as a "serious drug offense" under the ACCA. *See Swinton*, 495 F. Supp. 3d at 205-06 (finding that a conviction under NYPL § 220.39 is categorically broader than one under the CSA because "New York criminalizes the sale of Naloxegol, while federal law does not").

---

[1] Additionally, we understand that on July 21, 2021, Judge Buchwald similarly held in *United States v. Ferrer* that a New York drug offense was not a predicate "controlled substance offense" under the Guidelines based on the same cocaine isomer distinction discussed in *Baez-Medina* and *Fernandez-Taveras*. *See United States v. Ferrer*, No. 20-CR-650 (S.D.N.Y. July 21, 2021) (Buchwald, J.). We will provide the Court with the sentencing transcript from *Ferrer* once the transcript is available.



     Thus, if the Court were to apply a "time-of-sentencing" analysis here, Mr. Minter would not qualify as an Armed Career Criminal because of this 2015 distinction between the state and federal schedules of controlled substances, which still exists. We believe that time of sentencing is the proper analysis and is consistent with prevailing law. Nearly every recent court that has addressed this issue in the context of criminal sentencing has applied the time-of-sentencing analysis. *See, e.g.*, *United States v. Abdulaziz*, 998 F.3d 519, 531 (1st Cir. 2021) (applying a time-of-sentencing approach and holding that defendant's prior conviction was not a "controlled substance offense" for the purposes of a sentencing enhancement under the Guidelines where hemp was not included in the CSA's schedules at the time of sentencing); *United States v. Holliday*, No. 20-30048, 2021 WL 1511274, at *2 (9th Cir. Apr. 16, 2021) (finding that a prior state offense was not a "controlled substance offense" under the Guidelines, where Montana's drug schedules included substances that the federal schedules did not at the time of sentencing); *United States v. Williams*, 850 F. App'x 393, 398 (6th Cir. 2021) ("Thus, the district court should have employed the schedule (federal or state) effective at the time of sentencing."); *United States v. Bautista*, 989 F.3d 698, 703 (9th Cir. 2021) ("Thus, a court must ask whether [the defendant's] prior crime qualifies as a 'controlled substance offense' under the CSA and the corresponding Guideline *at the time of sentencing*."); *Swinton*, 495 F. Supp. 3d at 206 (finding that a time-of-sentencing approach should apply); Ex. D, Sent'g Tr. at 14, *United States v. Santana*, No. 1:18-cr-865 (S.D.N.Y. July 13, 2020) (Caproni, J.) (holding that the "determination [must] be made at the time of sentence"); Ex. E, Sent'g Tr. at 19, *United States v. Rollins*, Nos. 1:11-CR-251, 1:19-CR-34 (W.D.N.Y. July 1, 2020) (Skretny, J.) (holding that time-of-sentencing is the proper approach); Ex. F, Sent'g Tr. at 25, *United States v. Butler*, No. 1:19-CR-177 (S.D.N.Y. Feb. 12, 2020) (Daniels, J.) (applying the time-of-sentencing approach); Ex. G, Sent'g Tr. at 9, *United States v. Gibson*, No. 1:19-CR-66 (W.D.N.Y. Jan. 31, 2020) (Vilardo, J.) ("applying the current law is the way to do it"); Ex. H, Sent'g Tr. at 4-6, *United States v. Augustine*, No. 17-CR-753 (S.D.N.Y. Sept. 19, 2019) (Seibel, J.) (refusing to apply the career offender guideline based on a distinction between New York's definition of a "narcotic drug" at the time of the prior state conviction and the time of sentencing). *But see* Ex. I, Sent'g Tr. at 14, *United States v. Rodriguez*, No. 18-CR-895 (S.D.N.Y. Sept. 19, 2019) (Kaplan, J.) (agreeing with the government that a time-of-conviction approach applies); Ex. J, Sent'g Tr. at 9-10, *United States v. Ferrer*, No. 17-CR-773 (S.D.N.Y. Nov. 16, 2018) (Koeltl, J.) (applying a time-of-conviction approach).

     In applying the time-of-sentencing approach, courts have consistently held that "the entire structure of the Guidelines in 18 U.S.C. Section 3553(a)(4)(A)(ii) requires that determination be made at the time of sentence." Ex. D, Sent'g Tr. at 14, *Santana*, No. 18-CR-865(S.D.N.Y. July 13, 2020) (Caproni, J.); *see also Swinton*, 495 F. Supp. 3d at 209 ("a sentencing court must apply the Guidelines in effect at the time of sentencing."); Ex. E, Sent'g Tr. at 19, *Rollins*, Nos. 1:11-CR-251, 1:19-CR-34 (W.D.N.Y. July 1, 2020) (Skretny, J.) ("The structure of the guidelines is such that you are assessed under the current state of the law."). Consistent with that general sentencing principle, the definition of "controlled substance" should be "'interpreted according to a uniform, national definition,'" not a no-longer-operative definition that was applicable on the date of conviction. *See Williams*, 850 F. App'x at 397 (quoting *United States v. Martinez*, 232 F.3d 728, 732 (9th Cir. 2000)). As the court explained in *Santana*, "[i]t would make no sense for



two defendants sentenced on the same day, with the same offense, with the exact same criminal history, to have different [sentences] because one previous conviction, in which state and federal offenses were the same, and one previous conviction which was different." *See* Ex. D, Sent'g Tr. at 14-15, *Santana*, No. 1:18-CR-865(S.D.N.Y. July 13, 2020) (Caproni, J.); *see also* Ex. F, Sent'g Tr. at 25, *Butler*, No. 1:19-CR-177 (S.D.N.Y. Feb. 12, 2020) (Daniels, J.) (providing that comparing "the law as it existed at the time of the offense . . . is inherently problematic" as it "could create consequences that are unintended and inconsistent for the determination of the applicable [sentencing] range").

While some courts, including this one, have previously relied on *Doe v. Sessions*, 886 F.3d 203 (2d Cir. 2018), which endorsed a time-of-conviction approach in the immigration context, we respectfully submit that the reasoning underlying *Doe* does not extend to the criminal sentencing. Specifically, in *Doe*, the court held that for immigration removal proceedings, the schedules should be compared at the time of conviction, rather than at the time of removal, because that approach "provides both the Government and the alien with maximum clarity at the point at which it is most critical for an alien to assess (with aid from his defense attorney) whether 'pending criminal charges may carry a risk of adverse immigration consequences.'" *Id.* at 210 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 369 (2010)). Here, by contrast, the moment that a defendant needs clarity is not at the time he is convicted of a potential predicate crime, but rather when he is evaluating the consequences of a conviction on his current charge. *See, e.g.*, *Abdulaziz*, 998 F.3d at 531 (distinguishing *Doe* because "there is no similar concern in [the criminal sentencing] context", since the consequence of a prior state conviction "results only if a defendant commits a new crime"); *Williams*, 850 F. App'x at 400 ("Also distinct are immigration cases holding that courts should apply the time-of-conviction federal drug schedule"); *Swinton*, 495 F. Supp. 3d at 209 ("[t]he factual premise of Doe would not apply in this context").

In other words, in the immigration context, the conviction at hand would trigger removal and thus it makes sense to have clarity at that point. Here, the underlying charge would not trigger the applicability of ACCA, but rather it is triggered by a subsequent conviction. Thus, that is the point at which a defendant must be able to make an informed decision on whether to plead guilty. Defendants should not be put in the position that Mr. Minter found himself in here – having to make a decision to plead guilty without clarity of whether his arguments that ACCA is inapplicable would prevail.

Due to the cocaine isomer distinction, the Court need not necessarily decide whether the time-of-conviction or time-of-sentencing approach applies, however, we believe that the Naloxegol distinction provides another basis for finding that Mr. Minter's 2014 conviction is not an ACCA predicate and that time of sentencing is the proper analysis under the prevailing law outlined above. While those cases generally arise in the context of Guidelines-based sentencing enhancements, the rationale underlying the application of the time-of-sentencing approach in such cases applies equally to the ACCA. *See United States v. Evans*, 924 F.3d 21, 29 n.4 (2d Cir. 2019) (stating that we "look[ ] to cases analyzing ACCA's elements clause to interpret . . . § 4B1.2 of the Guidelines"); *United States v. Moore*, 916 F.3d 231, 241–42 (2d Cir. 2019) (relying on cases



construing ACCA's force clause in construction of guideline counterpart). Moreover, we have not identified any case where a court applied the time-of-conviction analysis in the ACCA context. Consequently, Mr. Minter maintains that under the time-of-sentencing analysis, the Naloxegol distinction provides an independent reason for finding that the ACCA is inapplicable.

**B.    Because the ACCA Does Not Apply, Mr. Minter's Guideline Range is 70-87 Months.**

As Mr. Minter is not subject to the ACCA, the U.S.S.G. § 4B1.4(b)(3)(B) enhancement does not apply and Mr. Minter's guideline range must be adjusted accordingly. (*See* PSR ¶ 28.) Without the Section 4B1.4(b)(3)(B) enhancement, Mr. Minter's total offense level is 21, resulting in a recommended sentencing range of 70-87 months based on a criminal history category of V. (*See id.* ¶¶ 27-30.)

## II.    A DOWNWARD DEPARTURE UNDER § 4A1.3(b)(1) IS WARRANTED.

In determining an appropriate sentence, courts must undertake a three-step process: (1) determine the applicable sentencing range under the Guidelines; (2) consider whether any departures from the Guidelines would be consistent with guideline policy statements and commentary; and (3) consider the other factors listed in 18 U.S.C. § 3553(a) to "impose a sentence sufficient, but not greater than necessary" in light of such factors. 18 U.S.C. § 3553(a); *see also* U.S.S.G. § 1B1.1.

Should the Court find that the ACCA is inapplicable, a downward departure is warranted under U.S.S.G. § 4A1.3(b)(1) because Mr. Minter's criminal history calculation substantially overrepresents the seriousness of his criminal history. In particular, the criminal history calculation places too much weight on Mr. Minter's two prior robbery convictions, which occurred sixteen and twelve years prior to the instant offense, resulting in a drastically increased offense level and criminal history category, and an unreasonably harsh recommended sentencing range.

Pursuant to Section 4A1.3(b)(1), a downward departure is appropriate if "the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(b)(1); *see also United States v. Hernandez*, No. 04 CR. 424-20 (RWS), 2005 WL 1423276, at *6 (S.D.N.Y. June 13, 2005) ("[T]he Sentencing Commission recognized the potential harm of overstating a defendant's criminal history and thus exposing the defendant to punishment far in excess of what may be necessary to deter recidivism."). Factors to consider in granting a downward departure under Section 4A1.3(b) may include: (1) the remoteness of the prior convictions; (2) the sentencing range that would be imposed if a criminal history enhancement did not apply; and (3) the disparity between the time served on the prior convictions and recommended sentence that would be imposed due to such convictions. *See United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001) (stating that a large disparity in the sentence for the current offense and times served on prior offenses is indicative of a "deterrent effect so in excess of what is required



in light of the prior sentences"); *United States v. Wheeler*, No. 04-CR-424-15 (RWS), 2004 WL 2646625, at \*7 (S.D.N.Y. Nov. 18, 2004) (finding a departure was justified due to the remoteness of two of the three prior offenses, "the significant disparity" between time served on such offenses and the recommended sentence, and the criminal history category that would apply absent the enhancement). Ultimately, a departure is warranted when the Guidelines recommend an "unreasonably harsh" sentencing range that overrepresents the seriousness of the nature of the defendant's prior offenses. *See United States v. Santos*, 406 F. Supp. 2d 320, 328 (S.D.N.Y. 2005) (imposing a three-level downward departure when the defendant's guideline range was enhanced for offenses he committed seven years earlier at age 22).

Mr. Minter's criminal history calculation overstates the nature and obscures the remoteness of his prior convictions. Mr. Minter has three prior offenses that contribute to his criminal history calculation—(1) a 2004 robbery offense, (2) a 2008 robbery offense, and (3) a 2013 drug offense.

Mr. Minter committed the 2004 robbery offense when he was just 19 years' old. (PSR ¶ 37.) He was sentenced to 6 months' imprisonment and 5 years' probation on 8/2/2004, but he was placed on probation the same day of his sentencing, and therefore initially served no prison time. (*Id.* ¶ 39.) Following a "technical violation," Mr. Minter's probation was revoked on 7/17/2006 and he was resentenced to 1-3 years' imprisonment on 7/12/2006. (*Id.* ¶¶ 37-39.) He was then paroled on 2/15/2007. (*Id.* ¶ 40.) In total, Mr. Minter was incarcerated for just seven months for his 2004 robbery offense. Mr. Minter's initial sentence on his 2004 robbery falls outside the applicable time periods provided in U.S.S.G. § 4A1.2(e) for determining whether prior convictions count toward a defendant's criminal history or are otherwise stale. However, due to Mr. Minter's "technical" probation violation and his subsequent resentencing on 7/12/2006, the 2004 robbery offense is counted under the Guidelines and increased his criminal history calculation by 3 points. (PSR ¶ 37.)

Mr. Minter committed the 2008 robbery offense when he was just 22 years' old. (*Id.* ¶ 43.) He was sentenced to 4 years' imprisonment for the offense, but ultimately served a total of just over 2 years. (*See id.* ¶¶ 43-45.) Mr. Minter received 3 criminal history points for the 2008 robbery offense. (*Id.* ¶ 43.)

Mr. Minter's 2004 and 2008 robbery offenses resulted in a significantly enhanced recommended sentence, not only due to the 6 criminal history points attributed to such offenses, but also because these offenses substantially increased Mr. Minter's base offense level. Under U.S.S.G. § 2K2.1(a)(2), Mr. Minter's base offense level is 24 because he committed the instant firearms offense after sustaining "at least two felony convictions of either a crime of violence or a controlled substance offense." Had Mr. Minter not committed a "technical violation" of his probation on the nearly stale 2004 robbery offense, his base offense level would have been 20 under U.S.S.G. § 2K2.1(a)(4). If neither the 2004 nor the 2008 conviction were counted toward Mr. Minter's criminal history, then his base offense level would have been just 14 pursuant to § U.S.S.G. § 2K2.1(a)(6). Ultimately, the robbery convictions that occurred sixteen and twelve years prior to the instant offense resulted in a 10-level increase in Mr. Minter's base offense level



and increased his criminal history category from category III to category V.  The significant impact of these remote prior offenses on the applicable criminal history category and offense level reveal that Mr. Minter's criminal history calculation substantially overrepresents the seriousness of his criminal history.  *See Wheeler*, 2004 WL 2646625, at *7 n.3 (concluding that where a career offender designation based on remote prior offenses increased the defendant's criminal history category from IV to VI, a departure was warranted).

A departure is further warranted in light of the disparity between the time served on the prior robbery offenses and the sentence that would be imposed due to the impact of such offenses on Mr. Minter's criminal history calculation.  *See Mishoe*, 241 F.3d at 220 (finding that "a large disparity" between the punishment prescribed by enhancements and the time served on the prior predicate offenses indicate "a deterrent effect so in excess of what is required in light of the prior sentences and especially the time served on those sentences as to constitute a mitigating circumstance present 'to a degree' not adequately considered by the Commission") (citation omitted).  Despite Mr. Minter serving just seven months for the 2004 offense, that conviction alone essentially adds 33-41 months to his range, resulting in a recommended sentence approximately 10-12 times greater than the sentence on the 2004 offense, which further supports imposing a departure.  *See id.* (when a defendant served only a few months for a prior offense, a sentence of three years "might be expected to have the requisite deterrent effect").

In light of the remoteness of the robbery offenses, their disparate impact on Mr. Minter's criminal history calculation, and the disparity in time served on those offenses versus the recommended sentence, a departure is warranted as Mr. Minter's criminal history is substantially overstated.  *See United States v. Walker*, 595 F.3d 441, 442–43 (2d Cir. 2010) (affirming the trial court's departure from criminal history category V to category IV when the defendant's Guidelines range for a firearms offense was enhanced by two prior robbery convictions, which occurred nine and seventeen years prior to the instant offense).   When the defendant's "criminal history determines both the criminal history category and the offense level," courts have discretion to reduce the criminal history category, the offense level, or both.  *See United States v. Rivers*, 50 F.3d 1126, 1130 (2d Cir. 1995); *see also Wheeler*, 2004 WL 2646625, at *6 (granting downward departure and reducing both the defendant's criminal history category and his offense level).  Even reducing one criminal history level here would result in a more reasonable guideline range of 57-71 months.

Mr. Minter's proposed departure certainly does not go so far as to understate the seriousness of his criminal history as he does not request any further departure based on the remote 2008 robbery conviction, which greatly impacts Mr. Minter's criminal history calculation.  The only other criminal conviction contributing to Mr. Minter's criminal history calculation is his 2013 drug offense, which occurred seven years prior to the instant offense.  The absence of any more recent criminal offenses by Mr. Minter lends further support for imposing a Section 4A1.3(b)(1) departure.



## III.    A SENTENCE OF NO MORE THAN 57 MONTHS IS APPROPRIATE.

Should the Court find that the ACCA does not apply, a sentence of not more than 57 months' imprisonment, consistent with the criminal history discussed above, is sufficient, but not greater than necessary, to achieve the sentencing goals of Section 3553(a).

### A.    Section 3553(a) Factors

Section 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing."  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)).  To guide courts in applying this principle, Section 3553(a) sets forth a list of factors to consider, including:

    i.    the nature and circumstances of the offense;

    ii.    the history and characteristics of the defendant;

    iii.    the need for the sentence imposed to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant; and

    iv.    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

18 U.S.C. §§ 3553(a)(1), (2), (6).

"A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors . . . ."  *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008); *see also United States v. Johnson*, 567 F.3d 40, 51 (2d Cir. 2009) (noting that courts must "consider all the § 3553(a) factors and then undertake 'an individualized assessment based on the facts presented") (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)). Courts are "generally free to impose sentences outside the recommended range."  *Cavera*, 550 F.3d at 189.

### B.    Background

Throughout the course of his life, Mr. Minter has always built meaningful relationships with the people around him.  Mr. Minter's parents speak to his consistent, caring, and loving demeanor.  (*See* Letter of Nadine Allen at 1, a true and correct copy of which is attached as Exhibit K hereto; Letter of Lamorris Minter at 1, a true and correct copy of which is attached as Exhibit L hereto.)  His friends – some of whom he has known for 20 years – speak to his thoughtful nature and stellar babysitting skills.  (*See* Letter of Julia Fowler, a true and correct copy of which is attached as Exhibit M hereto.)  Despite his troubled past, the common thread in Mr. Minter's



character is increasing self-awareness to seek honest work, obtain help, and be more present for his family. The past few years show Mr. Minter's upward trajectory away from crime and towards productivity and responsibility. While Mr. Minter took a step backwards in committing the instant offense, now at 36, he is determined upon release to return to the proper course.

Mr. Minter's uphill battle began younger than most. At 10 months old, he suffered a large dose of lead poisoning evidenced by very high levels of lead found in his blood. (*See* PSR ¶ 70.) The severe effects of childhood lead poisoning on brain development and behavior persist into adulthood, and these effects are well documented.[2] In fact, Mr. Minter's mother attributes certain behavioral issues Mr. Minter later exhibited as resulting from this early setback. (*Id.*)

From a very young age, Mr. Minter was surrounded by criminal activity. His father was in and out of prison and largely absent throughout his childhood. (*See id.* ¶ 66.) At just the age of four, Mr. Minter recalls that his father received a six-year sentence for drug charges. (*Id.*) Upon release, Mr. Minter's father was arrested and returned to prison several more times. (*Id.*) While his father was incarcerated, Mr. Minter's mother remarried and her new husband – Mr. Minter's stepfather – became abusive. (*See id.* ¶ 67.) As a young child, Mr. Minter at least once tried to stop his stepfather from hitting his mother, putting himself in harm's way to shield her, and was ultimately shoved into a table while protecting her. (*See id.*)

Despite a childhood plagued with poverty, abuse, and substantial family obstacles, Mr. Minter's mother described Mr. Minter as a respectful child, who was heavily involved in extra-curricular activities. (*See* Ex. K at 1.) Mr. Minter enrolled in Special Education classes beginning in the 4th grade to overcome his learning obstacles, but also found other ways to express his talents and engage with his community. (PSR ¶ 100.) Whether it was bringing home the golf championship trophy in junior high or performing in the talent show, he sought opportunities to develop his character.

With an incarcerated father and an abusive stepfather, it is unsurprising that Mr. Minter began associating with the wrong crowd and misbehaving in his adolescence. (*See id.* ¶ 68.) Then, at age 16, Mr. Minter dropped out of school to provide for his daughter. (*See id.* ¶ 96.) He worked all kinds of jobs – from sweeping at his mom's work, to cooking in Manhattan, and laying roofs – but with limited financial resources and early exposures to criminal activity due to his father, Mr. Minter turned to illicit activities to earn a living. (*See id.* ¶ 106.) Even into adulthood, Mr. Minter continued to be surrounded by criminal activity as his father and brother were convicted on drug charges in 2013. (*Id.* ¶ 69.)

Although Mr. Minter entered adulthood on poor footing, the last three years reflect a turning point towards progress and growth. Since his release from incarceration in September 2018, Mr. Minter has consistently found honest employment. He secured a job assignment for

---

[2] *See* Claudia Coulton et al., *Downstream Consequences of Childhood Lead Poisoning: A Longitudinal Study of Cleveland Children from Birth to Early Adulthood*, CASE W. UNIV. CTR. ON URB. POVERTY AND CMTY. DEV. 1, 7-8 (June 2020).



former prisoners through the Center for Employment Opportunities in 2019. (*Id.* ¶ 104.) Following that assignment, Mr. Minter began working as a delivery driver. (*Id.* ¶ 105.) Mr. Minter's release in September 2018 was a seminal point for him to pursue honest work with greater intention. His character largely shifted away from misbehavior and Mr. Minter's vision is set on self-improvement. While Mr. Minter is acutely aware that the instant offense was a grave step backwards, he is determined to return to an honest path.

Mr. Minter's familial ties remain as strong as ever. Throughout his adult life, Mr. Minter has continued to offer a helping hand to his friends when they need him. Whether helping with the family Christmas tree, cracking jokes to his mom, or hosting jam sessions at home, Mr. Minter's commitment to his family and friends has only become more focused since he protected his mother in adolescence. Now, while his mother faces a different battle – one against breast cancer – Mr. Minter continues to stand by her side and offer the support she needs. (*See* PSR ¶ 63.) There is no question as to why Ms. Allen refers to Mr. Minter as her rock. Mr. Minter's friends and family have continued to stand by his side even while incarcerated for the instant offense. (*See id.* ¶ 65.) In the form of supportive phone calls or errand runs, his friends and family – particularly his mom – respond to his needs in the way Mr. Minter has long served theirs. (*See id.*)

Mr. Minter's primary motivation for turning his life around is so that he can be a constant figure in his children's lives, and he makes a concerted effort to stay close to his kids even while incarcerated. (*See id.* ¶ 75.) In one way or another, all of Mr. Minter's kids are living in their formative years. Diavion, age 17, is on the cusp of adulthood as she finishes her last couple of years in high school. (*Id.* ¶ 74.) Dave Jr., age 13, prepares to begin high school as he enters into adolescence. (*Id.* ¶ 73.) Finally, Dav-eyah, age 15 months, was born just a few weeks before Mr. Minter's arrest for the instant offense. (*Id.* ¶ 74.) She is deeply curious about the world around her as she begins taking her steps – albeit with a few stumbles. As a father, Mr. Minter feels an obligation to guide his children through these formative moments and provide guidance that was rarely afforded to him at their ages. (*See id.* ¶ 75.)

For virtually all his life, Mr. Minter's environment has worked against him. Yet, he holds himself accountable for his wrongdoings. Most of all, the past three years have offered the opportunity to seek honest work and find greater fulfillment. For Mr. Minter, this means correcting course and prioritizing his family. With his kids' formative years ahead of them, Mr. Minter hopes to offer the fatherly guidance, support, and presence that was not afforded to him.

### A.     A Below-Guidelines Sentence Adequately Reflects Mr. Minter's Criminal History.

A sentence of no more than 57 months adequately reflects Mr. Minter's dated and overstated criminal history. The disparate impact of Mr. Minter's criminal history on his sentencing range is discussed at length in Section II. Even if this Court finds that a departure is not warranted, the Court has discretion to impose a below-guidelines sentence for the same reasons



outlined above. *See United States v. Ingram*, 721 F.3d 35, 37 (2d Cir. 2013) (affirming a sentence 44 months below the guidelines range based on the argument that the career offender enhancement overstated the seriousness of the felony crimes that put him in that category).

Such a sentence will provide just punishment for the instant offense, while adequately accounting for Mr. Minter's young age at the time of his prior offenses for which he already served time in prison. While Mr. Minter acknowledges and takes responsibility for his prior convictions, he should not continue to be punished to the degree the guidelines recommend for a technical probation violation that occurred fifteen years ago.

### B.    The Non-Violent Nature of the Instant Offense Supports a Below-Guidelines Sentence.

During his period of pre-trial detention, Mr. Minter has had time to reflect upon the instant offense. If given the chance to go back, Mr. Minter would never carry a firearm in violation of the law. However, as the PSR notes, there are no identifiable victims to this offense. (PSR ¶ 17.) Additionally, Mr. Minter was not engaged in illicit activity or a crime of violence when arrested. Rather, he was seated in the back seat of a vehicle spending time with friends. (*See* PSR ¶¶ 7-8.) While Mr. Minter deeply regrets his decisions and recognizes that a serious sentence is warranted, he respectfully submits that the Court consider the non-violent circumstances surrounding the instant offense and find that a below-Guidelines sentence provides adequate punishment.

### C.    Mr. Minter's History and Characteristics Support a Sentence of No More Than 57 Months.

Mr. Minter acknowledges the severity of his offense, but the Court must take into account the circumstances in his life that drove him to criminal activity. Throughout his childhood, Mr. Minter saw his father – a figure that one expects will lead their child away from a criminal path – convicted for crime after crime. Not only was his father incarcerated for most of Mr. Minter's youth, Mr. Minter's abusive stepfather was a poor example of a patriarchal figure Mr. Minter needed so badly in his life.

At school, Mr. Minter struggled through his classes. He was not enrolled in Special Education until the 4th grade, and thus spent several of his formative years in classes that did not meet his needs. After years of struggling through school, Mr. Minter eventually dropped out at the age of 16 to provide for his daughter. Given the difficulties he faced in school, improving his life through education did not seem like an attainable goal at the time to Mr. Minter. Instead, he continually witnessed close family members turn to criminal activities as a means of financial support.

Thus, it is no surprise that during his youth, Mr. Minter made the same mistakes as some of his family members. He recognizes even now that a significant sentence is warranted given the fact that he has violated the law even after serving time for past convictions. Mr. Minter regrets



the decision to carry a firearm in violation of the law and has clearly accepted responsibility for his misconduct by timely pleading guilty.  At only 36 years' old, he hopes to be released when he is still young enough to resume the hard work he started three years ago of turning his life around. Spending an inordinate amount of his adult life in prison will only harm Mr. Minter's chances of reintegration and perpetuate the cycle of incarceration he hopes to break out from.

### D. A Sentence of No More Than 57 Months Will Provide Adequate Deterrence and Adequately Address the Risk of Future Criminal Conduct.

A sentence of no more than 57 months' imprisonment is sufficient punishment to adequately deter Mr. Minter from further crime because he has significant external motivating factors – primarily his desire to be a stable father for his children and other family members – that will aid in deterring him from further criminal activity.  *See Ingram*, 721 F.3d at 37 (affirming a sentence 44 months below the Guidelines range, which was sufficient to address the risk of harm from future criminal conduct).

Mr. Minter is distraught over how his actions have directly affected those close to him. Growing up, he experienced firsthand how criminal activity can adversely affect a family.  Mr. Minter watched as his father spent years away from the family, incarcerated for various convictions.  He wants to do better by his family and own children.

Even during this past year of pre-trial detention, Mr. Minter has missed both the triumphs and struggles of the family: spending time with his newborn daughter and supporting his mother as she undergoes chemotherapy treatments.  Just a few weeks before he was arrested for the instant offense, Mr. Minter welcomed his third child into the world, Dav-eyah Minter.  Mr. Minter's detention has caused him to miss some of the most precious moments in Dav-eyah's life: her first words, her first steps, her first laugh.  Mr. Minter hopes to be released in time to experience some of Dav-eyah's other firsts, whether it is teaching her to ride a bicycle or taking her to her first school dance.  Mr. Minter recognizes that a sentence must be imposed for this offense, but he also realizes, now more than ever, the importance of leading an honest life and being present for his children and mother.

Despite life's hardships, Mr. Minter has had the love and support of his mother through it all.  Although she refers to Mr. Minter as her rock, her steadfast example of what it means to be a loving parental figure, in the face of familial and financial difficulty, has been an essential pillar in Mr. Minter's life.  Mr. Minter has maintained close ties with his family throughout his detention: he speaks to his mother every day, even as she undergoes chemotherapy.

Being apart from family is extraordinarily difficult in any circumstance.  Being apart from his newborn daughter and his ill mother, all in the midst of a global pandemic has made Mr. Minter's detention all the more difficult.  But Mr. Minter refuses to allow the instant offense to take him off his course, and he hopes to obtain his high school equivalency diploma while incarcerated in order to expand his future opportunities.  Mr. Minter is anxious to return home and



be present for his family as a father, son, and brother.  During his sentence, he hopes to be designated to a facility close to the New York metropolitan area so that his family will be able to visit him frequently.

Given these facts, a sentence of no more than 57 months is sufficient to adequately deter Mr. Minter from committing further crimes, while also giving Mr. Minter hope that he will still have time to build a productive life and support his family.

## IV.   CONCLUSION

For the foregoing reasons, we respectfully submit that: (1) the ACCA's mandatory minimum does not apply; (2) a downward departure from a criminal history category V to a category IV is appropriate; and (3) a sentence of no more than 57 months' imprisonment is appropriate punishment for Mr. Minter's offense.

Respectfully,

*/s/ Derek A. Cohen*
Derek A. Cohen


cc:    AUSA Kevin B. Mead (via ECF)

# Exhibit A

L71zzMEDSsj

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3
                        v.                    20 Cr. 24 (JGK)
4
    JAIME BAEZ-MEDINA,                        SENTENCE
5
                        Defendant.
6
    ------------------------------x
7
                                              New York, N.Y.
8                                             July 1, 2021
                                              1:04 p.m.
9
    Before:
10
                            HON. JOHN G. KOELTL,
11
                                              District Judge
12

13                              APPEARANCES

14  AUDREY STRAUSS
         United States Attorney for the
15       Southern District of New York
    REBECCA T. DELL
16  MICHAEL D. MAIMIN
         Assistant United States Attorneys
17
    FEDERAL DEFENDERS OF NEW YORK, INC.
18       Attorneys for Defendant
    AMY GALLICCHIO
19  ISAAC WHEELER

20
    Also Present:
21
    Jill Hoskins, Interpreter (Spanish)
22  James Hontoria, Interpreter (Spanish)

23

24

25

L71zzMEDSsj

1              (In open court)

2              (Case called)

3              THE DEPUTY CLERK:  All parties please state who they

4      are for the record.

5              MS. DELL:  Rebecca Dell and Michael Maimin for the

6      government.

7              MR. MAIMIN:  Good afternoon, your Honor.

8              THE COURT:  Good afternoon.

9              MS. GALLICCHIO:  Good afternoon, your Honor.

10             Federal Defenders by Amy Gallicchio, along with

11     Isaac Wheeler, on behalf of Jaime Baez-Medina.

12             THE COURT:  Okay.  Good afternoon, everyone.

13             I received the presentence report prepared January 22,

14     2021, revised March 12, 2021, together with the sentencing

15     recommendation and the addendum.  I received the defense

16     submission dated March 26, May 28, June 24, 2021.  I received

17     the government's submission dated May 14 and June 8.

18             It's useful at the outset to explain the Court's

19     calculation of the guideline sentencing range in this case.

20     The parties can then make their objection or any arguments.  I

21     have carefully reviewed all of the submissions, allowing me to

22     make the guideline sentencing range calculation first, and

23     allowing the parties then to direct their attention to the

24     Section 3553(a) factors.

25             By the way, since we're wearing masks, if at any time

L71zzMEDSsj

1    someone can't hear me, just let me know.

2         The government contends that the base offense level is

3    24, as set forth in Section 2K2.1(a)(2) of the current

4    guidelines, because the defendant committed the current offense

5    subsequent to sustaining at least two felony convictions for a

6    controlled substance offense.

7         The defendant disputes that he had two prior

8    controlled substance offenses, within the meaning of the

9    guidelines.  The parties agree that the defendant's 2010

10   conviction in state court for criminal sale of a controlled

11   substance in the fourth degree, in violation of New York Penal

12   Law, Section 220.34(5), based on a sale of methadone, is a

13   qualifying controlled substance offense; see ECF No. 40 at page

14   3, note 1.

15        The parties dispute whether the defendant's

16   convictions in state court in 2004 and 2011, were qualifying

17   controlled substance offenses for purposes of Guideline

18   Section 2K2.1(a)(2).

19        Having considered all of the lengthy submissions, the

20   court concludes that neither conviction is a qualifying

21   conviction.  The defendant was convicted in 2004 of a violation

22   of New York Penal Law, Section 220.34.

23        The government argues that the defendant's 2004

24   conviction must have rested on a subsection other than

25   subsections (7) or (8) of New York Penal Law, Section 220.34

L71zzMEDSsj

1    and, therefore, should be considered categorically a controlled

2    substance offense.

3             The parties agree that subsections (7) and (8) cover

4    substances broader than controlled substances under federal

5    law, but the other subsections do not.  The categorical

6    approach is used to interpret individual statutes describing

7    only one crime; whereas, the modified categorical approach is

8    used to compare divisible statutes, statutes with different

9    elements in the alternative, creating multiple crimes.

10            The modified categorical approach is used to determine

11   which elements of the alternatives listed in the statute were

12   necessarily found or admitted as a basis for the matching

13   analysis.  New York Penal Law, Section 220.34 is divisible

14   because there are separate crimes listed.

15            The government argues that pursuant to the modified

16   categorical approach, the defendant's 2004 conviction could not

17   have rested on subsection (7) or (8), and that the remaining

18   subsections are a categorical match to federal controlled

19   substances offenses.  Subsections (7) and (8) prohibit

20   substances not controlled by federal law, meaning that if the

21   defendant could have been convicted pursuant to those

22   subsections, the conviction cannot be considered categorically

23   a match for controlled substances offenses under federal law.

24            Both parties assume that the other subsections of the

25   New York statute are a categorical match to federal law;

L71zzMEDSsj

1     therefore, the issue is whether the government can prove that

2     defendant's 2004 conviction could not have rested on

3     subsections (7) or (8) of the New York statute.

4              Subsections (7) and (8) require that the illicit

5     substances be sold on school grounds, a school bus, or a

6     childcare center.  While the defendant's plea allocution did

7     not include any mention of being on school grounds or school

8     bus or at a childcare center, the Court cannot infer the

9     subsection under which the defendant was convicted, because the

10    defendant did not need to plead to all the elements of the

11    offense for which he was convicted.

12             The defendant was originally charged with a Class B

13    felony, pursuant to New York Penal Law, Section 220.39(1), see

14    ECF No. 47, f1.  As part of the plea agreement, the defendant

15    pleaded to a Class C felony, pursuant to New York Penal Law,

16    Section 220.34.  However, pursuant to New York state law, when

17    a defendant pleads guilty to a lesser-included offense, as part

18    of a plea bargain, the defendant need not admit the facts

19    charged against the defendant in the indictment or the lesser

20    included offense; *see People v. Griffin,* 160 N.E. 2d 684, 686,

21    (N.Y. 1960).

22             In fact, because plea bargains in New York can be

23    compromises between the defendant and the state, convictions

24    pursuant to plea bargains may relate to a hypothetical

25    situation without objective basis; *People v. Foster,* 225 N.E.2d

L71zzMEDSsj

```
1    200, 202 (N.Y. 1967) quoting Griffin, 166, N.E. 2d at 686.
2    Therefore, when accepting a guilty plea pursuant to a plea
3    bargain, it is unnecessary for a court to establish a factual
4    basis for the particular crime confessed; People v. Clairborne,
5    280 N.E.2d 366, 367 (N.Y. 1972).  See also People v. Falbo, 105
6    N.Y. Supp. 3d 721, 723 App Div 2019.
7              In the case of Mr. Baez's 2004 conviction, the state
8    court did not need to establish a factual basis for the
9    conviction, pursuant to New York Penal Law, Section 220.34,
10   because the plea was entered pursuant to a plea bargain;
11   therefore, the record cannot establish under which subsection
12   of the New York statute the defendant was convicted.
13             Because the statute as a whole cannot be considered
14   categorically a controlled substance offense, under federal
15   law, the defendant's 2004 conviction cannot be a controlled
16   substance offense, pursuant to Sentencing Guidelines
17   2K2.1(a)(2).  The Court cannot infer that the 2004 conviction
18   must have rested on one subsection rather than another, based
19   on an absence of the facts in a plea allocution, because the
20   defendant did not need to be allocated to the facts of any
21   particular subsection.
22             The defendant argues that his 2011 conviction,
23   pursuant to New York Penal Law, Section 220.39(1), cannot be
24   considered categorically a controlled substance offense.  In
25   particular, the defendant argues that certain cocaine isomers
```

L71zzMEDSsj

1    are controlled by New York law that are not controlled by

2    federal law; and therefore, the New York law is broader than

3    the federal law and is not a categorical match.

4          New York law controls.  "Coca leaves and any salt,

5    compound, derivative or preparation thereof, which is

6    chemically equivalent or identical with any of these

7    substances, including cocaine and ecgonine, their salts,

8    isomers, and salts of isomers, except that the substance shall

9    not include decocainized coca leaves or extraction of coca

10   leaves, which extractions do not contain cocaine or ecgonine."

11   New York Health Law, Section 3306, Schedule 2(b)(4).

12         The Federal Controlled Substance Act controls. "Coca

13   leaves, 9040, and any salt, compound, derivative or preparation

14   of coca leaves, including cocaine, 9041, and ecgonine, 9180,

15   and their salts, isomers, derivatives, and salts of isomers and

16   derivatives; and any salt, compound, derivative or preparation

17   thereof, which is chemically equivalent or identical with any

18   of these substances," with exceptions not relevant in this

19   case.  21 CFR, Section 1308.12(b)(4).

20         In this match between the statutes concerns the term

21   "isomer".  The New York statute does not specifically define

22   "isomer", but included isomers of cocaine in its list of

23   controlled substances.  Whereas, the federal law defines

24   "isomer" to include only known "optical and geometric isomers"

25   of cocaine, 21 CFR, Section 1300.01(b).

L71zzMEDSsj

1           By the way, I should have mentioned at the outset, we

2    have an interpreter.  Is the interpreter on staff or does the

3    interpreter have his oath on file?

4           THE INTERPRETER:  Yes, your Honor.  My oath is on

5    file.

6           THE COURT:  Could you state your name, please, for the

7    record.

8           THE INTERPRETER:  James Hontoria, H-O-N-T-O-R-I-A.

9           THE COURT:  Thank you.

10          Have you been translating since the beginning of the

11   proceeding?

12          THE INTERPRETER:  Yes, I have.

13          THE COURT:  Thank you very much.

14          So let me continue.

15          The government argues that nonoptical and nongeometric

16   isomers of cocaine are not controlled by New York law because

17   they are not chemically equivalent to cocaine.  Because the New

18   York statute does not define "chemical equivalent," the

19   government first proposed to define "chemical equivalent" as

20   "having a similar chemical environment, simplified by atoms

21   being attached by similar molecules."

22          The defendant counters that the government's

23   definition of "chemical equivalence" is too narrow, comparing

24   atoms with a molecule rather than comparing molecules to each

25   other.  Under the government's definition of "chemical

L71zzMEDSsj

1    equivalence," no isomers of cocaine would be chemically

2    equivalent to cocaine.

3           In reply, the government argues that the text in the

4    legislative history of the New York statute indicate that the

5    inclusion of the, "isomers" in the statute was designed to

6    capture solely the dextrose isomer of cocaine, which is also

7    controlled by federal law.  However, the government's textual

8    argument misreads the New York statute.  The New York statute

9    under a plain reading suggests that "cocaine and ecgonine,

10   their salt, isomers and salt isomers" can be chemically

11   equivalent to "coca leaves" or any "salt, compound, derivative

12   or preparations thereof" and are controlled by New York state

13   law.

14          Put differently "isomers" are specifically included in

15   the subset of molecules that can be chemically equivalent or

16   identical with coca leaves or any salt, compound, derivative or

17   preparation thereof.  That is the definition that the New York

18   State Legislature has given us.  The New York state statute

19   controls cocaine and all isomers of cocaine; while the federal

20   statute controls only the optical and geometric isomers of

21   cocaine.

22          The legislative history also counsels against the

23   government's interpretation of the statute.  The government

24   argues that the inclusion of the term "isomers" in the New York

25   statute was designed to counter the isomer defense, which

L71zzMEDSsj

1    posited that the dextro isomer of cocaine, before the inclusion

2    of isomers in the statute, was not prohibited by state or

3    federal law.  However, the sponsor's memorandum of the bill

4    that amended the statute to prohibit isomers of cocaine stated

5    that the problem of the dextro isomer defense "could be

6    resolved by enacting this amendment, which would include all

7    isomers of cocaine."  The sponsor's memo, Bill Jacket Law 1978,

8    Chapter 100, New York, Defense Exhibit D.

9          This legislative history belies the government's

10   contention that the statute was designed to prohibit just the

11   dextro isomer of cocaine, because it made clear that the chosen

12   solution of the New York State Legislature to deal with the

13   dextro isomer offense was to prohibit all isomers or to control

14   all isomers of cocaine.  Whether wise or not or overbroad or

15   not, the provisions of the New York state law should be

16   understood as drafted until amended.  The federal law pursued

17   the narrower path of prohibiting geometric and optical isomers.

18         Accordingly, under a plain reading of the New York

19   statute, and when considering the legislative history and

20   intent of the provision, the New York statute controlled all

21   isomers of cocaine, while federal law only controls geometric

22   and optical isomers of cocaine.  *See United States v. Fernandez*

23   *Tavares,* 2021 WL 66485 *5 (E.D.N.Y. January 7, 2021).  "As a

24   result of the difference in the definitions of cocaine under

25   New York law and federal law, possession of certain cocaine

L71zzMEDSsj

1    isomers is illegal under the New York statute, but legal under

2    the Controlled Substance Act."

3          Therefore, the 2011 conviction cannot be considered a

4    controlled substance offense pursuant to Sentencing Guideline

5    Section 2K2.1(a)(2).  It is unnecessary to reach the defense

6    argument that the 2011 New York state conviction is also not a

7    categorical match for the federal controlled substance offense

8    because the New York statute included naloxegol as a controlled

9    substance.

10         While the Federal Controlled Substance Act excludes

11   naloxegol today and the Court should compare the scope of the

12   New York statute at the time of conviction with the scope of

13   the federal statute today, that is a question that is pending

14   for decision before the Court of Appeals for the Second

15   Circuit.  See *United States v. Gibson* 20-3049, and has divided

16   district courts and other courts of appeals.

17         It is unnecessary to answer that question in this case

18   because the broader inclusion of isomers of cocaine render the

19   New York statute broader than its federal counterpart at the

20   time of the defendant's 2011 conviction and today.  Therefore,

21   the proper offense level is 20 under Section 2K2.1(a)(4),

22   because the defendant indisputably committed the instant

23   offense or the current offense subsequent to sustaining one

24   felony conviction for a controlled substance offense, not two.

25   The 2010 conviction is indisputably one controlled substance

L71zzMEDSsj

1   offense.

2          The probation department recommended a two level

3   enhancement under Section 2K2.1(b)(4), because the firearm was

4   stolen.  The defendant objects to this enhancement because the

5   enhancement was not based on empirical evidence and increases

6   the guideline without a sound basis.  The Court can certainly

7   take into account that a guideline is not well-founded, but

8   there certainly is an understandable effort in the guidelines

9   to discourage the possession of a stolen firearm.  That is

10  certainly a justification for the enhancement.

11         In any event, there is no question that the guideline

12  applies in this case, because there is no dispute that the

13  firearm was stolen.  There is no dispute that the defendant

14  possessed a stolen firearm; therefore, the two-level

15  enhancement is appropriate under Section 2K2.1(b)(4).

16  Therefore, the total offense level is 22; 20 under Section

17  2K2.1(a)(4)(a), and 2 under Section 2K2.1(b)(4).  The defendant

18  is entitled to a three-level reduction under Section 3E1.1 for

19  acceptance of responsibility.

20         The total offense level is, therefore, 19; the

21  Criminal History Category is VI; and the guideline sentencing

22  range is 63 to 78 months.

23         All right. I will now call on each of the parties, as

24  I always do: Defense counsel, the defendant, and the

25  government, asking if there are any objections to the

L71zzMEDSsj

1    presence report and then for any statements that the parties

2    would like to make.  You are welcome to make any discussion or

3    objections to what I've already said, in addition to any

4    objections that you may want to lodge with respect to the

5    presence report.

6              As you know, I always ask those two questions because

7    if there are objections to the presence report, I have to

8    either resolve them or determine that they don't affect the

9    sentence, so it's important for me to ask that question.  And

10   it's also important for me to ask the second question, which

11   is, I'll listen to each of the parties for anything they wish

12   to tell me in connection with sentence.  And so, as I said, you

13   can give me any objections to the presence report, as well

14   as any objections to what I already said.

15             So Ms. Gallicchio, have you reviewed the presence

16   report, the recommendation, and the addendum?  Have they been

17   translated for the defendant?  And have you discussed them with

18   the defendant?

19             MS. GALLICCHIO:  Yes.

20             Good afternoon, your Honor.

21             I have read the presence report and the addendum.

22   Mr. Baez does speak English very well, your Honor, but is more

23   comfortable in today's proceeding with an interpreter.  While I

24   did not translate the document, I did speak with him at great

25   length about it and was confident that he understood it.

L71zzMEDSsj

1                 THE COURT:  Thank you.

2                 MS. GALLICCHIO:  I have no further objections.  The

3     objections that we raised in the presentence report noted on

4     page 31 have already been addressed by the Court.

5                 Beyond that, I have no further objections.

6                 THE COURT:  All right.

7                 I'll listen to you for anything that you would like to

8     tell me in connection with sentence, any statement you'd like

9     to make, anything at all you'd like to tell me.

10                MS. GALLICCHIO:  Yes.  Thank you, your Honor.

11                At this point, your Honor, Mr. Baez has now been in

12    prison, in jail, in custody, for a total of 22 months from the

13    moment he was first arrested by NYPD for the possession of this

14    gun, which was on August 24, 2019.  As I've indicated in my

15    submission, your Honor, none of this time can be credited to

16    this federal sentence that the Court will impose today; and

17    that is because he is in primary state jurisdiction.

18                He was arrested by federal authorities on January the

19    6th, 2020, at Riker's Island, and then transferred into BOP

20    custody.  But at that time, a detainer was already lodged

21    against him for the pending Bronx matter for which he is

22    pending sentencing.  And so while all of the state firearm

23    offenses were dismissed when he was arrested on federal

24    charges, he was also in custody, remanded on that Bronx matter

25    that I outlined in my papers.

L71zzMEDSsj

 1          THE COURT:  Just so that I'm clear, I understand the

 2   statement that the defendant will not receive credit towards

 3   his federal sentence until the day that he's sentenced, today,

 4   because he has primary jurisdiction in the state court.  His

 5   time in detention will be credited to the state court offense

 6   for which he faces a five-year sentence, which the state court

 7   judge has indicated the state court judge will run concurrently

 8   with the federal sentence.

 9          MS. GALLICCHIO:  Yes, that's correct, your Honor.

10          THE COURT:  Again, so that I'm clear, the 22 months

11   that the defendant has spent in state custody will come from

12   his five years on the state court conviction, so that the

13   defendant has about two and-a-half years left on his state

14   court conviction, correct?

15          MS. GALLICCHIO:  I think he would have a little more

16   than that.  He would have approximately 40 months.  He's

17   expecting a sentence of 60 months, five years on that.

18   Subtracting 21 months from that would be approximately 40

19   months.  I'm assuming in the state court there will be some

20   time or time credited, so it's likely he wouldn't serve the

21   entire 40 months, but that would be the remainder on that

22   sentence.

23          THE COURT:  Will the defendant spend the remainder of

24   his sentence in state custody or in federal custody, when the

25   state court judge says he wants the state sentence to run

L71zzMEDSsj

1   concurrently with the federal sentence?  I would have thought

2   that there's some thought out there that some defendants would

3   prefer to be in federal rather than in state custody.

4           MS. GALLICCHIO:  Yes.  I don't know the answer to that

5   question, actually.  My instinct tells me that he will be in

6   state custody because that is the primary jurisdiction.  I

7   don't know whether there's a mechanism by which to change that.

8           THE COURT:  Okay.

9           MS. GALLICCHIO:  Your Honor, as we've asked, we have

10  asked for a sentence of time served.  But understanding that

11  that may not be what the Court is contemplating, we're asking

12  the Court that whatever sentence the Court imposes, that the

13  Court run it concurrent to the sentence that is yet to be

14  imposed in state court; and that is because it is our position

15  that a total sentence of five years is sufficient to serve the

16  interests of 3553(a) and the rules of sentencing.

17          And I've also outlined the reasons for that in my

18  sentence submission, and I'll briefly outline the mitigating

19  reasons now why I think that's appropriate in this case.

20          First, your Honor, I want to talk about something the

21  Court has heard many times, of course, which are the conditions

22  of confinement that Mr. Baez has suffered in the last 22 months

23  and, in particular, since he was transferred into federal

24  custody in January and when the pandemic began.  And even

25  before then, your Honor, as I outlined in our papers --

L71zzMEDSsj

1           THE COURT:  Can I stop you, Ms. Gallicchio.

2           We actually have two interpreters, I see.  Could the

3     second interpreter please indicate your appearance on the

4     record and tell me whether your oath is on file.

5           THE INTERPRETER:  Jill Hoskins, staff interpreter,

6     oath on file.

7           THE COURT:  Okay.  And between you and the other

8     interpreter, have the proceedings been continually translated

9     from the outset?

10          THE INTERPRETER:  Yes, they have, your Honor.

11          THE COURT:  Thank you.

12          Go ahead, Ms. Gallicchio.

13          MS. GALLICCHIO:  Your Honor, the last 22 months have

14    been brutal for Mr. Baez, and certainly since February of last

15    year right at the beginning of the pandemic.  He suffered

16    through a lockdown related to a rumor that there was -- and

17    ultimately found -- a firearm inside the MCC, a terrifying and

18    unbelievable event that created great trauma for not only

19    Mr. Baez, but many other people.  The firearm itself was

20    actually found in Mr. Baez's unit; so, again, added a fear

21    level of later realizing the danger that he was in.  He has

22    been incarcerated for the life of the pandemic, so he has seen

23    it all and experienced it all.  And not only that, your Honor,

24    he has been incarcerated in one of the toughest and harshest

25    federal detention facilities in the country, infamously so.

L71zzMEDSsj

1          I know the Court is well aware of the suffering of

2     inmates at the MCC.  And again, a terrifying experience, and

3     one that is a real, live experience for Mr. Baez.  And

4     obviously, we cannot underestimate the severity of the

5     experience, no matter how many times we hear these stories.

6          During one phone call, your Honor, I had with

7     Mr. Baez, I told him to stay positive.  And he responded to me,

8     Ms. Gallicchio, I'm trying, but it's hard to stay positive in

9     here.  It has been traumatizing, dehumanizing, and

10    demoralizing.  I don't think I can stress that enough.

11         And the question is -- and I know the Court has

12    considered this question -- what is that worth?  Does it

13    warrant a sentence reduction beyond what the Court would

14    normally sentence?  I submit to the Court that it does deserve

15    a significant sentence reduction, and indeed that has been the

16    trend in this district.  And of course, beyond the pandemic, as

17    I've already said, your Honor, the totality of the brutal

18    conditions on a good day at MCC, they are, for all intents and

19    purposes, deplorable and intolerable, as has been called out by

20    judges in this courthouse over and over again.

21         And so, your Honor, I submit to the Court, based on

22    those factors, Mr. Baez has experienced a level of punishment

23    by far disproportionate to the crime.

24         Second, your Honor, I ask the Court to look at the

25    personal history and characteristics of Mr. Baez.  He is a man

L71zzMEDSsj

1    who is well aware, who has struggled for all of his adult life

2    with his debilitating drug addiction.  It has resulted in

3    countless arrests; 57 misdemeanor convictions, four felony

4    convictions, all enmeshed with his addiction.  It has cycled

5    him in and out of jail, in and out of his life, and in and out

6    of rehab facilities.

7              Your Honor, I think what's important about those

8    arrests is that there's no history of violence.  These arrests

9    are clearly as a result of -- motivated by his drug addiction.

10   It's affected other parts of his life as well.  It's affected

11   his health.  It's in the motion papers.  It has affected his

12   relationship with his family, who worries about him endlessly.

13             THE COURT:  One of the unusual aspects of the history

14   is an argument in favor of a sentence that the defense seeks,

15   is that the defendant's family cares for him and will take care

16   of him when released, provide him with a job.  And I ask

17   myself, Where has the family been for years and years and years

18   through 60 convictions?  And then I ask myself, How realistic

19   or credible is it that now, after all of these years, the

20   family says they've always cared, they've always been there,

21   and of course, the defendant will have a job and they will take

22   care of the defendant.

23             MS. GALLICCHIO:  Your Honor, perhaps I should have

24   been clearer maybe in my papers, but I will say that the family

25   has been there.  The problem has been that Mr. Medina has not

L71zzMEDSsj

```
1    let them help him.  He has not reached out for help.  His
2    mother and father are in Puerto Rico, and they're elderly.
3    When they were younger, they tried to reach out; they tried to
4    offer him help.  And like so many people struggling with
5    addiction, he wasn't ready for it.  His brother, who is a
6    hardworking guy, lives in Florida, who I've been in touch with
7    on many occasions, has done the same thing.  But to some
8    degree, as his brother pointed out, Mr. Baez was like a lone
9    wolf floundering in New York City.  And at times, they didn't
10   even know where he was because his drug addiction took over his
11   life so much.
12           And so it is a good question; but from what I know
13   from this family, I know that they've been there and they
14   tried.  And sometimes family can only do so much until their
15   loved one gets ready to accept the love and the care that they
16   are offering.  And for a long time, Mr. Baez was not ready,
17   clearly, for decades probably.  But this experience, where he
18   is now in his life, his age, the depths that he's reached in
19   his addiction, he's ready.  He can't go anywhere else.  There's
20   nothing further below that he can get to.  He's reached rock
21   bottom at this point, and this really is his last chance,
22   regardless of whatever sentence the Court imposes.
23           At 48 years old, your Honor, he can't continue this
24   lifestyle or he's not going to survive.  And so, look, we have
25   to have faith and hope for the best.  Obviously, we can't
```

L71zzMEDSsj

1    predict the future, but I know from my interactions with

2    Mr. Baez, the sincerity of his convictions now, I think it has

3    been as a result of his incarceratory experience that has

4    really shaken his soul.

5           And so in answer to the Court's question, they are

6    there to the extent that they have tried, and tried like many

7    parents who have loved ones struggling with addiction.  And I'm

8    hopeful, based on my interactions with Mr. Baez and his

9    expression of commitment and remorse and desire to change, that

10   he can do it with, of course, the support of his family.

11          THE COURT:  The defendant has been in custody for 22

12   months.  How has the defendant done with respect to remaining

13   drug-free while in custody?  Any disciplinary proceedings with

14   respect to possession of drugs?

15          MS. GALLICCHIO:  No, your Honor.  He's done well,

16   despite -- as the Court knows, despite the presence, certainly,

17   of drugs at the facility.

18          THE COURT:  The defendant has been on methadone --

19          MS. GALLICCHIO:  Yes.

20          THE COURT:  -- in prison?

21          MS. GALLICCHIO:  That's correct.  And that certainly

22   has helped.  And he needs it, unless and until he can detox

23   from methadone at some point in his life, your Honor.

24          I think where we're at then is what is the need for

25   the sentence, of course.  I submit to the Court he has

L71zzMEDSsj

1    certainly been punished harshly and severely already.  As I've

2    already said, he's been deterred by this punishment and he's

3    motivated to change.  But what he needs is treatment.  What he

4    needs is help.  He has not gotten -- other than methadone,

5    methadone maintenance and medication, he's not had the

6    intensive treatment therapy that he needs to overcome his

7    addiction, largely because the prisons have been locked down

8    for so long and programs have ceased.  Hopefully that will

9    change, but I don't know what the future will hold with respect

10   to that.  But as I suggested to the Court, the best treatment

11   he can get is in the community, in a residential program, with

12   his family to support him.

13          So, your Honor, I would submit to the Court that a

14   sentence certainly in the range as the Court has found, even

15   though, of course, it's lower than what probation has

16   recommended and the government believes is appropriate, is

17   still excessive and harsh based on all the mitigating

18   circumstances I just laid out.  And so our request is the same,

19   that the Court consider a sentence of time served, or whatever

20   sentence the Court imposes to run concurrent to the five-year

21   sentence he is expected to receive on July the 8th, actually,

22   next week, your Honor.

23          Thank you.

24          THE COURT:  Okay.

25          Thank you, Ms. Gallicchio.

L71zzMEDSsj

1          Mr. Baez-Medina, have you reviewed the presentence

2     report, the recommendation and the addendum, and discussed them

3     with your lawyer?

4          THE DEFENDANT:  (In English) Yes, I do, your Honor.

5          THE COURT:  By the way, you're welcome to respond to

6     me in English, if you prefer or in Spanish and have the

7     interpreter interpret.  Whatever you feel comfortable with.

8          THE DEFENDANT:  (In English) I feel comfortable to

9     respond in English, sir.

10          THE COURT:  Okay.

11          Do you have any objection to the presentence report,

12     the recommendation and the addendum, other than what your

13     lawyer has already said and I've already dealt with?

14          THE DEFENDANT:  (In English) No, your Honor.

15          THE COURT:  I'll listen to you for anything that you

16     would like to tell me in connection with any sentence, any

17     statement you would like to make, anything at all you would

18     like to tell me.

19          THE DEFENDANT:  (In English) First and foremost, good

20     afternoon to everybody.

21          Your Honor, its been hard, not only this two years.

22     I've been in this addiction almost all my life.  I need help.

23     You the only one who can give me the help that I need.  I got

24     my family in my corner right now.

25          You just mention, where is the family all this time?

 1    Thank you for mentioning it.  Now I got it.  Now it's in my
 2    corner.  I see my team.  I got it, your Honor.  My family is in
 3    my corner and will help me.
 4              I would like you to give me the sentence, whatever you
 5    give me, just please run it together and send me to a program
 6    or a treatment residential program and I can do it.  I can do
 7    better than jail.  I would like to get a program, a residential
 8    program.  I going to 48 years old and I don't got nothing.
 9              The only thing I got is my family, and they willing to
10    help me.  I know I did wrong.  And you can see, I never got gun
11    problem in my life.  The only thing I got is drug problems.
12    Please, I begging you, your Honor, give me anything you can
13    give me to run it together.  I got my family.  I just need one
14    more chance.  Thank you.
15              THE COURT:  All right.
16              Thank you, Mr. Baez-Medina.
17              Has the government reviewed the presentence report,
18    the recommendation, and the addendum?
19              MS. DELL:  Yes, your Honor.
20              THE COURT:  Does the government have any objections?
21              You're welcome to raise any objections you have.
22              MS. DELL:  We just object to the Court's finding that
23    the 2004 and 2011 convictions cannot be considered controlled
24    substance offenses.  Other than that, we rely on our papers.
25    Aside from that, we do not have any objections.

L71zzMEDSsj

1          THE COURT:  Okay.

2          I'll listen to you for anything you'd like to tell me

3     in connection with sentence.

4          MS. DELL:  I believe your Honor had one question which

5     my colleague Mr. Maimin can speak on.

6          MR. MAIMIN:  Your Honor, I just have the advantage of

7     many years.  Your Honor asked Ms. Gallicchio about where

8     Mr. Baez-Medina will serve his sentence while there is still a

9     running state sentence that's concurrent to a federal sentence,

10    assuming that they run concurrently.

11         The answer is that while technically it's entirely up

12    to the Bureau of Prisons and the New York State Department of

13    Corrections to work it out, in my dealings with the Bureau of

14    Prisons on this very issue over and over, their policy is that

15    whoever has primary custody maintains actual custody during any

16    joint custodial sentence until the termination of that

17    sentence.

18         So if, to use easy numbers, Mr. Baez-Medina had one

19    more year on a state sentence, and your Honor sentenced him to

20    three years, he would serve the next year in the state, and

21    then be transferred to the federal government.

22         Your Honor also asked if there's any way around that.

23    And the answer is, I can think of ways to get around it;

24    namely, to transfer primary jurisdiction by the state, choosing

25    to bail Mr. Baez-Medina, wait for him to be picked up by the

L71zzMEDSsj

1   feds on a detainer, and then to revoke bail, that way they

2   transferred primary custody.

3          However, in my experience, that's not going to happen.

4   So the answer is -- my understanding of the policy is that

5   Mr. Baez-Medina will serve the rest of his state sentence in

6   state custody, even if there is a running federal sentence at

7   that time, and then be transferred to federal custody for any

8   remainder sentence that this Court has imposed.

9          THE COURT:  As I said to Ms. Gallicchio, my impression

10  is that defendants often would prefer to be in federal custody

11  because of the ability of some programs available in the

12  federal system that are not available in the state system.  But

13  I don't know, from what both parties have told me, there's

14  nothing that I can do to accomplish that.

15         MR. MAIMIN:  That's right, your Honor.

16         Also, I just wanted to raise one other purely

17  technical matter regarding your Honor's ruling before I leave

18  it to     Ms. Dell, which -- and obviously, we disagree with

19  your Honor's ruling, but it was a thoughtful ruling; but there

20  was one specific issue that I just want to make sure that we

21  were on the same page, at least about what our argument is.

22         THE COURT:  Sure.

23         MR. MAIMIN:  And that's the grammatical argument

24  dealing with New York Public Health Law, Section 3306.  Your

25  Honor seems to recognize that that's an extremely important

L71zzMEDSsj

1    part of the discussion and determination.  And as I understood

2    the Court, the Court's idea was -- because it says, including

3    cocaine and its isomers, to abbreviate, that that was how the

4    state law was defining "chemical equivalence".

5           And the reason that I take issue with that is both

6    historical and grammatical.  Historically, the statutes before

7    the legendary 3306, refer to chemical equivalence.  And, in

8    fact, that was part of the issue in the isomer, that it's not a

9    chemical equivalent.  It wasn't undefined, although it's not

10   terribly defined, the term being defined for the first time by

11   this statute.  But more importantly, there's the fact that this

12   led to an odd grammatical reading.

13          And if I may give a counterexample or hypothetical.

14   The Court and I may disagree all day long about whether a BMW

15   motorcycle is what we would consider, "a high performance

16   motorcycle".  However, if a motorcycle dealership advertises.

17   We have all of the high-performance motorcycles you need,

18   including BMW, and all of its varieties, nobody would say that

19   that motorcycle shop is thereby defining "motorcycle" to

20   include BMW, sedan, coups and SUVs.  Rather usually, when you

21   say something includes something else, the latter is a subset

22   of the former.

23          And there may be something that conforms it here; that

24   is, that tells the courts, hey, where there's a real issue with

25   what is or is not chemically equivalent, this may help to

L71zzMEDSsj

1   inform, we think, at least some isomers are chemically

2   equivalent.  I think it's grammatically odd to say that the

3   subset defines the set, rather than the other way around.

4           I suspect your Honor disagrees, from your Honor's

5   opinion; just wanted to make sure we were on the same page

6   about what our argument was.

7           THE COURT:  I do understand your argument.  And you're

8   right, I disagree.  I think I have to read the statute as the

9   legislature has left it to me.  And it may not be the most

10  artfully drafted statute, but there it is.  And the most

11  natural reading is the reading that I gave it, which is

12  certainly supported by the legislative history as to the broad

13  inclusion of isomers.

14          So perhaps the New York State Legislature was not

15  sufficiently careful in their drafting, but I have to deal with

16  the statute as it is.  And with so much of what's been argued

17  out in the papers, both with respect to isomers and naloxegol,

18  all of this is fixable by the parties who should be fixing it.

19  So the New York State Legislature -- if the arguments are that

20  New York State Legislature has really controlled more than it

21  really intended.

22          And with respect to naloxegol, if the Sentencing

23  Commission were simply sufficiently staffed so that it could

24  make a decision with one amendment to the guidelines, it could

25  resolve the issue of naloxegol.  And it is truly unfortunate

L71zzMEDSsj

1     that the parties have to spend as much time and effort in

2     drafting these issues, which don't really go to the central

3     issues that the Court ultimately has to decide under the

4     3553(a) factors.  And yet, for example, in this case, it was

5     only the initial briefs that touched on the 3553(a) factors,

6     and then we went off to five additional briefs on naloxegol and

7     isomers, which is not the way in which sentences really should

8     be determined.

9             And by the way, if there's no solution from the

10    Sentencing Commission -- and I have no idea what the prospects

11    are for a fully constituted sentencing conviction -- the Second

12    Circuit wouldn't decide this issue completely, perhaps; because

13    the government has made it clear in its papers that while the

14    issue of do you look at the sentencing guidelines at the time

15    of conviction or at the time of sentence, it reserves the

16    question of whether naloxegol is, in fact, controlled under

17    state law; and it reserves that to another day.

18            So if the defense wins on *Gibson*, the government would

19    fight out whether naloxegol is really controlled under state

20    law in subsequent cases, so it will be another year until

21    there's finally an answer.

22            MR. MAIMIN:  I understand.  I share your frustration,

23    especially regarding the commission, where, as we know, some of

24    the issues present -- not all of them, but some -- there was a

25    proposed amendment to resolve some of the issues that did not

L71zzMEDSsj

 1    get through before the commission lost its quorum so many years
 2    ago.  It was in 2016, I think, or 2017.  Of course, the problem
 3    with the idea of New York state fixing the statute is they have
 4    a very different incentive because they aren't in front of your
 5    Honor.
 6              As I think we've pointed out, their course of conduct
 7    shows that they don't think there is something to be fixed,
 8    because they don't treat naloxegol as a controlled substance.
 9    They don't treat scopolamine, which is a generic isomer for
10    pain, which has 17 carbon atoms, 21 hydrogen atoms, one
11    hydrogen and four oxygen, as a controlled substance.
12              THE COURT:  Okay.  Please.
13              The New York State Legislature is not deaf.  There is
14    an issue that is directly affected by New York state law.
15    Plainly that's an issue that can be presented to the New York
16    State Legislature.  And even though it may not affect
17    prosecution in the New York state courts, that doesn't mean
18    that the New York State Legislature would fail to listen to
19    what the effect of the New York state statute is on
20    prosecutions in federal court.  We have a federal system and
21    these are legislators who look at issues and make decisions, so
22    they made a decision with respect to isomers.
23              If that decision has untoward results that the New
24    York State Legislature did not think are appropriate, the New
25    York State Legislature can fix the New York state statute.  And

L71zzMEDSsj

1    by your argument, it doesn't affect the New York state

2    prosecution because New York state isn't prosecuting these

3    other isomers anyway.  So there have been, if memory serves me

4    right, other fixes to the New York state statutes in order to

5    make them consonant with the federal statute, so I leave it at

6    that.

7             MR. MAIMIN:  The last one that I recall, at least

8    regarding the narcotic statutes, was in, I want to say, 1987 or

9    '88.  Sadly, I think your Honor is a bit more optimistic than I

10   am on what the legislative intent is.  But as your Honor says,

11   we work with the statutes we're given, not the ones we wish we

12   had.  I just respectfully disagree with your interpreting the

13   ones that we were given.

14            Just finally, in case your Honor was hoping for

15   guidance from the Second Circuit, I think it's just worth

16   pointing out that *Gibson* won't necessarily resolve everything

17   because it's on plain error.  In fact, I don't know of any

18   Second Circuit cases currently pending on any of these issues

19   that are not on plain error.  So even if they find there's not

20   plain error, that doesn't necessarily resolve the underlying

21   question.

22            I do know that the government has started to take the

23   official position in briefs submitted to the Second Circuit,

24   including one submitted a week or two ago on the cocaine isomer

25   naloxegol issues as well.  But, again, those are only on the

L71zzMEDSsj

1    plain-error standard.

2              THE COURT:  What's the position that the government is

3    taking?

4              MR. MAIMIN:  The same one that we took here.  I think

5    that your Honor read those briefs, you would find it awfully

6    familiar.

7              THE COURT:  As I read the briefs before me on this

8    sentencing issue, they read like briefs submitted to another

9    court.  They read like briefs submitted to a Court of Appeals.

10   I don't usually get briefs written, just in terms of style, in

11   the way that some of the briefs were written, so I suspect that

12   they came from briefs submitted to another court.  So I checked

13   the briefs in *Gibson*, they were not the briefs in Gibson.  I

14   think I checked *Lucas*, and they didn't seem like the briefs

15   submitted in Lucas either.

16             MR. MAIMIN:  I can tell you the genesis.

17             A, they will seem a lot more similar to -- and I'm

18   trying to get the name of it, to the other district's brief --

19   Hadaya Johnson.  And I think you will find that they are a lot

20   more similar.  The briefs in front of your Honor were actually

21   written before the Hadaya Johnson briefs, but I certainly --

22   when we were preparing the argument, we saw where this was

23   likely to end up one day.

24             THE COURT:  Okay.

25             MR. MAIMIN:  I hope your Honor wasn't offended by our

L71zzMEDSsj

1    more appellate-style brief.

2              THE COURT:  Okay.

3              MS. DELL:  Just briefly, your Honor.

4              Your Honor mentioned 3553(a) factors, and I'd like to

5    just bring us back to those for a brief moment.  They were

6    mentioned in our opening briefs, but just to remind the Court

7    that the government believes that a significant sentence is

8    necessary here in order to promote respect for the law and for

9    the general and specific deterrence.

10             The defense noted herself, the defendant has over 60

11   prior convictions, and none of those prior conviction deterred

12   the defendant from continuing to commit crimes, nor to commit

13   the serious crime in this case.  Instead, this shows a pattern

14   of a consistent disregard for the law, and the government

15   believes that the defendant knew what he was doing was wrong.

16             As the facts in this case show, when the defendant had

17   the firearm in this case and observed police officers, he put

18   the firearm behind a van, likely because he knew he was not

19   supposed to hold it.  These prior convictions did not deter him

20   from committing this offense.

21             And the government also believes that a significant

22   sentence is necessary here because of the seriousness of this

23   offense.  While the firearm was not used in this case, again

24   the firearm was just left on the ground.  And had the police

25   not recovered it quickly, it's possible someone could have

L71zzMEDSsj

1     picked it up and used it.

2           In addition, the defendant was holding the firearm in

3     some way that prompted someone to call 911 and alert the

4     police.  Had someone with nefarious intent seen the defendant

5     with a firearm, there could have been a violent incident at

6     night in the Bronx.

7           For those reasons, the government believes a

8     significant sentence is warranted.

9           THE COURT:  Thank you.

10          I'll place the presentence report, the recommendation

11    and addendum in the record under seal.  I'll place the parties

12    submissions to me also in the record under seal.  The parties

13    should place their own submission in the record not under seal

14    after redacting any personal-identifying information.

15          I adopt the findings of fact in the presentence

16    report, except as I've already indicated.  Therefore, as I've

17    already indicated, I conclude that under the current

18    guidelines, the total offense level is 19.  The Criminal

19    History Category is VI, and the guideline sentencing range is

20    63 to 78 months.

21          I appreciate that the guidelines are only advisory,

22    and that the Court must consider the various sentencing factors

23    in 18 U.S.C., Section 3553(a), and impose a sentence that is

24    sufficient, but no greater than necessary, to comply with the

25    purposes set forth in Section 3553(a)(2).

L71zzMEDSsj

1          The offense is serious, the possession of a firearm by

2     a convicted felon.  Moreover, the defendant has a substantial

3     criminal history.  The defendant is in Criminal History

4     Category VI, the highest criminal history category.  He has

5     sustained over 60 criminal convictions.  While most of the

6     criminal convictions were for misdemeanors, the defendant also

7     had several felony convictions for various controlled substance

8     offenses.  Prior sentences have not deterred the defendant.

9          There are mitigating circumstances.  The Court

10    appreciates the defendant's history of addiction and mental

11    health problems, but the defendant has thus far been unable to

12    conform his conduct to the law, even when given a chance by the

13    state court.  The Court appreciates that the defendant's

14    addiction and mental health problems are mitigating

15    circumstances.

16         In addition, the defendant's confinement has been

17    particularly harsh because of the COVID restrictions that the

18    defendant has lived under.  The probation department concludes

19    that the defendant's difficult history warrants consideration

20    and suggests only a slight variance; but the probation 's

21    calculation of the guidelines, which is much higher than that

22    calculated by the Court, is appropriate.

23         In attempting to balance these variant factors, the

24    Court concludes that a substantial sentence is necessary for

25    purposes of deterrence and protection of the public.  On the

L71zzMEDSsj

1    other hand, the Court must take into consideration the

2    mitigating circumstances.

3         The Court also appreciates that the defendant has thus

4    far, for almost two years, been able to control his conduct

5    while in custody on a methadone maintenance program.  It is

6    also significant to the Court in determining the defendant's

7    sentence to take into account the total sentence that will be

8    served by the defendant since the defendant first came into

9    custody of the state authorities.  An incremental sentence is

10   necessary, but the Court should take into account the total

11   time that the defendant will have spent in custody.

12        The Court also takes into account the beneficial

13   effects of a substantial period of supervised release.  The

14   defendant will receive treatment during supervised release, and

15   any violation of supervised release will come before the Court.

16        So taking into account all these factors on balance in

17   this case, the Court intends to impose a sentence of 48 months

18   on Count One, to be followed by a three-year term of supervised

19   release, with the standard conditions of supervised release in

20   this district and those recommended by the probation

21   department.

22        The Court will provide that the sentence is to run

23   concurrently with the undischarged term of the defendant's

24   state court conviction.  The Court recommends that the

25   defendant be admitted in the intensive residential substance

L71zzMEDSsj

1    abuse treatment program of the Bureau of Prisons.

2            The Court will not impose a fine because the defendant

3    lacks the ability to pay a fine, after taking into account the

4    presentence report.  The Court will not impose restitution

5    because there is no victim under 18 U.S.C., Section 3263.  The

6    Court will impose a $100 special assessment.

7            The sentence is consistent with the factors in Section

8    3553(a); and it's sufficient, but no greater than necessary, to

9    comply with the purposes of Section 3553(a)(2).

10           I've already explained the reasons for the sentence.

11   Before I actually impose the sentence, I'll recognize defense

12   counsel for anything defense counsel wants to tell me.

13           MS. GALLICCHIO:  Your Honor, there's nothing else that

14   I wish to add at this point.  Thank you.

15           THE COURT:  Before I actually impose the sentence,

16   Mr. Baez-Medina, I'll recognize you for anything that you wish

17   to tell me, anything you'd like to say, anything at all you'd

18   like to tell me.

19           THE DEFENDANT:  (In English) Your Honor, thank you.

20   Thank you.

21           You give me my life back now.  Now I just got -- I

22   can't forget this time.  Its gonna be two years in this

23   pandemic situation, this bring -- really open my eyes.  Thank

24   you, Judge Koeltl.  I don't know if I'm saying it correct.

25   Thank you for your help.  Thank you.  Thank you for help me and

L71zzMEDSsj

1    thank you for help others I'm 47 years old.  I suppose to be in

2    my house trying to pick something to my kids, not here, you

3    know.

4              Thank you.  Thank you for everything.

5              THE COURT:  Mr. Baez, thank you.

6              A couple of other comments, Mr. Baez-Medina.

7              I know from your submissions that you were thinking

8    about the possibility of a job with your family down south.  It

9    could be that if that comes to pass, supervised release will be

10   supervised by a judge in another jurisdiction.  If you're

11   supervised in this jurisdiction, any violation of supervised

12   release comes to me.  And I have a very good memory.  And if

13   you violated the terms of supervised release for whatever

14   reason, you'd be back before me.  Please don't let that happen.

15             The probation department does a very good job of

16   supervising people, of making programs available to them.  It's

17   in their interest to look out after people that they supervise.

18   So work with them.  Assure yourself that you're never back

19   here.  Do you understand what I've said?

20             THE DEFENDANT:  (In English) I understand.

21             THE COURT:  All right.

22             I'll recognize the government for anything the

23   government wishes to tell me.

24             MS. DELL:  Nothing further.

25             THE COURT:  All right.  Let me make one final comment

L71zzMEDSsj

1    before I actually impose the sentence, just to finish the

2    discussion that I had with the government.

3            The other solution that is out there and which is open

4    to the government to pursue is to urge a different

5    understanding of the categorical approach.  That's a change

6    that district courts can't make questionable, whether the Court

7    of Appeals can make that change.  But it is certainly odd that

8    important decisions in the sentencing process depend upon such

9    things as where does naloxegol and isomers of cocaine stand.

10   So one would think that both the government and institutional

11   defense organizations should think about that and think about

12   to whom such arguments could possibly be made.

13           All right.  Pursuant to the Sentencing Reform Act of

14   1984, it is the judgement of this Court that the defendant,

15   Jaime Baez-Medina, is hereby committed to the custody of the

16   Bureau of Prisons, to be imprisoned for a term of 48 months on

17   Count One.  The sentence is to run concurrently with the

18   undischarged term of the defendant's state court conviction.

19           I recommend that the defendant be admitted to the

20   intensive residential substance abuse program of the Bureau of

21   Prisons.

22           Upon release from imprisonment, the defendant shall be

23   placed on supervised release for a term of three years.

24           Within 72 hours of release from the custody of the

25   Bureau of Prisons, the defendant shall report in person to the

L71zzMEDSsj

1    probation office in the district to which the defendant is

2    released.  While on supervised released, the defendant shall

3    comply with the standard conditions of supervised release in

4    this district.

5          The defendant shall not commit another federal, state

6    or local crime.  The defendant shall not possess a firearm or

7    destructive device as defined in 18 U.S.C., Section 921.  The

8    defendant shall refrain from any unlawful use or possession of

9    a controlled substance.  The defendant shall submit to one drug

10   test within 15 days of release from imprisonment, and at least

11   two periodic drug tests thereafter, as directed by the

12   probation officer.  The defendant shall cooperate in the

13   collection of DNA as directed by the probation officer.

14         The defendant will participate in an outpatient

15   treatment program approved by the United States Probation

16   Office, which program may include testing to determine whether

17   the defendant has reverted to the use of drugs or alcohol.

18         The defendant must contribute to the cost of services

19   rendered based on his ability to pay and the availability of

20   third-party payments.

21         The Court authorizes the release of available drug

22   treatment evaluations and reports, including the presentence

23   investigation report, to the substance abuse treatment

24   provider.  The defendant must participate in an outpatient

25   mental health program approved by the United States probation

L71zzMEDSsj

1    office.   The defendant must continue to take any prescribed

2    medications unless otherwise instructed by the healthcare

3    provider.   The defendant must contribute to the cost of

4    services rendered based on his ability to pay and the

5    availability of third-party payments.

6            The court authorizes the release of available

7    psychological and psychiatric evaluation and reports, including

8    the presentence investigation report, to the healthcare

9    provider.

10           The defendant shall submit his person and any

11   property, residence, vehicle, papers, computer, other

12   electronic communication, data storage devices, cloud storage

13   or media internet to a search by any United States Probation

14   Officer and, if needed, with the assistance of any law

15   enforcement.   The search is to be conducted when there is

16   reasonable suspicion concerning violation of a condition of

17   supervision or unlawful conduct by the person being supervised.

18   Failure to submit to a search may be grounds for revocation of

19   release.   The defendant shall warn any other occupants that the

20   premises may be subject to search pursuant to this condition.

21   Any search shall be conducted at a reasonable time and in a

22   reasonable manner.

23           It is further ordered that the defendant shall pay to

24   the United States a special assessment of $100, which shall be

25   due immediately.

L71zzMEDSsj

1              I've already explained the reasons for the sentence.

2    Does either counsel know of any legal reason why the sentence

3    should not be imposed as I've so stated it?

4              MS. DELL:  Not from the government.

5              MS. GALLICCHIO:  No, your Honor.

6              THE COURT:  All right.  I'll order the sentence to be

7    imposed as I've so stated it.

8              There's no waiver of the right to appeal, correct.

9              MS. DELL:  Correct.

10             THE COURT:  Okay.  Mr. Baez-Medina, you have the right

11   to appeal the sentence.  The notice of appeal must be filed

12   within 14 days after the entry of the judgment of conviction,

13   so you should discuss this issue promptly with your lawyer.  If

14   you cannot pay the cost of appeal, you have the right to apply

15   for leave to appeal *in forma pauperis*.  If you request, the

16   clerk will prepare and file a notice of appeal on your behalf

17   immediately.

18             Do you understand?

19             THE DEFENDANT:  Yes, I understand, your Honor.

20             THE COURT:  As a matter of prudence, will the

21   government move to dismiss all open counts?

22             MS. DELL:  This is the only count.

23             THE COURT:  Yes.  As a matter of prudence, will the

24   government move to dismiss any open counts?

25             MS. DELL:  Yes.

L71zzMEDSsj

1          THE COURT:  The reason that I say that is every now

2     and then -- and this is probably not a case -- there is, for

3     example, a plea to a lesser-included offense.  And if there's

4     no motion to dismiss any open counts, it ends up coming back to

5     me.  So as a matter of prudence, I usually ask the government

6     to dismiss any open counts.  It can't be harmful if no one

7     thinks there is any open count.  And it can only be helpful.

8          So the government moves to dismiss any open counts and

9     the defense agrees, right?

10          MS. GALLICCHIO:  Yes.

11          THE COURT:  All open counts are dismissed on the

12     motion of the government.

13          All right.  Anything further?

14          MS. GALLICCHIO:  No, your Honor.

15          MS. DELL:  No, your Honor.

16          THE COURT:  Thank you.

17          (Adjourned)

18

19

20

21

22

23

24

25

# Exhibit B



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

TH:JPM
F.# 2019R00582

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 30, 2020

<u>By ECF and E-Mail</u>

The Honorable Frederic Block
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. James Devane
     <u>Criminal Docket No. 19-244 (FB)</u>

Dear Judge Block:

   The government respectfully submits this letter in advance of the defendant James Devane's sentencing proceeding, which is scheduled for December 2, 2020. For the reasons set forth below, the government respectfully requests that the Court impose a sentence within the advisory United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 81 to 87 months' imprisonment.

I. <u>Background</u>

   The defendant stands convicted, following a guilty plea pursuant to a plea agreement, of possessing with intent to distribute cocaine base, in violation of Title 21, United States Code, Section 841(a)(1), and possessing a firearm during and in relation to a drug-trafficking crime, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i). <u>See</u> Presentence Investigation Report ("PSR") ¶¶ 1-3.

   The defendant's conviction stems from his arrest by the New York City Police Department ("NYPD") on March 27, 2019. PSR ¶ 5. At approximately 3:00 p.m. that day, multiple NYPD officers assigned to the NYPD's Brooklyn South Narcotics Bureau were driving in an unmarked police van on Rockaway Parkway in the Brownsville section of Brooklyn, New York. To the right of the police van, on the sidewalk, two NYPD detectives observed the defendant engaging in an apparent hand-to-hand drug transaction in front of a residential building. PSR ¶ 5.

After the transaction, the defendant entered the front door of the residential building and went into the lobby.  PSR ¶ 5.  NYPD detectives followed the defendant into the building's lobby and confronted the defendant as well as the woman who had purchased narcotics from him.  When the officers went to arrest the defendant, he refused to comply and began to argue.  PSR ¶ 5.  As captured on surveillance video, a significant struggle ensued as the officers then attempted to arrest the defendant.  During a struggle, two additional patrol officers, who were already inside the building on an unrelated matter, came upon the scene and began to assist the detectives in attempting to subdue the defendant.  All told, it took at least four officers to subdue the defendant.  During the struggle, one of the detectives saw a black firearm in the defendant's waistband.  The detective removed the firearm from the defendant's waist and handed it to two additional officers who had entered the lobby of the building.

During a search of the defendant after his arrest, a detective recovered multiple clear plastic bags of a white, rock-like substance from the defendant's pants pockets, which appeared to be cocaine base (i.e., crack cocaine).  PSR ¶ 6.  Following his arrest, the defendant was taken to the NYPD's 67th Precinct, where was he was read Miranda warnings, waived his rights, and agreed to speak with an NYPD detective.  During a recorded interview, the defendant, stated, among other things, that the firearm belonged to him and that he was keeping the firearm for protection because he was selling drugs on another individual's "turf."  PSR ¶ 6.

II.     Procedural History

On April 2, 2019, the government filed a criminal complaint against the defendant charging him with possession with intent to distribute cocaine base, in violation of Title 21, United Stats Code, Section 841(a)(1); possession of a firearm during a drug-trafficking crime, in violation of Title 18, United States Code, Section 924(c); and being a felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g).  On April 4, 2019, the defendant made his initial appearance before a magistrate judge and was ordered detained.  ECF Dkt. No. 4.  On May 29, 2019, the grand jury returned an indictment against the defendant charging the same three offenses contained in the criminal complaint.

On November 22, 2019, the defendant pleaded guilty, pursuant to a plea agreement, to Count One of the Indictment (possession with intent to distribute cocaine base) and to Count Two (unlawful use of a firearm during and in relation to drug-trafficking offense).  Count Two carries a five-year mandatory minimum sentence.

On May 15, 2020, the U.S. Probation Office ("Probation") issued the PSR.  On November 27, 2020, the defendant filed his sentencing letter requesting a sentence of five years and one day imprisonment.  ECF Dkt. No. 24 ("Def. Ltr.").

III.    PSR and Guidelines Calculation

        The government and defendant are in agreement on the Guidelines calculation that should be adopted by the Court for Count One:

Count One: Possession of Cocaine Base with Intent to Distribute

        Base Offense Level (§§ 2D1.1(a)(5) & (c)(13))                         14

        Less: Acceptance of Responsibility (§ 3E1.1(a))                       -2

        Total:                                                                12

        For Count Two, the Guideline provision for the § 924(c) conviction is § 2K2.4(b), which specifies that a term of imprisonment between five years and life must run consecutively to the sentence imposed on Count One.

        The PSR differs from the parties' Guidelines calculation principally in the conclusion that the defendant is a Career Offender under Guidelines § 4B1.1.  The defendant has filed an objection to that designation by the PSR.  The government joins in that objection only as it relates to the defendant's 2015 conviction for criminal sale of a controlled substance in the third degree, in violation of N.Y. Penal Law § 220.39(1).[1]  Under controlling Circuit precedent, this drug offense is not a "controlled substance offense" under the Guidelines because the New York drug statute currently criminalizes the sale of certain substances that are not criminalized under federal law.  In United States v. Townsend, 897 F.3d 66 (2d Cir. 2018), the Second Circuit held that Guidelines § 4B1.2(b)'s definition of "controlled substance offense" does not include a violation of a state statute that prohibits more substances than are prohibited under federal law, regardless of what substance was actually at issue in the underlying state conviction.  Id. at 71.  There is no dispute that in May 2015, the New York State definitions of "controlled substances" and "narcotic" drugs swept more broadly than the corresponding federal definitions, and thus the defendant's conviction is not a controlled substance offense under the Guidelines.  See also United States v. Swinton, No. 6:15-CR-06055-EAW, 2020 WL 6107054, at *7 (W.D.N.Y. Oct. 15, 2020) ("Like its counterpart found at NYPL § 220.31, this Court concludes that NYPL § 220.39(1) is indivisible and thus, applying Townsend, the categorical approach must be used and the inquiry is limited to whether a "narcotic drug" under NYPL § 220.39(1) is a

---

        [1] The defendant's alternative argument that his prior conviction for assault in the second degree does not qualify as a crime of violence was explicitly rejected by the Second Circuit in United States v. Tabb, 949 F.3d 81, 85 (2d Cir. 2020) ("[W]e find that the substantive crime of second degree assault under N.Y.P.L. § 120.05(2) 'has as an element the use, attempted use or threatened use of physical force against the person of another' and is categorically a crime of violence under U.S.S.G. § 4B1.2.").

3

categorical match with the [Controlled Substances Act's] definition."); see also id. ("New York's definition of a 'narcotic drug' is broader than its federal counterpart. Specifically, schedule II(b)(1) under New York law regulates '[o]pium and opiate, and any salt, compound, derivative, or preparation of opium or opiate,' but excludes 'apomorphine, dextrorphan, nalbuphine, nalmefene, naloxone, and naltrexone, and their respective salts[.]'" (citations omitted)).

Because the defendant is not a career offender, his criminal history category is IV. PSR ¶ 49. With offense level 12, the advisory Guideline range is 21 to 27 months' imprisonment for Count One. With the addition of the five-year mandatory minimum term, the effective Guidelines range is 81 to 87 months' imprisonment.

IV.    Applicable Law

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still required to consider Guidelines ranges in determining sentences, but also may tailor the sentence in light of other statutory concerns. See 543 U.S. 220 (2005); see also 18 U.S.C. § 3553(a). Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

Later, in Gall v. United States, the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume that the Guidelines range is reasonable. [The court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

V.    The Appropriate Sentence

The government submits that a term of imprisonment within the Guidelines range of 81 to 87 months is appropriate. Such a sentence is warranted here because each of the defendant's offenses were serious and the defendant's history and characteristics reveal no prior dissuasion from shorter periods of incarceration or community supervision.

The defendant's crimes are unquestionably serious. And the interplay of them—drug dealing coupled with possession of a firearm—exponentially increased the

4

gravity of both offenses.  Illegal firearms in Brooklyn and in New York City as a whole cause significant suffering and hardship on ordinary and law-abiding residents.  The defendant has a long and troubling history of drug trafficking offenses and kept the illegal gun to protect his "turf."  He intentionally sold crack cocaine in another drug dealer's area, thus inviting violence that the defendant came equipped to meet.  The serious risks that the defendant posed to others warrants clear and significant punishment.

The circumstances of the defendant's arrest, coupled with a long-history of parole violations and disciplinary infractions in prison (PSR ¶ 35) indicate that the defendant has little respect for the law and is unlikely to be rehabilitated by the minimum period of incarceration he has requested.  The defendant's longest prior sentence to date, in both 1994 and 1998, was three years.  After the latter sentence, the defendant was subsequently convicted of 14 offenses, including his conviction in this case.  Without a meaningful and substantial penal consequences for his actions, the defendant will continue to commit crimes and threaten the safety of the community.

The Guidelines also fairly reflect the history and characteristics of the defendant.  See 18 U.S.C. § 3553(a)(1).  The defendant has previously been convicted a violent assault (PSR ¶ 35) and felony drug-trafficking offenses (PSR ¶¶ 32, 46), six trespassing offenses and numerous low-level marijuana possession offenses.  Although the defendant is not a "career offender" and therefore not subject to a Guidelines range in excess of 20 years, the defendant has clearly made crime his profession, as his lengthy criminal history reflects.  Despite these prior convictions and state sentences of incarceration, the defendant was not deterred from the instant criminal conduct.  The defendant had many inflection points in his life when he could have changed his behavior, but he never did.  The Court's sentence should be a beacon that forces the defendant to change course.

The defendant's argument that he should receive some leniency because of a "disparity" between crack and powder cocaine also fails to account for the reality of the defendant's crime.  (Def. Ltr. at 4).  The defendant chose which type of drug to sell.  He chose crack cocaine because the sale of crack cocaine is significantly more profitable than the sale of powder cocaine.  For every one gram of powder cocaine (which generally costs $35), a dealer can make 16 individual "twists" of crack cocaine, which are generally sold for $10 apiece.  There is nothing "political" (Def. Ltr. at 4) about applying clear federal law to a case where a defendant chooses to distribute a particular dangerous narcotic drug on account of his own desire to make a profit.

Finally, the government respectfully requests a significant term of supervised release, here three years, and the entry of an order of forfeiture, as provided for in the plea agreement, as to the firearm and ammunition that belonged to the defendant.

VI.  <u>Conclusion</u>

For the foregoing reasons, the government respectfully requests that the Court impose a Guidelines sentence of imprisonment of 81 to 87 months and a three-year term of supervised release.

Respectfully submitted,

SETH D. DuCHARME
Acting United States Attorney

By:  /s/ James P. McDonald
James P. McDonald
Assistant U.S. Attorney
(718) 254-6376

cc:  Clerk of Court (FB) (by ECF)
Michael Weil, Esq. (by ECF)
Probation Officer Steven Guttman (by E-mail)

Exhibit C



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

United States District Courthouse
300 Quarropas Street
White Plains, New York 10601

November 30, 2020

**BY ECF & HAND**

The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
New York, New York 10007

      Re:    *United States v. Jeyson Disla,* **20 Cr. 222 (AKH)**

Dear Judge Hellerstein:

      The Government respectfully submits this letter in advance of sentencing in this matter, currently scheduled for December 2, 2020 at 11 a.m. For the reasons explained below, the Government submits that a sentence within the corrected Guidelines range of 21 to 27 months' imprisonment (the "Corrected Guidelines Range"), would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

**A. Factual Background**

      1.   The Offense Conduct

      The relevant offense conduct is set forth in part in the Pre-Sentence Report ("PSR"). On February 26, 2020, two men approached the defendant as he walked toward the street from his residence. PSR ¶ 7. The men drew firearms as they ran towards him. ¶ 8. The defendant drew his own firearm, fired his weapon, and ran back to his apartment. ¶ 9. NYPD officers responded to the area and recovered a spent 9mm caliber bullet casing at the scene of the shooting and a live 9mm caliber bullet in the stairway leading to the defendant's apartment.[1] ¶ 11. The spent 9mm caliber casing and 9mm caliber ammunition were not manufactured in New York State. ¶ 15. The defendant was prohibited from carrying a firearm or ammunition because he had previously been convicted in January 2017, in New York County Supreme Court of Criminal Sale of Controlled Substance in the 3rd Degree, in violation of New York Penal Law § 220.39, a felony. ¶ 16.

      The next day, on or about February 27, 2020, the defendant was charged by complaint with being a convicted felon in possession of ammunition in violation of 18 USC § 922(g). The defendant remained a fugitive for approximately 10 days, until he surrendered to the Westchester Police Department ("WCPD") and was transferred to federal custody on or about March 9, 2020.

---

[1] Officers also recovered a .38 caliber revolver with three live .38 caliber cartridges in the chamber from where the defendant's assailants fled. ¶ 13.

2. Detention and Bail Appeal

A bail hearing was held the same day before the Honorable Judge Ona T. Wang, Magistrate Judge for the Southern District of New York. Judge Wang ordered the defendant detained based, in part, on the court's finding that the Government had shown by clear and convincing evidence that the defendant was a danger to the community. The defendant appealed the determination to the Court. The Court denied the appeal by written order dated April 29, 2020. *See* Dkt. 13.

3. The Plea Agreement

The defendant was charged by Indictment on or about March 19, 2020. On or about August 10, 2020, the defendant pleaded guilty, pursuant to written plea agreement, to being a convicted felon in possession of ammunition in violation of 18 USC § 922(g). The plea agreement calculated the defendant's Criminal History Category as II, and calculated the applicable offense level as 21 based on the following:

- Pursuant to U.S.S.G. § 2K2.1(a)(4)(A), the base offense level is 20 because the defendant committed the instant offense subsequent to sustaining one felony conviction for a controlled substance offense.

- Pursuant to U.S.S.G. § 2K2.1(b)(6)(B), the base offense level increases by 4 because the defendant used and possessed a firearm or ammunition in connection with another felony offense, to wit, aggravated assault.

- Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

The plea agreement accordingly determined that the defendant's Guidelines Range (the "Stipulated Guidelines Range") was 41 to 51 months' imprisonment. The plea agreement added, however, that "[t]he Government agrees with the defense that, in light of the circumstances of the offense, a downward variance from the Stipulated Guidelines Range is warranted."

**B. The Presentence Report**

The PSR recommends a sentence within the Stipulated Guidelines Range of 41 months' imprisonment because of the defendant's high risk of recidivism. PSR at 17. As the PSR explains, the defendant dropped out of high school in tenth grade, has no verifiable history of employment, and has a pattern of drug abuse. *Id.* In addition, the defendant was terminated unsuccessfully from his previous probation term, which demonstrates his unwillingness to comply with court-imposed supervision. *Id.*

**C. The Defense Submission**

The defense submission, dated November 25, 2020, asks the Court to impose a sentence of time served. The defense submission argues that the Stipulated Guidelines Range within the Plea Agreement is incorrect because the defendant's prior narcotics conviction does not qualify as a "controlled substance offense." The defense submission accordingly argues that the base offense level should be 14 rather than 20, *see* § 2K2.1(a)(6), and the corrected Guidelines Range should be 21 to 27 months' imprisonment. The defense submission further argues that the Court should impose a sentence of nine months' imprisonment (or time served) because the defendant allegedly purchased the illegal firearm in order to protect himself; was relatively young as the time of the offense (22 years old); has been incarcerated during the COVID-19 pandemic; and has the support and assistance of two sisters and his aunt upon his release.

**D. Discussion**

*1.    Applicable Law*

As the Court is well aware, the Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).   Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall* v. *United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49. After that calculation, however, the Court must consider not only the Guidelines, but also the six other factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing (as set forth below); (3) "the kinds of sentences available"; (4) any relevant policy statement by the Sentencing Commission; (5) "the need to avoid unwarranted sentence disparities among defendants"; and (6) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *Gall*, 552 U.S. at 50 & n.6. In determining the appropriate sentence, the Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)      to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)      to afford adequate deterrence to criminal conduct;

(C)      to protect the public from further crimes of the defendant; and

(D)      to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### 2. The Corrected Guidelines Range of 21 to 27 Months' Imprisonment Is Correct

The defense submission is correct that at the time of the Plea Agreement, the parties believed that the Stipulated Guidelines Range of 41 to 51 months' imprisonment was the correct Guidelines calculation. For the reasons set forth in the defense submission, however, the Government agrees that the defendant's prior narcotics conviction does not constitute a "controlled substance offense" under § 2K2.1(a). The Government accordingly agrees that the proper Guidelines range is the Correct Guidelines Range of 21 to 27 months' imprisonment.

### 3. A Sentence Within the Corrected Guidelines Range Is Appropriate in this Case

For the reasons set forth below, the Government submits that a sentence within the Corrected Guidelines Range of 21 to 27 months' imprisonment would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

#### a. The Nature and Circumstances of the Offense and the Need for the Sentence Imposed to Reflect the Offense's Seriousness

First, a sentence within the Corrected Guidelines Range is necessary to reflect the seriousness of the offense. The defendant is not a happenstance victim who purchased a firearm only to protect himself. As the Court has previously recognized based on the evidenced proffered by the Government, the defendant was a "drug dealer engaged in an ongoing and violent feud with a rival drug dealer." *See* Dkt. 13.

Moreover, there is no evidence that that the defendant purchased his illegal firearm *after* he was threatened by this rival dealer. Instead, the defendant admitted in a post-arrest statement that his rival threatened him earlier on the day shooting. The circumstances suggest that the defendant purchased his illegal firearm *before* he was threatened by his rival and did so in order to protect his drug territory.

#### b. The Defendant's History and Characteristics

Second, the defendant's history and personal characteristics warrant a sentence within the Corrected Guidelines Range of 21 to 27 months' imprisonment. This is the defendant's second felony conviction by the age of 22. His first conviction, at the age of 19, arose from his attempt to sell cocaine to an undercover officer. PSR ¶ 33.

Rather than get his life back on track following that conviction, he failed to report to Probation at least 13 times, failed to comply with a home visit at least 9 times, failed to comply with employment training, and failed to advise the Probation Officer of an address change. *Id.* His conduct was so deplorable that Probation issued a Violation Report stating, "[W]hile on probation, the probationer has been resistant with probation and undermines any effort to effectively supervise him in the community." *Id.* After several unsuccessful attempts by the Probation Officer to bring the defendant into compliance, he was ultimately resentenced to a term of incarceration of six months, ending October 2018. *Id.* Yet within a year and a half of his release, he was involved in a turf war with a rival drug dealer.

c. *The COVID-19 Pandemic Does Not Warrant a Departure*

The COVID-19 pandemic further does not warrant a departure. As set forth in the PSR, the defendant does not suffer from any pre-existing medical conditions that make him more vulnerable to the virus. He is a healthy 22-year-old male with not history of hospitalizations, medical treatment, or medication. PSR ¶¶ 52-54.

**E. Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the Corrected Guidelines Range of 21 to 27 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney

By: _____

Mathew S. Andrews
Assistant United States Attorney
(212) 637-6526

Exhibit D

<pre>
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                          18 cr 865 (VEC)

JOSE SANTANA,

            Defendant.
                                      Sentence
------------------------------x

                                      New York, N.Y.
                                      August 22, 2019
                                      3:00 p.m.

Before:


                    HON. VALERIE E. CAPRONI,

                                      District Judge

                          APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  BENJAMIN SCHRIER
     Assistant United States Attorney

FEDERAL DEFENDERS OF NEW YORK
     Attorney for Defendant
BY:  IAN M. AMELKIN

Also Present:
Karen Brill, Intern, U.S. Attorney's Office
</pre>

1  psychologist.  It also included letters from the defendant, his

2  uncle, a cousin, two of his sons, and a friend.  The submission

3  also included a number of certificates and reports from the

4  MCC, including his educational report and work evaluation.  I

5  also received a letter, dated August 19th, responding to the

6  government's argument regarding the correct guidelines

7  calculation and attaching a transcript from a recent sentencing

8  that was held in front of Judge Furman.

9        I received a submission from the government, dated

10  August 13, 2019, and one dated August 14, 2019, that included

11  two video clips.  The defendant pled guilty to one count of

12  being a felon in possession of a firearm.  The presentence

13  report reflects the guidelines level of 21, criminal history

14  category six, which yields a guideline range of 77 to 96

15  months.

16        There are two disputes:  First, whether the base

17  offense level is found in 2K2.1(a)(4)(A), based on one prior

18  controlled substance conviction, or in 2K2.1(a)(2), because the

19  defendant has at least two prior felony convictions for

20  controlled substance offenses.

21        And second, whether the enhancement in 2K2.1(b)(6)(B)

22  applies because the defendant possessed the gun in question in

23  connection with another felony offense, specifically

24  first-degree reckless endangerment, in violation of New York

25  penal law 120.25.

1          So let's deal with the first issue.

2          MR. AMELKIN:  Your Honor, before you start, I just

3    want to make sure you received the letter that we submitted

4    today from his aunt, the person who raised him.  We had an

5    additional --

6          THE COURT:  I did not.  But we'll pull it up right

7    now.

8          MR. AMELKIN:  Okay.  If you want, I could pass you up

9    a hard copy.

10          THE COURT:  If you could pass me up a hard copy, that

11    would be great.

12          MR. AMELKIN:  Sure.  We received it this morning, and

13    we filed it this morning as well.

14          THE COURT:  Okay.  Hang on just a sec.  Let me read

15    it, and then we'll talk first about the prior controlled

16    substance offenses and then about the question of whether the

17    gun was possessed in connection with the felony offense.

18          MR. AMELKIN:  Thank you.

19          THE COURT:  Okay.  I've read that letter as well.

20          Who would like to be heard on the issue of whether

21    there are two prior controlled substance offenses?

22          MR. AMELKIN:  I mean, it's their burden.  I'm happy to

23    go first but --

24          THE COURT:  Well, I think the government should

25    probably go first.

1        Probation has decided there's only one, right?

2        MR SCHRIER:  Yes, your Honor.  That's correct.

3        So, for the most part on this point, the government

4  rests on its written submission.  The government believes this

5  is controlled by analogy to *Doe v. Sessions* -- obviously not

6  directly on point, but we think it is fairly analogous.  I just

7  wanted to orally respond to some of the points that defense

8  counsel made in his reply to the government's submission.

9        THE COURT:  Okay.

10        MR SCHRIER:  So, first, defense counsel -- or a

11  significant percentage of that reply is devoted to this

12  hypothetical and the argument that absurd results would flow

13  from the government's proposed method of comparing the state

14  schedule in effect from the time of conviction with the federal

15  schedule in effect also at the time of the conviction.

16        But if you tweak that hypo just a little bit, it shows

17  how results that are no less absurd would flow from defense

18  counsel's formulation.  So, for example, imagine with defendant

19  A and B, in defense counsel's example, if instead of being

20  convicted of the state controlled substances offense back long

21  before the sentencing, instead of them being convicted on days

22  that are different from one another, they're convicted on the

23  exact same day of the exact same offense.  But then, instead of

24  being sentenced on the same day, they're sentenced one day

25  apart.  And after defendant A is sentenced on the first day,

1    the DEA, or some other regulatory agency with appropriate

2    authority, changes the scope of the controlled substances

3    schedule.  That would result in a different guidelines level

4    for defendant A and defendant B, even though they are convicted

5    on the exact same day of the exact same offense originally

6    regarding the controlled substance offense.  So I would submit

7    that that's no less absurd an outcome than what the government

8    is proposing.  Indeed, I would submit it is more absurd.

9             To return to *Doe v. Sessions*, yes, it's an immigration

10   case and, yes, the concern that an alien would have about the

11   potential removability consequences is much more of a real

12   concern, a practical concern, than a defendant pleading guilty

13   to a state offense, wondering if perhaps some day this will be

14   essentially a predicate for a guidelines enhancement if they're

15   convicted of a federal offense.  But I think that the general

16   thrust of *Doe v. Sessions* -- and there's language that I will

17   quote from *Doe v. Sessions* that I think supports this notion --

18   is that what you should really be able to determine at the time

19   you plead guilty to that state conviction is, what are the

20   legal consequences which will flow from your conviction at that

21   date, at that time, not subject to a future regulatory decision

22   that does not have any specific bearing on your case.

23            So, specifically, there's this paragraph in *Doe v.*

24   *Sessions* -- and I'll quote.  It says:  "As the BIA has noted,

25   the CSA schedule is a moving target.  Since 1970, approximately

 1   160 substances have been added, removed or transferred from one

 2   schedule to another.  A petitioner's removability should not,

 3   as a rule, be based on fortuities concerning the timing of the

 4   petitioner's removal proceedings or DEA rule-making."

 5        And I think in this case similarly, the question of

 6   whether the base offense level is 24 or 20, should be

 7   determined by looking to what was known to everyone, what were

 8   the facts in existence at the time of conviction, not

 9   regulatory changes that are made long after that.

10        Additionally, I would note that the government is not

11   aware of any published decision in the Circuit that has

12   directly addressed this issue, you know, which federal schedule

13   do you look at, time of state conviction or current.  But the

14   government is now aware of a ruling by Judge Koeltl in a case

15   called *United States v. Ferrer*.  And the sentencing hearing in

16   that case was held on November 16th, 2018, in which Judge

17   Koeltl applied *Doe v. Sessions* and found that the state

18   schedule in effect at the time of the state conviction should

19   be applied to the federal schedule in effect at that exact same

20   time, and rejected the specific argument that defense counsel

21   is making here.

22        THE COURT:  Okay.  Thank you.

23        Mr. Amelkin?

24        MR. AMELKIN:  Thank you, your Honor.

25        Before going into those arguments, I want to ensure

Case 1:19-cr-00026-CLC-CHS   Document 52   Filed 07/21/21   Page 80 of 209

1   that the state of play is such that the Court agrees with us

2   that we're operating under the premise that, first, we all

3   agree that, if convicted under 220.44 today, it would not

4   count.

5           THE COURT:  That's my understanding, yes.  And I

6   agree.

7           MR. AMELKIN:  Right.  And that we also --

8           THE COURT:  Because there are some minor differences

9   in the twos schedules that have nothing to do with the drug

10  that this defendant was involved with.  Just kind of bizarre.

11          MR. AMELKIN:  Right.  And then the second thing we

12  agreed on is that the New York statute is the same today as it

13  was in 2009.  However, it's just the federal schedule is

14  narrowed.

15          So I want to go to the government's point about A and

16  B in his hypothetical.  The Court knows this, but the Second

17  Circuit has said, you apply the earlier guideline manual in

18  that situation, if it's beneficial to the defendant.  And

19  that's *Guerrero*.  It's a 2018 case that was published after

20  *Townsend*, that says as much, that, if at the time of the crime,

21  and at the time of sentencing the guidelines are not in my

22  client's favor, you would apply the earlier guidelines.

23          THE COURT:  Right.

24          MR. AMELKIN:  So that solves that problem.

25          So let's just talk about *Doe* and whether or not it

1    makes sense to apply that rule here.  And I think that we

2    shouldn't for several reasons.  *Doe* follows the INA and is not

3    a guidelines case.  And the guidelines provide the temporal

4    choice of law.  The guidelines say that you apply the book that

5    you have in front of you at the time of sentencing.  And then

6    the guidelines incorporate the definition of the Controlled

7    Substances Act within its text.  So it flows that the

8    definitions within the CSA are the same definitions that are in

9    effect at the time of the guidelines being used.

10           So, I think that 353(a) is really the controlling

11   statute here.  Yes, there's no case law on point, but the

12   statutory text is clear.  And that makes sense within this

13   immigration guidelines context.  There are so many terms under

14   the INA which are different than under the guidelines.  For

15   example, if you plead guilty to a misdemeanor in federal court,

16   and the judge gives restitution over $10,000, under INA law,

17   that's an aggravated felony; but, of course, under the

18   guidelines, it's considered a misdemeanor and would only count

19   for one point.

20           The other thing -- there's a few other matters I

21   wanted to raise, which is just again on Monday, the Second

22   Circuit issued an opinion in *Parkins*, in which they said --

23   which has been known for a long period of time -- that the rule

24   of lenity applies to the guidelines.  If it's at all unclear

25   what to do in this situation, the tie goes to the defendant.

 1          I think, otherwise, Your Honor, probation's right,

 2   that *Townsend* controls here, that it would lead to -- I believe

 3   that it would lead to absurd results if the Court would have to

 4   apply multiple books for multiple different convictions based

 5   upon the date of conviction and determine under the categorical

 6   approach which applies, it's good judicial economy, it's good

 7   for justice to apply the book at the time of sentencing,

 8   regardless of when the defendant was convicted of the state

 9   offense.

10          I just want to make sure.  I think that unless the

11   Court has specific questions, those, I think, are the main

12   points.  And under the rule of lenity and applying *Guerrero* and

13   applying the guideline book, we should not count these four

14   points.

15          THE COURT:  Okay.

16          Mr. Schrier.

17          MR SCHRIER:  I just want to very briefly respond,

18   your Honor.

19          I would just note that, yes, the guidelines says you

20   apply the guidelines in effect at the time.  And then the

21   guidelines, in turn, refer to the CSA, but they do not that say

22   you apply the CSA in effect at time of sentencing.  Right?

23   It's just a reference to the guidelines.  And Mr. Amelkin can

24   correct me if I'm wrong, but I'm pretty sure that the INA

25   essentially does the same thing, it refers to the CSA, just

1   like the guidelines refer to the CSA.  But it doesn't specify

2   you apply the CSA at what particular time.  And, yes, in

3   *Sessions* the court held that, yes, as a reference to the CSA.

4   That doesn't mean you automatically apply the version of the

5   CSA in effect.

6           THE COURT:  Okay.

7           MR. AMELKIN:  I just want to make one more point,

8   your Honor, if that's okay.

9           THE COURT:  You don't need to.

10          MR. AMELKIN:  Okay.  Very good.

11          THE COURT:  Okay.  On the first issue, whether the

12   defendant has two prior controlled substance offenses, I concur

13   with probation and the defense.  In *United States vs. Townsend*,

14   897 F.3d 66 (2d. Cir. 2015), controlled substance offense, as

15   used in the guidelines, is an offense under federal law.

16   *Townsend* makes clear that if the state offense is broader than

17   the federal offense, then a violation of the state offense does

18   not qualify.  The question then becomes whether with we

19   consider the state and federal schedules at the time of the

20   offense or at the time of sentence.

21         I agree with the defense that the entire structure of

22   the guidelines in 18 U.S.C. Section 3553(a)(4)(A)(ii) requires

23   that determination be made at the time of sentence.  It would

24   make no sense for two defendants sentenced on the same day,

25   with the same offense, with the exact same criminal history, to

1  have different basic offense levels because one previous

2  conviction, in which state and federal offenses were the same,

3  and one previous conviction which was different.  Thus, I agree

4  with probation that the base offense level is 20, because the

5  defendant has a prior controlled substance conviction, namely,

6  his federal conviction in 1996.  That said, the fact that he

7  actually has at least three other felony drug convictions might

8  warrant an upward variance or sentence at the top of the

9  guidelines.

10         All right.  Let's talk about the second issue,

11  Mr. Schrier.

12         MR SCHRIER:  Yes, your Honor.

13         So, again, for the most part, we rely on our written

14  submission.  But, again, I would like to orally address some of

15  the points defense counsel made in --

16         THE COURT:  Let me just say for the record also.  I've

17  viewed both of the videos several times.

18         MR SCHRIER:  Thank you, your Honor.

19         So, first, I just want to start with this issue of

20  *Diaz*, this case that Judge Furman recently decided in which he

21  found that the defendant had not committed reckless

22  endangerment in the first degree, such that the four-level

23  enhancement didn't apply.

24         And I wanted to correct what I think is an incorrect

25  characterization of the facts of that case, and defense

# Exhibit E

```
                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK


    UNITED STATES OF AMERICA,   *        Docket Nos.
                                         1:11-cr-00251-WMS-HKS-1 and
                                         1:19-cr-00034-WMS-1
                                *
                                *        Buffalo, New York
                  v.            *        July 1, 2020
                                *        9:10 a.m.
                                *
    TOMMIE ROLLINS,             *        SENTENCING
                                *
              Defendant.        *
                                *
    *  *  *  *  *  *  *  *  *  *  *  *  *


                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE WILLIAM M. SKRETNY
                 UNITED STATES DISTRICT JUDGE



    APPEARANCES:

    For the Government:         JAMES P. KENNEDY, JR.,
                                UNITED STATES ATTORNEY,
                                By JEREMIAH E. LENIHAN, ESQ.,
                                Assistant United States Attorney,
                                Federal Centre,
                                138 Delaware Avenue,
                                Buffalo, New York  14202,
                                Assistant United States Attorney
                                Appearing for the United States


    For the Defendant:          FEDERAL PUBLIC DEFENDER
                                By FONDA D. KUBIAK, ESQ.,
                                   MARYBETH COVERT, ESQ.,
                                100 Pearl Street,
                                Suite 200,
                                Buffalo, New York   14202


    Courtroom Deputy:           GENEVIEVE S. RADOS
```

1    guideline calculation in the plea and agreed not to seek any

2    other departures, the application of any other guidelines

3    provisions or to advocate for a non-guideline sentence.

4           So that's a lot of concessions, basically, right?

5           **THE DEFENDANT:**  Yes, Your Honor.

6           **THE COURT:**  All right.  You've read all the stuff that

7    Ms. Kubiak and Ms. Covert submitted, right?

8           **THE DEFENDANT:**  Yes.

9           **THE COURT:**  Okay.  Nevertheless, to assist me in

10   fulfilling my independent obligation to reach the correct

11   sentencing calculations, your attorney has filed submissions

12   suggesting that the career offender law has developed since the

13   time that you entered your plea, which was not all that long

14   ago, but, you know, roughly two years ago.

15          In particular, she argues on your behalf that there

16   has been a development in post-Townsend case litigation that

17   calls into question whether your prior drug convictions qualify

18   as predicate convictions.

19          In that Townsend case -- we're in the Second Circuit

20   and those judges held that the term, "controlled substance" in

21   the sentencing guideline section 4B1.2(b) refers exclusively to

22   drugs listed under the Federal Controlled Substances Act, thus

23   precluding a state statute that, "speaks more broadly than its

24   federal counterpart" from serving as the basis for a predicate

25   conviction for a career offended -- offender status, and that's

 1   the Townsend case.

 2           That's 897 f.3d 68 (2018), and one of our judges here

 3   from this district was sitting on the Appellate Court and

 4   actually authored that majority opinion.

 5           In short, if the state conviction fell under a statute

 6   that criminalizes more substances than the Federal Controlled

 7   Substances Act -- and that makes it more expansive, a conviction

 8   under the statute cannot serve as a predicate conviction for

 9   career offender status, and that would be to your benefit.

10           Do you understand that?

11           **THE DEFENDANT:**  Yes, Your Honor.

12           **THE COURT:**  All right.  This is relevant in

13   determining whether indivisible state statutes, those that

14   define a single crime that can be committed under various

15   factual scenarios, are categorical matches to their federal

16   counterparts.

17           So if the elements of the prior state conviction are

18   the same as or narrower than the federal counterpart for that

19   crime, the prior state conviction is a predicate conviction.

20           But if the elements of the state conviction are

21   broader, the prior state conviction does not serve as a

22   predicate conviction.

23           So at issue here are your prior convictions under New

24   York Penal Law, Section 220.39(1), which criminalize the sale of

25   a narcotic drug and Section 223.34(1), criminalizing the sale of

1    a narcotic preparation.

2           Those convictions are from 2002 and 2005,

3    respectively.  Both involve indivisible statutes that require an

4    application of the categorical approach analysis that I just

5    described.  In other words, the comparison of the state statute

6    with the federal counterpart to that state statute.

7           The parties agreed that at the time of your conviction

8    in -- convictions, plural, in 2002 and 2005, the state and

9    federal schedules aligned.  They were together.

10          Such that a conviction for either state offense that

11   you were convicted of constituted a conviction for a controlled

12   substance offense under the career offender guideline.

13          But on January 23, 2015, the opium derivative

14   Naloxegol, N-a-l-o-x-e-g-o-l, was expressly excluded from the

15   Controlled Substances Act, yet that remained on the state

16   schedules.

17          As a result, the state statutes under which you were

18   convicted now criminalizes a broader range of substances than

19   the federal counterparts.

20          And, therefore, under Townsend, your conviction

21   seemingly cannot serve as a predicate conviction for career

22   offender purposes.

23          So the dispute is whether a district court, like

24   myself, should look to the schedules in place at the time of

25   conviction or at the time of sentencing, which is today.

1          The development in the law that you rely on through

2    your attorney is a bench decision by Judge Vilardo, who

3    authorized Townsend in United States versus Vincent Gibson,

4    19-cr-66.

5          In Gibson, Judge Vilardo noted the statutory

6    requirement in 18 USC Section 3553(a) that courts apply the

7    version of the guidelines in effect on the date of sentencing,

8    today, and cited the rule of limine as requiring the court to

9    apply the comparison most beneficial to the defendant who's

10   being sentenced, which was to compare the schedules in effect at

11   the time of sentencing.

12         Now, there are two judges, District Judges Caproni and

13   Sebold, of the Seventh District, that's the Manhattan area.

14   They have reached similar decisions on that issue.

15         But I note, as does the Government, that in both

16   Townsend and its summary opinion in Sadler, Second Circuit 2019,

17   the Second Circuit analyzed the schedules in effect at the time

18   of conviction, not at the time of sentencing.

19         It appears, however, that the time of conviction

20   versus the time of sentencing issue was not before the Court.

21   And it is unclear whether there was any difference between the

22   two time periods for purposes of conducting the required

23   analysis.

24         Instead, it appears that the Court may have simply

25   defaulted to time of conviction without critically analyzing

1   whether that was consistent with the structure of the guidelines

2   as a whole.

3        Accordingly, I do not consider either Townsend or

4   Sadler to be binding precedent in this issue.  Instead, I agree

5   with Judge Vilardo's analysis.

6        The structure of the guidelines is such that you be

7   assessed under the current state of the law.  By statute,

8   district courts, like myself, are required to apply the

9   guidelines manuals in effect at the time of sentencing, see 18

10  USC Section 3553(a)(4)(ii).

11       In my judgment, it reasonably follows from that

12  mandate that the sentencing court must also apply the current

13  version of any cross reference or corollary necessary to

14  complete the guidelines calculations, such as the controlled

15  instances schedules at issue here.

16       And given the rule of limine, which is to give you the

17  benefit of the doubt, this is particularly so where that

18  application yields the most beneficial result to the defendant.

19       Consequently, I find that neither of your past

20  controlled substances offenses, those convictions, qualify as

21  predicate convictions.  They don't, because the state schedule

22  applicable to each is broader than the Federal Controlled

23  Substances Act.

24       So, Mr. Rollins, under that analysis, you are not a

25  career offender under the guidelines for sentencing purposes

1    today.

2              It's a big deal, right?

3              **THE DEFENDANT:**  Yes, Your Honor.

4              **THE COURT:**  Since I find that the career offender

5    enhancement in US Sentencing Guidelines, Section 4B1.1(b)(3)

6    does not apply, the guidelines calculations are a total offense

7    level of 19 and a criminal history category of VI, which yields

8    a substantially different guideline from what you were facing,

9    and that is 63 to 78 months imprisonment.

10             I find these to be the correct guidelines calculations

11   in this case.  Those are my findings.  That's my decision.

12   Okay.

13             Now -- so, we have a total offense level of 19, a

14   criminal history category of VI, 63 to 78 months.  Supervised

15   release is three years.  Ineligibility for probation and a fine

16   range of $30,000 to one million dollars, or the violation of

17   supervised release with respect to 11-cr-251.

18             My findings are that that is a Grade A violation, a

19   criminal history category of VI, an advisory range for custody

20   of 24 months and supervised release of three years less current

21   revocation of sentence adjustments.

22             As far as sentencing, what will be -- I will hear you

23   out.  You know, I think, I know the record here.  I know

24   Mr. Rollins pretty well from everything that's been submitted.

25             You know, it's like trying to sentence two different

# Exhibit F

K2c1buts

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        19 Cr. 177 (GBD)

5   TUREAN BUTLER,

6              Defendant.                Sentencing

7   ------------------------------x

8                                        New York, N.Y.
                                         February 12, 2020
9                                        10:30 a.m.

10
    Before:
11
                    HON. GEORGE B. DANIELS,
12
                                         District Judge
13

14                         APPEARANCES

15  GEOFFREY S. BERMAN
         United States Attorney for the
16       Southern District of New York
    BY:  EMILY A. JOHNSON
17       Assistant United States Attorney

18  FEDERAL DEFENDERS OF NEW YORK INC.
         Attorneys for Defendant
19  BY:  IAN H. MARCUS AMELKIN, ESQ.

20

21

22

23

24

25

K2c1buts

1              (Case called)

2              THE LAW CLERK:  Will the parties please rise and make

3    their appearances, beginning with the government.

4              MS. JOHNSON:  Good morning, your Honor.  Emily Johnson

5    for the government.

6              THE COURT:  Good morning, Ms. Johnson.

7              MR. MARCUS AMELKIN:  Good morning, your Honor.  Ian

8    Marcus Amelkin of the Federal Defenders of New York on behalf

9    of Mr. Butler.  We're joined in the courtroom today by

10   Mr. Butler's partner, Anis Lebron, as well as his cousin Jaden

11   Butler, and Ms. Lebron's children, who Mr. Butler cares for.

12             THE COURT:  All right.  Have you received a copy of

13   the presentence report and had an opportunity to review it with

14   your client?

15             MR. MARCUS AMELKIN:  I have, your Honor.

16             THE COURT:  Do you have any objections or corrections

17   to the report itself other than we'll discuss in a moment the

18   calculation of the guidelines?

19             MR. MARCUS AMELKIN:  Well, I don't have an objection

20   to the calculation of the guidelines.  I believe the government

21   does.  But I think the government and I are both in agreement

22   that paragraph 32 and paragraph 33, which assigns one point for

23   two misdemeanors that he received in 2006, should be zero

24   points and not one point, because they're timed out.

25             THE COURT:  32 and 33?

K2c1buts

1              MR. MARCUS AMELKIN:  That's correct.

2              THE COURT:  And does that --

3              MR. MARCUS AMELKIN:  It does not change the criminal

4    history category.

5              THE COURT:  All right.

6              MR. MARCUS AMELKIN:  But it's possible -- sorry, your

7    Honor.

8              Yeah, that doesn't require any other corrections.

9              THE COURT:  All right.  Then why don't I hear from the

10   government first with regard to the guideline range and with

11   regard to sentence.  Ms. Johnson?

12             MS. JOHNSON:  Sure.

13             So defense counsel is correct that the government is

14   objecting to the guidelines range as calculated by probation in

15   the PSR.  Excuse me.

16             THE COURT:  Would you like some water?

17             MS. JOHNSON:  I think I'm okay.  Oh, thank you.

18             The question that we have to decide here is whether

19   Mr. Butler's 2005 conviction for criminal sale of controlled

20   substance in the third degree in New York State qualifies as a

21   controlled substance offense.

22             THE COURT:  Well, it was not a criminal conviction.

23             MS. JOHNSON:  It was a criminal conviction.

24             THE COURT:  It was a youthful offender adjudication.

25             MS. JOHNSON:  The only information we have on it is

K2c1buts

1    what is in --

2              THE COURT:  That's what I'm asking.

3              MS. JOHNSON:  -- the PSR.  It is under the adult

4    criminal conviction section.  Our understanding is it was

5    sealed.  The government only learned about it when probation

6    issued the PSR.  It does say, "Adjudicated youthful offender on

7    May 27, 2005."  So I suppose it's a youthful offender

8    conviction.  I can't really tell from the information in the

9    PSR.

10             THE COURT:  Well, wouldn't that make a difference,

11   whether it's a conviction or not?  I thought your position was

12   that because it was a prior -- are you treating it as a prior

13   felony or misdemeanor conviction?

14             MS. JOHNSON:  Yes.  It counts under the guidelines

15   because probation was revoked in 2007 and so the sentence that

16   he served for this case goes into the period that would be

17   counted by the guidelines, as a felony conviction.

18             THE COURT:  So you believe the guideline range should

19   be what?

20             MS. JOHNSON:  I believe the guideline range should be

21   77 to 96.

22             THE COURT:  To 96?

23             MS. JOHNSON:  Yes.

24             THE COURT:  And was there a plea agreement or *Pimentel*

25   letter exchanged?

K2c1buts

1          MS. JOHNSON:  There was a *Pimentel*.  The defendant

2    pled open.  It was not listed in the *Pimentel* because the

3    government didn't know about the conviction.  It was sealed.

4    We only learned about it when probation issued the draft PSR.

5          THE COURT:  So the *Pimentel* letter calculated the

6    guideline range without that adjudication.

7          MS. JOHNSON:  That is correct.

8          THE COURT:  In the same manner that the probation

9    department did.

10          MS. JOHNSON:  That is correct.

11          THE COURT:  Okay.

12          MS. JOHNSON:  And the government asserts that this

13   conviction should count as a prior controlled substance

14   offense, and thus the base offense level under the Sentencing

15   Guidelines would be 24 instead of 20.  The reason for this is

16   that -- it's a little convoluted, but *Townsend*, which is a

17   Second Circuit case, defined controlled substances under the

18   guidelines as substances that are controlled by the federal

19   Controlled Substances Act, and said that to the extent that the

20   state criminalizes something more broadly than the federal

21   government does, that that can't be a predicate for the

22   guidelines purposes.  But *Townsend* doesn't tell us how we

23   compare these drug schedules.  It tells us to compare them; it

24   doesn't tell us how to compare them and what time to use to

25   compare them, and so that's how we get into these details about

K2c1buts

1    what time is appropriate.

2         The defendant would like to compare the New York State

3    drug schedule as it existed in 2005, when the defendant was

4    convicted, with the 2020 federal Controlled Substances Act.

5    The government thinks that the proper way to compare those two

6    drug schedules is an apples-to-apples comparison at the time of

7    the original state conviction, arguing by analogy to *Doe v.*

8    *Sessions*, which is a Second Circuit case.  In the immigration

9    context, that says that because the drug schedules do change so

10   frequently, when a defendant pleads guilty, he should be able

11   to understand the consequences of his conviction.  One would

12   never be able to understand the consequences of a conviction in

13   2005 if you're going to be sentenced at some future point and

14   the drug schedule then will be compared to 2005.  There are 15

15   years between these two dates.  The federal drug schedule is

16   amended incredibly frequently due to the fact that new drugs

17   are discovered, new uses for previously thought safe drugs were

18   discovered and controlled.  During the pendency of this case,

19   from October 2018 until now, the federal drug schedule has been

20   amended 11 times.  It's completely illogical to compare these

21   two schedules across 15 years.  And the substances that the

22   defendant cites for the differences between these two

23   schedules, they're not -- there are two substances.  There's

24   Naloxegol and naldemedine.  They're not listed as substances

25   that are controlled on the federal schedule today.  What they

K2c1buts

1   are listed as are substances that are explicitly excluded from

2   control.  And one thing that highlights like how, you know,

3   completely illogical it is to do a comparison across 15 years

4   is that these drugs did not even exist in 2005.  There's no

5   possibility they could have been on a drug schedule or excluded

6   from a drug schedule in 2005 because they were not even in

7   existence.  The new drug applications were filed in 2013 and

8   2016, respectively.

9            THE COURT:  Well, I'm not sure I'm following what

10  comparison that you're talking about.  What is being compared

11  and what is the consequence of comparing those two?

12           MS. JOHNSON:  Sure.  So *Townsend* tells us that for

13  guidelines purposes, a controlled substance offense refers to

14  something controlled by the federal Controlled Substances Act.

15  But frequently we're dealing with underlying state convictions

16  that are regulated by some kind of state drug schedule.

17           THE COURT:  Right.

18           MS. JOHNSON:  So *Townsend* says that if the state

19  criminalizes more conduct than the federal CSA does, that that

20  prior state conviction cannot count as a controlled substance

21  offense for guidelines purposes.

22           THE COURT:  And that was the case when he was

23  convicted on --

24           MS. JOHNSON:  It was not the case when he was

25  convicted.  When he was convicted in 2005, the schedules were

K2c1buts

1    the same.

2            THE COURT:  Okay.

3            MS. JOHNSON:  Now the federal schedule is different

4    than it was in 2005.

5            THE COURT:  Okay.

6            MS. JOHNSON:  And the difference that the defendant

7    points to is not that the federal schedule includes additional

8    items for control, you know, drugs that the federal government

9    is regulating; it excludes specifically two drugs from control.

10   It says, in the definition of opiates, you know, the federal

11   government controls 23 opiates, which are the exact same

12   opiates that the state controls.  But the federal government

13   explicitly will not control two substances, and the state

14   schedule does not say that.

15           THE COURT:  Okay.

16           MS. JOHNSON:  Okay.  So right now there is a delta

17   between the state schedule and the federal schedule.

18           THE COURT:  Okay.

19           MS. JOHNSON:  But with respect to these substances,

20   there's absolutely no evidence that anyone is trying to

21   criminalize these substances.  There are new pharmaceutical

22   products.  They're both designed to relieve constipation for

23   people taking opiates.  In one of the rulemakings, it says

24   there's never been a drug seizure of these drugs.

25           THE COURT:  Okay.

K2c1buts

1          MS. JOHNSON:  Like this isn't -- we're not --

2          THE COURT:  Why do you want to treat it more harshly

3   in federal court than it's been treated in state court?

4          MS. JOHNSON:  At 2005, in the state court, they were

5   the same.

6          THE COURT:  Okay.

7          MS. JOHNSON:  Today there's a difference.

8          The government thinks that the relevant time period

9   for comparing what conduct was criminalized by the state and

10  what conduct was criminalized by the federal government is at

11  the time of the original state conviction.  There's just no

12  meaningful comparison otherwise.  Like *Townsend* tells us

13  that --

14         THE COURT:  Why isn't there a meaningful comparison to

15  analyze currently how the law views these substances?  If he is

16  to be sentenced now, the consequences that he's suffering with

17  regard to his prior case is going to be suffered presently, and

18  the evaluation should be how seriously should it be handled now

19  to enhance his sentence.

20         MS. JOHNSON:  We think that what *Doe v. Sessions* tells

21  us, which is a Second Circuit case, is that -- yes, it is in

22  the immigration context, but it says that you should look to

23  how substances were regulated at the time of the original

24  conviction, which would be the 2005 conviction in this case,

25  because that is the only point in time at which the defendant

K2c1buts

1    would be able to determine the future consequences of that

2    conviction.  When we compare across 15 years, across something

3    like a drug schedule, it's been amended 11 times in the last 18

4    months, like it's a moving target.

5            THE COURT:  Right.  Why does that make it more

6    complicated to assess what the appropriate sentence is for this

7    defendant and this crime, given his criminal history?

8            MS. JOHNSON:  We think that given his criminal history

9    in a prior conviction for a controlled substance offense, we

10   think it should count, because in 2005, when he was convicted,

11   there was absolutely no daylight between New York and the

12   federal system.  They criminalized the same conduct.

13           THE COURT:  Well, but in his particular instance, in

14   2005, his conviction was treated even more lightly than a

15   regular conviction because he got youthful offender treatment,

16   and he technically does not have a criminal conviction for that

17   offense.  So I'm trying to understand.  I understand the logic

18   of your argument in the abstract, but I'm trying to find the

19   reasonable basis to treat an –– and *Townsend* and the other

20   cases, I don't think any of the cases we're talking about

21   address a situation of a youthful offender treatment in terms

22   of whether or not that should affect how it's evaluated.  He

23   received youthful offender treatment on a case where the

24   substances were treated more harshly –– no, equally at the

25   time, but now the substances are not on the controlled

K2c1buts

1  substance schedule.

2          MS. JOHNSON:  Well, the difference between the

3  schedule is simply that the federal schedule explicitly says

4  we're not going to criminalize these two pharmaceutical

5  products --

6          THE COURT:  Right, right.

7          MS. JOHNSON:  -- that no one is suggesting anyone is

8  using in a criminal manner.

9          THE COURT:  Right.

10         MS. JOHNSON:  Judge, it's largely an academic

11 guidelines argument.  The government is just --

12         THE COURT:  Well, it's not academic.  It's never

13 academic for the defendant.  It's academic for you and I

14 because we're not the ones doing the time.

15         MS. JOHNSON:  Understood.

16         THE COURT:  So the real question is, ultimately:  (1)

17 what is this we're fighting about; (2) what is the government's

18 position as to what a reasonable sentence is in this case.  If

19 the government's position is that a reasonable sentence is at

20 or below the guideline range that they laid out in the *Pimentel*

21 letter, then it seems to me that's where we should start.  If

22 your position now has changed and your position is that a

23 reasonable sentence is the higher guideline range that you're

24 advocating, then it's not academic; it has serious consequences

25 for the defendant if I accept that view.  And so I'm trying to

K2c1buts

understand.  I mean, in the abstract, I don't want to set a bad

precedent for the government's future arguments, but I'm a

little concerned about making that determination in this case,

and given the youthful offender treatment and given the

*Pimentel* letter and given that the government -- I can only

assume that you had an opportunity to convince probation of

this point of view and probation took the contrary point of

view, and they have calculated the guideline range as the

government calculated it in its *Pimentel* letter, and the

government is making an argument that the youthful offender

adjudication should be an aggravating factor to raise his

guideline range beyond what the government believes was a

reasonable guideline range when they submitted the *Pimentel*

letter.

        So I guess I'm really trying to figure out what you

really want me to do with this other than, as I say, chalk up a

point that the government has made an academic argument that

they get to win.  But it's never an academic argument for

either the defendant or the Second Circuit if I start out with

a higher guideline range that's inconsistent with the guideline

range as calculated by the probation department, inconsistent

with the *Pimentel* letter which the government submitted to the

defendant and pursuant to the Second Circuit directive that the

government should give the defendant some guidance as to what

the guideline range is, and I'm not sure that it's the

K2c1buts

government's position that a reasonable sentence in this case

is a sentence within the higher range that you're advocating

now or is within the range of the *Pimentel* letter.

          MS. JOHNSON:  Just a few points in response.

          I understand what your Honor is saying with respect to

the *Pimentel*, but the *Pimentel* specifically says that, you

know, this is our guidelines calculation with respect to the

information that we had at the present time, and at that time

we had no information regarding this conviction because it was

sealed.  Had we had that information at the time we issued the

*Pimentel*, we would have included it and our guidelines

calculation would have been the higher one.  You know, it is

significant to us that, you know, as for the guidelines, this

particular guidelines provision, it does make the conduct more

serious if there are two prior controlled substance offenses.

That is what the guidelines tell us, and our office's position

would remain the same.  You know, when we found out about this,

we do think a sentence in the guidelines range is appropriate,

because we didn't actually know about this other conviction --

          THE COURT:  And have you made this argument

successfully before any of the other judges?

          MS. JOHNSON:  There's a decision by Judge Koeltl that

is a very similar circumstance.  It involves a 2008 conviction

for a criminal sale, the same underlying state conviction, it's

a 2008 conviction, where Judge Koeltl said that the schedules

K2c1buts

1    should be compared in 2008 and that the conviction should count

2    under the guidelines.

3            There was another case that I just recently found out

4    about in front of Judge Kaplan, where he also reached the same

5    conclusion.

6            There are two other judges who have gone the other

7    way.  There's Judge Caproni and Judge Seibel.

8            THE COURT:  And you said Judge Koeltl and Judge --

9            MS. JOHNSON:  Kaplan.

10           THE COURT:  Kaplan?

11           MS. JOHNSON:  Yes.

12           THE COURT:  And Judge Koeltl and Judge Kaplan's cases,

13   what were the prior convictions?

14           MS. JOHNSON:  In Judge Koeltl's case, it was this

15   particular -- it was criminal sale of a controlled substance in

16   the third degree.

17           THE COURT:  And do you know what substance it was?

18           MS. JOHNSON:  We don't.  These cases are all analyzed

19   under the categorical approach so no one gets into the details

20   of what the actual underlying --

21           THE COURT:  But that's what you're doing here.  You're

22   getting into the details --

23           MS. JOHNSON:  Exactly.

24           THE COURT:  No.  You're getting into the details of

25   the underlying substances here.

K2c1buts

1           MS. JOHNSON:  We're not.  I don't know --

2           THE COURT:  Well, your argument was that we should

3   compare what substances were on the schedule back in 2005 to

4   the substances that are on the schedule presently.

5           MS. JOHNSON:  Right.  That's what *Townsend* tells us to

6   do to figure out if federal law is broader or narrower than

7   state law.  I thought -- if I misunderstood, I apologize, your

8   Honor.  I thought you were inquiring what the substance, what

9   the controlled substance was in this particular conviction.  I

10  don't --

11          THE COURT:  No, in the prior conviction.

12          MS. JOHNSON:  In the prior conviction?  I don't know

13  what substance was at issue.

14          THE COURT:  And do you know whether or not, in Judge

15  Kaplan and Judge Koeltl's cases, that that was in fact a

16  conviction for a felony, underlying felony conviction or a

17  youthful offender adjudication?

18          MS. JOHNSON:  I believe those were felony convictions.

19  At least for Judge Koeltl's case.  I would have to get more

20  information to answer that question with any level of

21  assurance, though.

22          THE COURT:  And you're saying that they did what in

23  their case that should be followed here?  I wasn't quite sure I

24  followed that.

25          MS. JOHNSON:  Judge Koeltl said that the prior

K2c1buts

1   conviction should count.

2           THE COURT:  The prior conviction -- okay.  But we

3   don't know what the prior conviction was, do we?

4           MS. JOHNSON:  It was a New York conviction for 220.39,

5   which is criminal sale of a controlled substance in the third

6   degree, the same conviction as here.

7           THE COURT:  Okay.  But we don't know what the drug

8   was.

9           MS. JOHNSON:  Correct.

10          THE COURT:  And what was the conviction, the current

11  conviction in Judge Koeltl's case?

12          MS. JOHNSON:  Same as here, felon in possession.

13          THE COURT:  And what about Judge Kaplan?

14          MS. JOHNSON:  Judge Kaplan, I don't know what the

15  underlying conviction was.  Let me see if I can find it.  But

16  the instant conviction for the sentencing in federal court was

17  a narcotics case.  I believe it was whether the defendant

18  qualified as a career offender was the question.

19          THE COURT:  And how do you characterize -- if there is

20  a conflict or disagreement between Judge Koeltl and Judge

21  Kaplan and Judge Caproni and -- who was the other judge?

22          MS. JOHNSON:  Judge Seibel.

23          THE COURT:  -- and Judge Seibel, what do you say was

24  the conflict between the two, those sets of judges?

25          MS. JOHNSON:  I think both Judges Kaplan and Koeltl

K2c1buts

decided the case on the idea that there should be some

apples-to-apples comparison of the drug schedule, which is the

government's argument here.  I believe Judge Caproni and Judge

Seibel decided the case on the argument that the defendant

should be sentenced under the law and at the time of

sentencing, as the guidelines say, and that sort of any tie

goes to the defendant under the rule of lenity.  You know, the

government asserts there's not really any binding precedent on

this.  *Townsend* tells us to do this comparison and doesn't tell

us how to do it.  So, you know, the defendant points out absurd

results that follow from the way the government suggests to do

it, and I can make those same hypothetical arguments, absurd

results following from the way that the defense wants us to do

it.  You know, the government thinks it's more absurd that you

would compare schedules that are constantly changing, across 15

years, because the practical effect of that is that an earlier

state conviction for a controlled substance offense will almost

never count for guidelines, under any guidelines analysis,

because the federal schedule changes with such frequency.

THE COURT:  Well, in this case I don't have to

evaluate that.  That's why I'm trying to factor in the fact

that this was a youthful offender adjudication, because none of

that really matters to me.  It's a youthful offender

adjudication, it wasn't a criminal conviction; it was treated

less seriously than a criminal conviction, not because of the

1    substance but because of his youth.

2              MS. JOHNSON:  I mean, with respect to that analysis, I

3    mean, perhaps the best -- I don't -- I think there's

4    conflicting information, and the government hasn't gone to the

5    state to try to unseal the records from this conviction.  It is

6    in the PSR under the section Adult Criminal Convictions, and

7    there is a youthful offender section in the PSR that lists

8    additional convictions under juvenile adjudications.  I note

9    that it does say adjudicated youthful offender, but if you do

10   the math, the defendant was over 18 at the time he was

11   adjudicated.  I'm just not sure, with the information we have

12   in the PSR, how this all played out.

13             THE COURT:  Well, you're saying he was over 18 at the

14   time he was adjudicated or at the time the crime was committed?

15   Because that would be the operative date.

16             MS. JOHNSON:  I'm just doing the math.

17             I believe he was 18 when the crime was committed.  His

18   birthday, according to the PSR, is June 1, 1986, and the date

19   of arrest is November 23, 2004, and he would have been a little

20   over -- he would have been 18 at the date of arrest.

21             THE COURT:  That's assuming that the day of the arrest

22   is the day of the offense.

23             MS. JOHNSON:  That is true, although it is a criminal

24   sale of a controlled substance so --

25             THE COURT:  There are plenty of people selling drugs

K2c1buts

1   today and get arrested tomorrow.

2            MS. JOHNSON:  That is true, but his birthday is in

3   June.

4            THE COURT:  All right.  But ultimately is it your

5   position that because of this new information the government

6   has, that a sentence in this higher range is a reasonable

7   sentence?

8            MS. JOHNSON:  That is our position.  We do think that

9   had we known about -- this is a significant other conviction.

10   It counts for three criminal history points.  You know, he had

11   his probation revoked after this sentence and was

12   reincarcerated as a result, which, you know, has happened a

13   couple of times.  We do think it impacts --

14            THE COURT:  Sorry.  What page are you on?

15            MS. JOHNSON:  I'm on page 8 of the PSR.  It's

16   paragraph 30.

17            THE COURT:  That's the 11/23 --

18            MS. JOHNSON:  Yup.

19            THE COURT:  -- conviction?  And his parole was revoked

20   3/14/2007?

21            MS. JOHNSON:  Yeah.

22            THE COURT:  And let's see what happened.

23            2007.  Do we know why his parole was revoked?  Was

24   that a new offense?

25            MS. JOHNSON:  It says a new conviction here, but --

K2c1buts

1        THE COURT:  I don't see it.

2        MS. JOHNSON:  I don't see it here and I didn't see it

3   on his rap sheet either.  It might be that it's something from

4   another state that's sealed.  If you go all the way to the

5   back, on paragraph 47, there's something in September of 2017,

6   where it says fugitive from another state that lists

7   North Carolina.  That would be the government's best guess.

8        THE COURT:  All right.  Let me hear from the defense.

9   Mr. Marcus Amelkin.

10        MR. MARCUS AMELKIN:  Thank you, your Honor.

11        So first off, I think that the defense is academically

12   correct or legally correct or morally correct on this point,

13   but I'm concerned about -- while I agree with the Court that

14   the YO should not count, the Second Circuit has made clear that

15   YOs for the most part count and can be used to enhance an

16   offense.  So I don't want the Court to be on shaky ground with

17   the YO.  I think that the *Rehaif* decision, which recently came

18   out about felon in possession, might be a way in which we can

19   revisit the YO, because under *Rehaif*, it says that you have to

20   know that you were convicted of a crime that made you

21   prohibited from holding a gun.  And they found under that case

22   law that YOs wouldn't count in that aspect because as the Court

23   well knows, when you receive a YO, you're told, it's going to

24   be sealed, you're not going to have a criminal conviction, and

25   that's the end of it.  But unfortunately, the Second Circuit

K2c1buts

has said previously that YOs should be treated as adult

convictions.

          The bottom line is that the past three judges who have

looked at this have gone the defense's way, and while I have

enormous respect for Judge Koeltl and I was his intern when I

was in law school and love Judge Koeltl, he made that decision

without a full briefing and directly after *Townsend* was issued.

And I think that the briefing in front of Judge Caproni and the

decision made by Judge Caproni is really all the Court needs to

think about, which is that the statute really does control

here, 18 U.S.C. 353(a), which says that the Court uses the

guidelines in effect on the date of the defendant's sentencing.

          Now the book that you have in front of you, the red

book, is the guidelines that you're going to use to sentence

Mr. Butler in a few minutes.  Incorporated into that book by

way of statute and by of way of guidelines, under 4B1.2(b), is

the CSA, the Controlled Substances Act, and the schedule is

incorporated into that book.  So what the government is asking

you to do -- I'm sorry.  I'm on duty today.  It should still be

on silent though.

          What the government is asking you to do is say that

for prior convictions, you go back into your chambers and you

get the light blue book from 2004 for this conviction and use

the red book for everything else.  And that is fundamentally

against what the guidelines are about, which is that the

K2c1buts

defendant, at the time of his sentence, knows what he is up

against.  As Judge Caproni said, the entire structure of the

guidelines in 18 U.S.C. Section 353(a)(4)(A)(ii) requires that

determination be made at the time of sentence.  And Judge

Seibel said:  If the Court is at all on the fence in Augustine,

a tie goes to the defendant.  And that's the rule of lenity,

which the Second Circuit has said applies to the guidelines

several times in recent years.  And what the government is

asking you to do is saying that, depending upon the time of his

conviction, you have to go back and figure out what the CSA

said and what drugs were on it and what drugs were off it.

Now in New York, we're really talking about two

compounds, but in other states we're talking about a lot of

different drugs.  In California, for example, stems of

marijuana don't count but seeds do.  So really, it's a

nationwide issue, and I feel for the Court because the

categorical approach has opened the door to all of these

questions, but the way to simplify it and the way that Judge

Caproni and Judge Seibel and just last week Judge Vilardo

decided is that you use the book at the time of sentencing, the

book incorporates the Controlled Substances Act, and the rule

of lenity, if it's close, goes to the defendant.  Because

otherwise, what the government is saying to you is that the

government concedes that right now, if he was arrested

yesterday for a 220.39 -- which, by the way, is normally a $10

K2c1buts

1    hand-to-hand sale in a park somewhere; we're not talking about

2    like a big drug situation -- would not count.  The government

3    concedes that in their briefing, that today, if he was arrested

4    yesterday, it would not count.

5         So let's say he has two convictions, one from

6    yesterday and one from 2004.  It's asking you, in the same

7    sentencing, for the same prior crime, to use two different

8    standards.  And that is simply not acceptable, under the

9    guidelines, under 353(a).

10        I'll close with this.  It's their burden, both as the

11   objecting party but also to apply an enhancement to my client,

12   and they just cannot reach it, because they do not have any

13   direct binding precedent on the Court on point, and we have the

14   better of the logical and academic argument.

15        Thank you.

16        THE COURT:  Yes.

17        Ms. Johnson?

18        MS. JOHNSON:  Yes.  I just want to clarify one point

19   on Mr. Marcus Amelkin's *Rehaif* argument, just to make sure the

20   record is clear.

21        I understand what he's saying with respect to youthful

22   offender convictions, but in this particular instance, the

23   defendant does have another felony conviction for which he was

24   sentenced to four years of imprisonment, so I just want the

25   record to be clear on that point, that that is a conviction the

K2c1buts

1    government is relying on for purposes of --

2            THE COURT:  I'm sorry.  Say that again.  You're

3    referring to which?

4            MS. JOHNSON:  I'm referring to paragraph 38, the

5    attempted robbery conviction.

6            THE COURT:  I'm sorry.  I just didn't follow when you

7    say that's the prior conviction that the government is relying

8    upon.

9            MS. JOHNSON:  Right.  I just wanted to make clear,

10   because defense counsel made an argument about *Rehaif* in the

11   context of youthful offender adjudications, and I just want to

12   make clear that *Rehaif* tells us that the defendant had to know

13   that he was a felon, and the government is not asserting that

14   he knew he was a felon because of that youthful offender

15   conviction.  We're asserting it because of this other

16   conviction.

17           MR. MARCUS AMELKIN:  Nor is the defense, your Honor.

18   Mr. Butler is guilty of being a felon in possession of a

19   firearm.  The argument I'm making under *Rehaif* is that I think

20   it opens the door to question whether these YOs can be used to

21   enhance sentences in which they did not know at the time that

22   they pled that it could be used in federal court to enhance

23   their sentence.  But that's more to this guideline issue and

24   not to the 922(g).  Mr. Butler is here today to be sentenced

25   for having a gun, and he admits that he had it.

K2c1buts

1          THE COURT:  All right.  I'm at this point inclined to

2     accept the probation's calculation of the guideline range in

3     this case.  I think there are several factors.  Ultimately I

4     think my reaction is that I agree more with Judge Caproni on

5     this issue than Judge Koeltl.  I think there is a compelling

6     argument that, as I say, it sounds logical to go back and

7     compare the guidelines as they existed or the law as it existed

8     at the time of the offense, but I think that that, in my view,

9     is inherently problematic in and of itself that could create

10    consequences that are unintended and inconsistent for the

11    determination of the applicable guideline range, which is

12    required by law.  And I think it is somewhat problematic to

13    calculate the guideline range based on an evaluation of two

14    different sets of guidelines.

15          I'm not sure that if this was further significantly

16    argued on a full record in another case in the abstract, how

17    the circuit would resolve this split among us, but I believe

18    that particularly under the unique circumstances of this case,

19    I think that there's a greater danger that an inappropriate

20    sentence would be applied if I were to apply this rule under

21    these circumstances, given the nature of the prior conviction,

22    given the position the government took in the *Pimentel* letter,

23    although I concede that that is always subject to the current

24    information that the government has available to it at the

25    time.  And I'm not sure that I would accept the position that

K2c1buts

1   this 2005 youthful offender conviction, itself, a youthful

2   offender adjudication, would enhance the defendant's

3   culpability to the extent that the guideline range should be

4   raised another year or two as being the more appropriate

5   reasonable sentence.

6          So I'm going to accept, for these purposes -- and I'll

7   indicate for the record, I don't think that this should be

8   precedent for cases in the future.  I think the debate will

9   rage on, and it will be resolved on a more complete and more

10  appropriate record in the appropriate case, for all of us

11  judges to come to some sort of consensus on this issue.  But in

12  the circumstances of this case, I do believe it is appropriate

13  to accept the guideline range as calculated by the presentence

14  report, which is consistent with the guideline range that was

15  in the *Pimentel* letter and is consistent with what would be a

16  reasonable sentence -- in that range or below that range -- a

17  reasonable sentence in this case.

18         So I'm going to accept the total offense level of 17,

19  criminal history category VI, again, which is significantly

20  enhanced, that his criminal history is significantly enhanced

21  by his criminal history of VI, and his total offense level of

22  17.  So I believe that that is an appropriate calculation of

23  the guideline range, and I will accept a guideline range of 51

24  to 63 months, as was indicated to the defendant in the *Pimentel*

25  letter prior to his plea of guilty.

Exhibit G

<pre>
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF NEW YORK
 2


 3
      UNITED STATES OF AMERICA,        )
 4                                     ) Case No. 1:19-CR-0066
                                       )                  (LJV)
 5                    Plaintiff,       )
                                       )
 6    vs.                              ) January 31st, 2020
                                       )
 7    VINCENT GIBSON,                  )
                                       )
 8                    Defendant.       )


 9


10                 TRANSCRIPT OF MOTION HEARING
           BEFORE THE HONORABLE LAWRENCE J. VILARDO
11                 UNITED STATES DISTRICT JUDGE


12


13    APPEARANCES:

14    For the Plaintiff:    JAMES P. KENNEDY, JR.
                            UNITED STATES ATTORNEY
15                          BY:  SETH MOLISANI, ESQ.
                            ASSISTANT UNITED STATES ATTORNEY
16                          138 Delaware Avenue
                            Buffalo, NY 14202
17
      For the Defendant:    FEDERAL PUBLIC DEFENDER'S OFFICE
18                          BY:  JEFFREY T. BAGLEY, ESQ.
                            ASSISTANT FEDERAL PUBLIC DEFENDER
19                          300 Pearl Street, Suite 450
                            Buffalo, NY 14202
20
      Court Reporter:       MEGAN E. PELKA, RPR
21                          Robert H. Jackson Courthouse
                            2 Niagara Square
22                          Buffalo, NY 14202

23

24

25
</pre>

Case 1:19-cr-00026-CLC-CHS Document 59 53 Filed 07/13/20 07/02/21 Page 122 of 209 Page 2 of 13
US v GIBSON -- 1/31/20 -- STATUS CONFERENCE

1

| | | |
|---|---|---|
| 02:07PM | 1 | THE CLERK:  19-CR-66.  United States of America v. |
| 02:07PM | 2 | Vincent Gibson.  Assistant United States Attorney Seth T. |
| 02:07PM | 3 | Molisani appearing on behalf of the government.  Assistant |
| 02:07PM | 4 | Federal Public Defender Jeffrey T. Bagley appearing with |
| 02:07PM | 5 | defendant.  Defendant is present.  This is the date set for a |
| 02:07PM | 6 | motion hearing. |
| 02:07PM | 7 | THE COURT:  Okay.  Good afternoon. |
| 02:07PM | 8 | MR. BAGLEY:  Good afternoon, Judge. |
| 02:07PM | 9 | THE COURT:  So, is this -- was this briefing as a |
| 02:07PM | 10 | result of an order that I issued? |
| 02:07PM | 11 | MR. BAGLEY:  Yes. |
| 02:07PM | 12 | THE COURT:  Asking for further briefing? |
| 02:07PM | 13 | MR. MOLISANI:  There was a request that defense |
| 02:07PM | 14 | counsel made at the time of the plea, he wished to submit |
| 02:07PM | 15 | argument to the Court relative to the career offender |
| 02:07PM | 16 | status -- |
| 02:07PM | 17 | THE COURT:  Yes. |
| 02:07PM | 18 | MR. MOLISANI:  -- at the time and the Court granted |
| 02:08PM | 19 | that. |
| 02:08PM | 20 | THE COURT:  So, I've got a few questions and let's |
| 02:08PM | 21 | cut to the chase here.  Let me ask the government, first of |
| 02:08PM | 22 | all, the statute, 18 U.S.C. Section 3553(a)(4)(A)(ii) says |
| 02:08PM | 23 | that the Court must look to the guidelines at the time of |
| 02:08PM | 24 | sentencing as opposed to the time of conviction.  How do you |
| 02:08PM | 25 | get around that? |

02:08PM 1         MR. MOLISANI:  Your Honor, I think that's where you

02:08PM 2  can kind of parse things out a little bit, where if it's

02:08PM 3  really looking to statute rather than the guidelines, the

02:08PM 4  guidelines are what the guidelines are and I think they

02:08PM 5  absolutely -- the present guidelines are the ones that apply,

02:08PM 6  but it's how you interpret those guidelines that depend on

02:08PM 7  other statutes and the interplay between the guidelines and

02:08PM 8  statutes and I think that's where the government's argument

02:08PM 9  stems from, that here we need to look at -- I don't know how

02:08PM 10  far you want me to go.

02:08PM 11         THE COURT:  No, go ahead.  Tell me, because I'm

02:09PM 12  troubled by -- so, I understand the *Townsend* -- I'm intimately

02:09PM 13  familiar with *Townsend*.  The *Townsend* decisions says that

02:09PM 14  based on the Second Circuit's prior determination, you have to

02:09PM 15  apply the categorical approach that you look at the statutes.

02:09PM 16  And if the state statute under which the defendant was

02:09PM 17  convicted criminalizes the possession of a certain substance

02:09PM 18  that is not criminalized under the federal statute, then the

02:09PM 19  state statute doesn't reply, right?  Got that?

02:09PM 20         MR. MOLISANI:  Correct.

02:09PM 21         THE COURT:  All right.

02:09PM 22         MR. MOLISANI:  Yes.  You have more intimate knowledge

02:09PM 23  of how that decision was rendered.

02:09PM 24         THE COURT:  And we've got a drug here that's

02:09PM 25  criminalized under the state statute, but it's not under the

02:09PM     1   federal -- what is the word?

02:09PM     2           MR. BAGLEY:  Controlled substance schedule.

02:09PM     3           THE COURT:  Schedule.  It's not under the federal

02:09PM     4   schedule.  So, why wouldn't the rule of lenity require me to

02:10PM     5   chose whichever of the two benefits the defendant and apply

02:10PM     6   that?

02:10PM     7           MR. MOLISANI:  Well, I think, Your Honor, that can be

02:10PM     8   decided with the savings statute as well.  1 U.S.C. Section

02:10PM     9   109 assures that a convicted criminal defendant does not

02:10PM    10   fortuitously benefit from more lenient laws that are passed

02:10PM    11   after he or she has been convicted.  And in this case, the

02:10PM    12   defendant was convicted at a time where the schedules were

02:10PM    13   exactly the same.

02:10PM    14           THE COURT:  But, it's not a more lenient law.  You're

02:10PM    15   not saying there's a more lenient law that's passed after his

02:10PM    16   convictions.

02:10PM    17           MR. MOLISANI:  I think technically, yes, it is more

02:10PM    18   lenient where certain controlled substances were essentially

02:10PM    19   forbidden and then, something is removed from that schedule

02:11PM    20   well after the time that he was convicted of that offense.

02:11PM    21           THE COURT:  How do you deal with the example that

02:11PM    22   Mr. Bagley includes in his papers where one defendant commits

02:11PM    23   a crime at one time and at another time and we're going to

02:11PM    24   apply --

02:11PM    25           MR. MOLISANI:  I'm sorry, Your Honor.  That's no

02:11PM 1    different than any time there's a change in the law.  I mean,

02:11PM 2    if you look at -- I've cited this case that, yes, it is in the

02:11PM 3    context of ACCA where the maximum term of imprisonment, say,

02:11PM 4    for a particular drug offense in New York State was, at one

02:11PM 5    time, 20 years.  And New York has subsequently gone back and

02:11PM 6    changed its laws to lessen the maximum term of imprisonment

02:11PM 7    for that same offense, for that same conduct.

02:11PM 8         And yet, the individual who was convicted of now the

02:11PM 9    same offenses, mind you, we look at the time of the actual

02:11PM 10   conviction what the law was at that time.  And so, there is a

02:12PM 11   disparity, unfortunately and unfortunately for any defendant

02:12PM 12   where there's a situation like this where there is a change in

02:12PM 13   the law and it results in one defendant facing a greater

02:12PM 14   penalty than the other, but I'm not sure how you get around

02:12PM 15   that.

02:12PM 16        And I think another point that should be brought up

02:12PM 17   with Mr. Bagley's argument is, let's say, for instance, that

02:12PM 18   New York State now decides to remove Minoxidil from its

02:12PM 19   controlled substance list tomorrow.  Then, Mr. Gibson would

02:12PM 20   now become a career offender because he's not to be sentenced

02:12PM 21   until the end of February?  These issues come up all the time.

02:12PM 22        THE COURT:  Let me ask you this.  Judge Caproni and

02:12PM 23   Judge Seibel both issued decisions that seem to be contrary to

02:12PM 24   your position, right?  You can't distinguish them, can you?

02:12PM 25        MR. MOLISANI:  No, there definitely seems to -- I

| | | |
|---|---|---|
| 02:12PM | 1 | mean, there's no clarity here and that's why we're here |
| 02:12PM | 2 | arguing -- |
| 02:12PM | 3 | THE COURT:  Yes. |
| 02:13PM | 4 | MR. MOLISANI:  -- there's not anything that |
| 02:13PM | 5 | definitive on that issue. |
| 02:13PM | 6 | THE COURT:  Those two judges decided against you, |
| 02:13PM | 7 | right? |
| 02:13PM | 8 | MR. MOLISANI:  Correct. |
| 02:13PM | 9 | THE COURT:  Do you have anything -- any court that |
| 02:13PM | 10 | has actually considered this?  I know you have the Second |
| 02:13PM | 11 | Circuit case, but the Second Circuit case doesn't really seem |
| 02:13PM | 12 | to consider this issue.  And as Mr. Bagley points out, it's |
| 02:13PM | 13 | a -- what's the word that they use for non-precedential |
| 02:13PM | 14 | opinions? |
| 02:13PM | 15 | MR. MOLISANI:  Summary order. |
| 02:13PM | 16 | MR. BAGLEY:  Summary order. |
| 02:13PM | 17 | THE COURT:  Summary order.  Yeah.  So, it's a summary |
| 02:13PM | 18 | order that is non-precedential by the Court's own rules, |
| 02:13PM | 19 | right?  So, you've got that one case that seems to come out |
| 02:13PM | 20 | your way that does not really address the issue straight on. |
| 02:13PM | 21 | And then, you've got an immigration case that I don't think is |
| 02:13PM | 22 | of -- is on point, because it's an immigration case and not a |
| 02:13PM | 23 | guidelines case.  Is there any case that you have where a |
| 02:13PM | 24 | court has addressed this issue and has come out your way? |
| 02:14PM | 25 | MR. MOLISANI:  Well, I think Mr. Bagley addresses |

| | | |
|---|---|---|
| 02:14PM | 1 | that. I cited the *Warren* decision from the Southern District |
| 02:14PM | 2 | of New York that held that 2012 criminal sale conviction, the |
| 02:14PM | 3 | 220.39-1, which this defendant was also convicted of, was a |
| 02:14PM | 4 | controlled substance offense. Mr. Bagley notes that that same |
| 02:14PM | 5 | judge later revisits that. So, I don't have -- |
| 02:14PM | 6 | MR. BAGLEY: It's Judge Seibel. |
| 02:14PM | 7 | THE REPORTER: Judge what? |
| 02:14PM | 8 | THE COURT: Seibel. S-E-I-B-E-L I think it is. So, |
| 02:14PM | 9 | you really don't have one? |
| 02:14PM | 10 | MR. MOLISANI: I have not seen something. |
| 02:14PM | 11 | THE COURT: Okay. |
| 02:14PM | 12 | MR. MOLISANI: That's not to say that in the next |
| 02:14PM | 13 | five months, there's won't be another decision. |
| 02:14PM | 14 | THE COURT: This is not an easy case intellectually. |
| 02:14PM | 15 | This is not -- I don't mean to make short of your argument, I |
| 02:15PM | 16 | get it, and it's not easy conceptually for me because, you |
| 02:15PM | 17 | know, you're right. There are considerations that goes both |
| 02:15PM | 18 | ways. Mr. Bagley, anything you want to add? |
| 02:15PM | 19 | MR. BAGLEY: Judge, I did try to think of a way to |
| 02:15PM | 20 | try to simplify why it is that you apply the statute and apply |
| 02:15PM | 21 | the guidelines at the time Mr. Gibson is being sentenced and I |
| 02:15PM | 22 | think that's -- first of all, it's straightforward. That's |
| 02:15PM | 23 | what the law says. That's what the guidelines say. If |
| 02:15PM | 24 | there's any issue with that, then I think you can -- I think |
| 02:15PM | 25 | I've come up with an example that maybe makes it even easier, |

Case 1:19-cr-00026-CLC-CHS Document 45-3 Filed 07/13/20 Page 8 of 13 PageID #: 333
US v GIBSON -- 1/31/20 -- STATUS CONFERENCE

7

02:15PM 1 because I've struggled with it too, Judge. And that is, let's

02:15PM 2 pretend that we're in an ACCA context, all right? So, you're

02:15PM 3 an armed career criminal in this context. For that, as you

02:15PM 4 know, Judge, just to lay the ground work, you need three

02:15PM 5 predicates and then a current gun possession charge.

02:15PM 6 So, let's say somebody in Mr. Gibson's position has a

02:15PM 7 burglary charge, for instance, in 2012, 2013 and 2014. And

02:15PM 8 then, in 2015, Congress says, you know what, burglary is no

02:16PM 9 longer a predicate for purposes of ACCA. And in 2018,

02:16PM 10 Mr. Gibson or somebody in his position possesses a firearm.

02:16PM 11 There's no way that the government would be coming in here and

02:16PM 12 telling you, well, look, Judge. In 2012 and in 2013 and 2014

02:16PM 13 when those burglaries were committed, burglary was a predicate

02:16PM 14 for purposes of ACCA. That simply is kind of preposterous,

02:16PM 15 right?

02:16PM 16 So, that, I feel, it makes clear that you look at the

02:16PM 17 law at the time when the person is being sentenced. So, a

02:16PM 18 person being sentenced in 2018 when burglary is no longer an

02:16PM 19 ACCA predicate, he doesn't have any burglary predicates. He

02:16PM 20 doesn't have any predicates for purposes of ACCA. So, I don't

02:16PM 21 know that that helps, but just another way to think about it.

02:16PM 22 The savings clause, Judge, just quickly, I think that

02:16PM 23 my reading of that would apply in the context where, again, to

02:16PM 24 put it in Mr. Gibson's position, if Mr. Gibson -- for

02:16PM 25 instance, if the Congress changed the laws to make federal

02:16PM 1    bank robbery no longer a crime under federal law, then he

02:17PM 2    couldn't, by virtue of the savings clause come back before you

02:17PM 3    and say, Judge, I'm not guilty of this crime.  They'd have to

02:17PM 4    make it retroactive.  I think that's what the savings clause

02:17PM 5    says.  I don't think it applies here.

02:17PM 6          And then, finally, Judge, I'm not going to belabor

02:17PM 7    those points anymore.  There is this issue of attempt that is

02:17PM 8    still floating out there.  I filed a supplemental brief with

02:17PM 9    your permission arguing that even if the Court were to find

02:17PM 10   the 220.39 is a controlled substance offense for purposes of

02:17PM 11   the career offender guideline, that an attempt to do so would

02:17PM 12   not be.  The government filed a response to that arguing that

02:17PM 13   it's settled law under *Jackson* from 1995 that the application

02:17PM 14   note to the guidelines are authoritative.

02:17PM 15         I just simply ask, Judge, you didn't really set a

02:17PM 16   reply for that.  I realize I probably could have replied, if I

02:18PM 17   wanted to.  I don't think you have to even get there.  I'd ask

02:18PM 18   that if you are going to get there Judge, you give us an

02:18PM 19   opportunity to submit some more briefing on that, because I

02:18PM 20   think it is an open question.

02:18PM 21         THE COURT:  Is that the issue where the DC Circuit

02:18PM 22   and the Sixth Circuit have weighed in in your favor?

02:18PM 23         MR. BAGLEY:  Yes.  I don't know if it's DC.  I know

02:18PM 24   it's Sixth Circuit on bond and I'm not sure the other one off

02:18PM 25   the top of my head.

02:18PM   1          THE COURT:  I think it's DC.

02:18PM   2          MR. MOLISANI:  I believe it's DC.

02:18PM   3          MR. BAGLEY:  So, those courts have weighed in *en*

02:18PM   4  *banc.*  I know for sure the Sixth Circuit, Judge.  The

02:18PM   5  government cites *Jackson*.  That is the summary order that says

02:18PM   6  that it's an open question.  So, there is -- it's not -- those

02:18PM   7  are very murky waters, Judge.  I'd like the time to brief that

02:18PM   8  if you have to get to it.  My position is you don't even have

02:18PM   9  to get there, Judge, because 220.39 under the New York State

02:18PM  10  statute is broader than the federal statute.

02:18PM  11          THE COURT:  Yeah.  I agree with defense.  And I'm not

02:18PM  12  going to get there, not just because I want to dodge a tough

02:19PM  13  issue.  I do think that you're right on this.  I'm going to

02:19PM  14  agree with Judge Caproni and Judge Seibel.  I think that it

02:19PM  15  doesn't qualify because of *Townsend*, because of what the court

02:19PM  16  said in *Townsend*.

02:19PM  17          I understand where you're coming from, Mr. Molisani

02:19PM  18  and I think you've done as good a job as you can making the

02:19PM  19  argument, but I just find based on all the considerations that

02:19PM  20  we're talking about, the rule of lenity and all the

02:19PM  21  considerations that we're talking about, that applying the

02:19PM  22  current law is the way to do it.  So, that's what we're going

02:19PM  23  to do.

02:19PM  24          MR. MOLISANI:  So, hopefully New York does not change

02:19PM  25  and drop Miloxadil.

| 02:19PM | 1 | THE COURT: Let's hope not, by the time of sentencing |
| 02:19PM | 2 | okay. Thank you folks very, very much. |
| 02:19PM | 3 | MR. MOLISANI: Thank you. |
| 02:19PM | 4 | THE COURT: And we'll see you at -- sentencing is |
| 02:19PM | 5 | just a few weeks away? |
| 02:19PM | 6 | MR. BAGLEY: It is, Judge, yes. |
| 02:19PM | 7 | THE COURT: So, we'll see you at sentencing. |
| 02:19PM | 8 | MR. BAGLEY: Judge, there is -- if I could have a |
| 02:19PM | 9 | housekeeping point. So, there was an issue that I believe |
| 02:19PM | 10 | probation resolved for me. I have not submitted a statement |
| 02:20PM | 11 | with respect to sentencing factors yet. It was due a week |
| 02:20PM | 12 | ago. So, I believe that I will have no objections to the |
| 02:20PM | 13 | presentence report because there's -- |
| 02:20PM | 14 | THE COURT: Your time is preserved, if that's what |
| 02:20PM | 15 | you are asking. |
| 02:20PM | 16 | MR. BAGLEY: If I -- Judge, I'm actually more worried |
| 02:20PM | 17 | about complying with the Court's order that I submit the |
| 02:20PM | 18 | statement and if I do have objections, I don't -- I certainly |
| 02:20PM | 19 | would be asking for more time and allowing everyone more time |
| 02:20PM | 20 | to respond to my objections. |
| 02:20PM | 21 | THE COURT: Don't worry about that. Submit a |
| 02:20PM | 22 | statement with respect to sentencing factors when you can |
| 02:20PM | 23 | submit it. If it's clean, if you are not objecting to |
| 02:20PM | 24 | anything, Mr. Molisani is not going to have any problems. And |
| 02:20PM | 25 | if there are some objections, we're going to need more time |

02:20PM   1   and I'll give you more time.

02:20PM   2           MR. BAGLEY:  Thank you.

02:20PM   3           THE COURT:  Okay.  And you have no objection to that?

02:20PM   4           MR. MOLISANI:  No.

02:20PM   5           THE COURT:  Great.  Perfect.  Okay.  Thanks

02:20PM   6   everybody.

          7    (End of proceedings.)

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1                 *    *    *    *    *    *    *

2

3                 I certify that the foregoing is a

4         correct transcription of the proceedings

5         recorded by me in this matter.

6

7

8

9                                 s/ Megan E. Pelka, RPR

10                                Court Reporter,

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit H

20199jaugusf

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------x

3   UNITED STATES OF AMERICA

4
                    v.                    17 CR 753(CS)
5
                                          SENTENCE
6
    JERRY AUGUSTINE,
7
                 Defendant.
8
    ------------------------------------x
9
                                          United States Courthouse
10                                        White Plains, N.Y.
                                          September 19, 2019
11

12

13

14
    Before:   THE HONORABLE CATHY SEIBEL, District Judge
15

16

17                              APPEARANCES
18

19  GEOFFREY S. BERMAN
         United States Attorney for the
20       Southern District of New York
    CELIA COHEN
21       Assistant United States Attorney

22

23  SUSAN WOLFE
         Attorney for Defendant
24

25

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914) 390-4103

20199jaugus

```
 1              THE DEPUTY CLERK:   The Honorable Cathy Seibel
 2   presiding.
 3              United States v. Jerry Augustine.
 4              THE COURT:   Good afternoon, Ms. Cohen and Ms. Wolfe
 5   and Mr. Augustine.
 6              MS. COHEN:   Good afternoon, your Honor.
 7              MS. WOLFE:   Good afternoon, your Honor.
 8              THE DEFENDANT:   Good afternoon.
 9              THE COURT:   Everyone can have a seat.
10              Let me start by putting on the record what I've
11   received in connection with the sentencing so I can be sure I
12   have everything.
13              I have the presentence report dated March 1st.   I
14   have Ms. Wolfe's September 5th letter regarding the career
15   offender guideline.   I have Ms. Wolfe's September 8th
16   sentencing memorandum with attachments.   And I have the
17   government's September 11th letter.
18              Is that everything I should have?
19              MS. COHEN:   Yes, it is, your Honor.
20              MS. WOLFE:   Yes.
21              THE COURT:   All right.
22              Mr. Augustine, have you read the presentence report?
23              THE DEFENDANT:   Yes, ma'am.
24              THE COURT:   Have you gone over it with your lawyer?
25              THE DEFENDANT:   Yes, ma'am.
```

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914) 390-4103

20199jaugus

1          THE COURT:  Ms. Wolfe, you've read the presentence

2     report and gone over it with your client?

3          MS. WOLFE:  Yes, I have.

4          THE COURT:  I know we have guidelines issues to

5     discuss, but do you have any objections to the factual material

6     in the presentence report?

7          MS. WOLFE:  No, your Honor.  Objections that I had

8     and prior counsel had were incorporated into the report and

9     resolved.

10         THE COURT:  All right.

11         Does the government have objections to the factual

12    material in the presentence report?

13         MS. COHEN:  No, your Honor.

14         THE COURT:  Then the findings of fact in the

15    presentence report are my findings of fact.

16         I have given some thought to the career offender

17    guideline.  Does anybody have anything they want to add on that

18    subject that's not covered by the papers?

19         MS. COHEN:  Not from the government, your Honor.

20         MS. WOLFE:  I do, your Honor.

21         I've been steeped in pharmacology for the last couple

22    days, and what I noticed is that the government's position is

23    that naloxogel is a derivative of naloxone, which is excluded

24    by the New York State schedules.  And the actual language of

25    the Public Health Law is that it criminalizes certain drugs and

20199jaugus

1   their compounds, derivatives, salts, et cetera, excluding other

2   drugs and their salts, and it excludes naloxone.  And a salt is

3   a salt.  It is not a derivative.  It is a substance that's

4   added to a drug to increase absorption.  It doesn't change the

5   drug like calcium and calcium carbonate.

6       THE COURT:  So you're saying that the statute

7   includes all these drugs and their derivatives and then the

8   exceptions only exclude certain things and their salts.

9       MS. WOLFE:  Right.

10      THE COURT:  Okay.

11      MS. WOLFE:  I'm saying that because I -- you know, I

12  printed out the Section 3306 to bring and forgot it, but that's

13  what it says.  And I can probably pull it up on my phone if

14  your Honor wanted it.

15      THE COURT:  I believe you.

16      So you're saying that the government can't rely on

17  the argument that -- I want to make sure that I get the names

18  right -- naloxegen -- that naloxegol is a derivative of

19  naloxone because the statute that's carving out naloxone only

20  carves out its salts, not its derivatives.

21      MS. WOLFE:  Yes.

22      THE COURT:  Okay.  Well, the motion raises several

23  interesting issues.  One is whether the instant offense is a

24  controlled substance offense under the meaning of the career

25  offender guideline.  Second is the issue we've just been

20199jaugus

1  discussing, whether there's a difference between the federal

2  and state controlled substances schedules that would render the

3  defendant's prior conviction for criminal sale of a controlled

4  substance third not a controlled substance offense.  And third

5  is whether the defendant's prior for attempted criminal sale of

6  a controlled substance third is not a controlled substance

7  offense because it's only the commentary rather than the

8  guideline itself that includes inchoate offenses.

9       I don't really need to reach the first and third

10  arguments, although I tend to think the government has the

11  better of those, because I think the defendant has the better

12  of the second.  And I will start by saying that I think,

13  without meaning any disrespect to the Second Circuit, that

14  reasonable minds could differ on Townsend and I don't know why

15  our elected representatives aren't doing something to fix what

16  is, to my mind, a kind of ridiculous technicality.  However,

17  they haven't.  It seems like all they have to do -- they could

18  fix this easily, or the Commission could fix this easily, but

19  whatever.

20       Given that we live in this world where Townsend is

21  the law, I am persuaded by defendant's argument that this

22  totally obscure compound, naloxogel, may be criminalized under

23  New York law and is clearly not criminalized under federal law

24  and, therefore, categorically, the one is broader than the

25  other and, under Townsend, the state crime can't constitute a

20199jaugus

```
1    controlled substance offense.
2              Is this silly?  Yes.  Is it the law?  Yes.
3              It seems that even the government is not confident in
4    coming out and saying New York law is clear.  The government
5    says New York law is not clear and, in that event, a tie goes
6    to the defendant.  But I think, based on what Ms. Wolfe just
7    said and on the fact that at least the DEA, when it was
8    excluding naloxogel, seemed to think that it otherwise would be
9    included as a derivative of naloxone and because it's not
10   specifically excluded under state law, the state law is
11   broader.
12             Lucky Mr. Augustine the criminal sale of a controlled
13   substance third degree doesn't count as a prior controlled
14   substance offense and he's not a criminal offender.  Lucky
15   Mr. Augustine the government is not ripping up his plea
16   agreement even though he got a lot of benefits out of it,
17   including that the government didn't file a prior felony
18   information and agreed to other stipulations.
19             So I'm not going to apply the career offender
20   guideline, but even if I were applying it, it would only be a
21   starting point.  So I'm interested in whatever the parties want
22   to add about what the sentence should be.
23             Does the government wish to be heard?
24             MS. COHEN:  Briefly, your Honor.  Thank you.
25             The fact that Mr. Augustine is not technically a
```

# Exhibit I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

        v.                          18 CR 895 (LAK)

ELLIUS RODRIGUEZ,

          Defendant.
                               Sentence

------------------------------x

                               New York, N.Y.
                               September 19, 2019
                               3:05 p.m.

Before:

                HON. LEWIS A. KAPLAN,

                               District Judge

                   APPEARANCES

GEOFFREY S. BERMAN
    United States Attorney for the
    Southern District of New York
BY:  ELINOR LYNN TARLOW
    Assistant United States Attorney

DAVID E. PATTON
    Federal Defenders of New York, Inc.
    Attorney for Defendant
BY:  JONATHAN A. MARVINNY
    DANIEL G. HABIB
    Assistant Federal Defenders

1      (Case called)

2           THE DEPUTY CLERK:  Government, are you ready?

3           MS. TARLOW:  Yes.  Good afternoon, your Honor.  Elinor

4  Tarlow for the government.

5           THE COURT:  Ms. Tarlow.

6           THE DEPUTY CLERK:  Defendants, are you ready?

7           MR. MARVINNY:  Yes, your Honor.  Federal Defenders of

8  New York by Jonathan Marvinny and Daniel Habib for Ellius

9  Rodriguez.

10          THE COURT:  Good afternoon.

11          Mr. Marvinny, have you and your client had the

12  presentence report for the necessary period?

13          MR. MARVINNY:  Yes, your Honor.

14          THE COURT:  Mr. Rodriguez, have you read the

15  presentence report?

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  Did you discuss it fully with

18  Mr. Marvinny?

19          THE DEFENDANT:  Yes, sir.

20          THE COURT:  All right.  The presentence report will be

21  sealed and made available to counsel in the event of an appeal.

22          I understand we have an outstanding guidelines issue.

23          MS. TARLOW:  Yes, your Honor.

24          THE COURT:  I will hear from counsel if they want to

25  add to what they've written.  I'll hear the government first.

1          MS. TARLOW:  Your Honor, we essentially rest on our

2     submission.  Just as a general overview, if your Honor would

3     like to hear with respect to our arguments, the defendant is,

4     in the government's view, a career offender.

5          And the career offender enhancement is applicable to

6     him, both because his instance offense qualifies as a

7     controlled substance offense, as well as his prior 2017

8     conviction.

9          The instant offense, in the government's view,

10     qualifies as a controlled substance offense, both based on the

11     plain meaning of the guidelines, as well as the Second

12     Circuit's interpretation of those guidelines which squarely

13     forecloses, in the government's view, the defendant's position

14     here.

15          With respect to the 2017 conviction, again, the

16     government's view is that the New York state statute does not

17     criminalize more conduct than its federal counterpart.

18          At the time of the defendant's conviction, the state

19     drug schedule included a category of substances that included

20     the particular substance at issue here, naloxegol.

21          There is no evidence that New York state at that time

22     intended to prosecute naloxegol which was not explicitly named

23     but fell within a category of substances that was already

24     excluded.

25          THE COURT:  Thank you.

1            Mr. Marvinny.

2            MR. MARVINNY:  Your Honor, if it's okay with the

3    Court, Mr. Habib would like to address the legal issues.

4            THE COURT:  Okay.

5            MR. HABIB:  Thank you, your Honor.

6            I'm happy to take guidance from the Court --

7            THE COURT:  I'm sorry.  You're happy to do what?

8            MR. HABIB:  I'm happy to take guidance from the Court

9    as to what the Court would be interested to hear about, but I

10   would like to make a few brief points in reply to the

11   government's submission.

12           First, with respect to the 846 conviction, the instant

13   offense, as the Court is aware, two judges in this district,

14   Judge Oetken and Judge Castel, have accepted the defense's

15   position and ruled that 846 offenses are not controlled

16   substance offenses for purposes of the career offender

17   guideline.

18           THE COURT:  What did they do in those decisions with

19   *Jacobs*?

20           MR. HABIB:  Yes.  So, your Honor, in both of those

21   cases, the government cited *Jackson*.  And neither of those

22   judges --

23           THE COURT:  Thank you for correcting me.

24           MR. HABIB:  Not at all.

25           THE COURT:  Especially so tactfully.

 1          MR. HABIB:  Neither of those judges concluded that

 2    *Jackson* was binding.  This is why:  The precise legal question

 3    in *Jackson* was whether the Sentencing Commission has statutory

 4    authority to define a controlled substance offense for purposes

 5    of the career offender guideline to encompass conspiracy

 6    offenses.

 7          I'm reading now from the first page of *Jackson* which

 8    states the question presented:  "Whether the United States

 9    Sentencing Commission exceeded its statutory authority in

10    treating a drug conspiracy conviction as a predicate for

11    sentencing as a career offender."

12          The argument that we are making now accepts, for

13    purposes of sentencing, that the Commission has authority to

14    define controlled substance offenses -- for purposes of

15    sentencing, we accept the holding of *Jackson* that the

16    Commission has statutory authority to define controlled

17    substance offense to include conspiracies.  The question

18    presented today is did they accomplish the objective of

19    including 846 within that term by virtue of the application

20    note that was promulgated.

21          We submit the answer to that question is no because

22    the term "conspiring" in application note 1 must take a generic

23    meaning, and the generic meaning requires an overt act, as 846

24    does not.

25          In addition, I would point out that the precise

1    question that we've presented here was not litigated in *Jackson*

2    and, to my knowledge, has not been litigated in the Circuit or

3    resulted in a published decision in the Circuit.

4         And the circuit has many times said that issues that

5    lurk in the background but aren't contested and are not brought

6    to the Court's attention are not to be regarded as having been

7    decided so as to constitute precedence.

8         THE COURT:  Let me ask you this:  The presentence

9    report says that without regard to career offender, the

10   defendant would be in the criminal history category of IV.

11        Do you dispute that?

12        MR. HABIB:  Actually, your Honor, I'm glad your Honor

13   called that to our attention.  Mr. Marvinny and I earlier

14   caught that that's actually a mistake.

15        Mr. Rodriguez has six criminal history points which,

16   absent the career offender designation, would place him in

17   criminal history category III and would yield a guideline range

18   of 46 to 57 months which would increase to 60 months by virtue

19   of the mandatory minimum.

20        THE COURT:  Let me just take a moment on that.

21        MR. HABIB:  Sure.

22        THE COURT:  What would the adjusted offense level be

23   if you were correct?

24        MR. HABIB:  Without the career offender enhancement,

25   the adjusted offense level would be 21.  In category III, the

1   range would be 46 to 57 months.  But because there is a

2   60-month mandatory minimum, that would be the guideline range,

3   60 months.

4            THE COURT:  Walk me through how you get to that.

5            MR. HABIB:  Sure.  So if your Honor wants to look at

6   paragraph 23 of the PSR, we have a base offense level of 24

7   based on the drug quantity, minus three for acceptance of

8   responsibility, 21.  That's the offense level.

9            THE COURT:  Okay.  Thank you.

10           MR. HABIB:  With respect to the New York offense,

11  again, to my knowledge, two district judges in this Circuit

12  have addressed this question.

13           As the Court is aware, Judge Caproni has accepted the

14  argument that the New York offense of third-degree sale, as

15  incorporated in a different provision of New York law but in

16  substance third-degree sale, is not a controlled substance

17  offense.

18           Judge Koeltl in a case not cited by the parties

19  declined to resolve this question, instead resolving the issue

20  on the basis of the timing question that's pointed out in

21  footnote 7 of the government's submission.  So the point is the

22  only judge in this district who has actually opined on this

23  question has gone our way, and that's Judge Caproni.

24           The argument, your Honor, is straightforward.  Under

25  *Townsend*, the term "controlled substance" in the guidelines

 1    means federally controlled substances.  In the New York statute

 2    encompasses any substance --

 3            THE COURT:  I'm sorry.  Run that sentence past me

 4    again.

 5            MR. HABIB:  I'm sorry.  The holding of the Circuit's

 6    decision in *Townsend* is that the term "controlled substance" in

 7    the guidelines in 4B1.2B means a federally controlled

 8    substance.  So if the state offense criminalizes any substance

 9    that is not federally controlled, the state offense does not

10    count as a career offender predicate.

11            So in *Townsend*, the state statute criminalized the

12    sale of one substance and only one, HCG, which does not appear

13    on the federal schedule.  On that basis, *Townsend* held that the

14    state offense did not qualify as a career offender predicate.

15            Our argument is a direct application of *Townsend*.

16    Here, the New York statute criminalizes the sale of at least

17    one substance, naloxegol, that is not a federally controlled

18    substance.

19            We know this from the plain text of the New York

20    statute, and I'm happy to tell the Court why.  On page 6 of our

21    sentencing submission, you'll find the relevant statutory

22    language.

23            The New York definition of a narcotic drug includes --

24    and I'm paraphrasing.  I'm including ellipses here -- opium and

25    any derivative of opium.  As a matter of chemistry, naloxegol

1  is a derivative of opium.  Therefore, it's encompassed within

2  the New York statutory language.

3        The corresponding federal regulation which appears on

4  the same page just below the New York statutory language is the

5  same, except it expressly excludes naloxegol.

6        It says opium ... and any ... derivative excluding

7  naloxegol.  On a plain statute-to-statute comparison, New York

8  controls one substance that the federal government does not.

9        The government's position --

10  THE COURT:  This is really sort of an exultation of

11  form over substance if ever there was one, isn't it?

12  MR. HABIB:  Your Honor, I think I've often encountered

13  this question.  And the answer is the Circuit resolved this

14  issue -- the Circuit spoke to your Honor's question in *Geneaux*

15  (phonetic), a case from 2017, when it said, the guideline

16  calculation may be technical, but this court's required under

17  *Gall* and under the sentencing statute to correctly calculate

18  the guideline range.

19        If the Court wants to vary from the guideline range,

20  the Court is free to do that based on all of the 3553(a)

21  factors.  But at this step, the Circuit has laid out the

22  methodology in *Townsend*.

23        The methodology is we compare state schedule and

24  federal schedule.  If there is any daylight between the two,

25  the holding of *Townsend* is the state offense cannot qualify as

1    a career offender predicate.

2            Just to address the government's point about naloxone,

3    I think that, with respect, it's not an accurate reading of the

4    New York statute.  The New York statute excludes naloxone.

5            The government says that because naloxegol is a

6    derivative of naloxone, it too is excluded.  But that's simply

7    not what the New York statute says.

8            And we know that the New York statute doesn't have

9    that effect because prior to the amendment of the federal

10   regulation in 2015, the federal regulation had exactly the same

11   wording as the state regulation.

12           It says opium, any derivative of opium, excluding

13   naloxone.  But the DEA concluded that it was necessary to amend

14   the federal regulation to explicitly exclude naloxegol because

15   had it not done so, it would have been encompassed in the

16   language any derivative of opium.  So that's the DEA's

17   judgment, that the language excluding naloxone does not also

18   exclude naloxegol.

19           I would also take a step back here and say I take the

20   Court's point that there is a domain where the rule of lenity

21   applies.  The Circuit said that a few weeks ago in

22   *United States v. Parkins*.

23           In addition, a 1991 Circuit case, *United States v.*

24   *Larenzo* said that the career offender guidelines definition of

25   controlled substance is to be interpreted "strictly" because of

1   the dramatically enhanced penalties it yields.  And the Court

2   can see that here.

3          We're talking about a difference of 60 months as a

4   noncareer offender and 188 to 235 as a career offender, so a

5   more than threefold increase in the guideline range.  For the

6   government to prevail on this issue, it's not enough that

7   they're right.  They have to be unambiguously right.

8          We submit that in light of the plain text of the two

9   statutes, the Circuit's holding in *Townsend* and Judge Caproni's

10  reasoning in *Santana*, the government hasn't shown that its

11  position is unambiguously correct.

12         THE COURT:  Okay.  Thank you.

13         Any final words, Ms. Tarlow?

14         MS. TARLOW:  Yes, your Honor.  With respect to the

15  first argument regarding the 846 conviction, the government's

16  position is that *Jackson* is clearly stating that it does

17  qualify as a controlled substance offense.

18         To quote from the opinion:  "Blackman challenges his

19  sentence as a career offender on the grounds that a prior drug

20  conspiracy conviction cannot be a predicate for career offender

21  status.  We find this argument to be without merit."

22         We have also quoted similar portions of that case for

23  your Honor.

24         With respect to the New York offense --

25         THE COURT:  But your adversary says that's just

1     lurking.

2              MS. TARLOW:  Your Honor, we think it is controlling

3     under Second Circuit law that your Honor should apply here.

4              With respect to the 2017 New York state offense,

5     again, it's our position that based on the plain terms of the

6     drug schedule, naloxegol is included because it is a derivative

7     of a substance that is already excluded.

8              And it is true that after being petitioned by the drug

9     sponsor, the DEA engaged in a rule-making process to explicitly

10    list a new substance that had been developed but which was

11    derived from a substance that had already been listed on the

12    exclusion.

13             The government isn't aware of any evidence that

14    New York state criminalizes conduct based on the substance

15    which, as your Honor is aware, is a substance used for

16    individuals who are constipated after taking opioids.

17             There is no evidence that this substance is one that

18    would be prosecuted by the state.  In fact, in the rule-making

19    process, the DEA noted that based on several databases

20    collecting both federal and state reports, there have been no

21    seizures of this substance.  And the defense has not cited to

22    any case showing any evidence that the substance would be

23    prosecuted.

24             As the government noted in its sentencing submission,

25    the Second Circuit and Supreme Court have expressly cautioned

1    against courts attempting to use legal imagination to figure

2    out when a state statute might be applied.

3          And here, there is no evidence that there is a

4    realistic probability or even a theoretical probability that

5    the state would criminalize conduct involving this substance.

6          So, your Honor, for those reasons, we would submit

7    that both the instant offense and the 2017 conviction are

8    controlled substances offenses under the guidelines.

9          THE COURT:  Okay.  Thank you.

10         MR. HABIB:  Your Honor, I apologize.  May I just say

11   one sentence for my record?

12         THE COURT:  One sentence.

13         MR. HABIB:  The realistic probability inquiry in this

14   case is satisfied by the language of the state statute under

15   the Second Circuit's decision in *Hilton v. Sessions* which says

16   that if the statute itself criminalizes the conduct, a case

17   isn't necessary to demonstrate a realistic probability of

18   prosecution.  Thank you.

19         THE COURT:  Thank you.

20         Now, a couple of other details before we go on.

21         Is there any forfeiture request here?

22         MS. TARLOW:  No, your Honor.

23         THE COURT:  I still haven't accepted the plea yet.

24         Mr. Rodriguez, I'm reading the transcript of the plea.

25   I don't think the magistrate judge informed you of your right

1    to have counsel not only at trial but at every critical stage

2    of the proceedings.

3              Do you understand that you would have such a right?

4              THE DEFENDANT:  Yes, I do, your Honor.

5              THE COURT:  Do you want to withdraw your plea in light

6    of the fact that you weren't so advised earlier?

7              THE DEFENDANT:  No.

8              THE COURT:  Okay.  I accept the plea.

9         I am persuaded by the government's argument with

10   respect to the guidelines issues substantially for the reasons

11   set forth in the government's letter and in Ms. Tarlow's

12   argument.  So I adopt the presentence report and the guideline

13   computation and range it contains.

14        I think it is entirely possible as we go along here

15   that this ruling may turn out not to be material to the

16   sentence.  But in the interests of good order, I make the

17   ruling.

18        Okay.  That said, let me advise everyone that I've

19   received Mr. Marvinny's submission of September 5, the

20   government's letter of September 16, the presentence report,

21   and I believe nothing else in relation to the sentencing.

22        Is there anything I've omitted?

23        MS. TARLOW:  Not from the government.

24        MR. MARVINNY:  No, your Honor.

25        THE COURT:  Okay.  Fine.  Then I will hear counsel for

 1    the defendant.

 2              MR. MARVINNY:  Thank you, your Honor.

 3              Notwithstanding the Court's ruling on the guidelines

 4    issues, we continue to request that the Court impose a sentence

 5    at the mandatory minimum of 60 months.

 6              That is the sentence that the Court imposed on a

 7    codefendant in this case, Timothy Young, who we submit,

 8    your Honor, is essentially identically situated to

 9    Mr. Rodriguez, except for obviously the Court has now concluded

10    that they have different guideline ranges.

11              Mr. Young was not a career offender, in part, because

12    Mr. Young's two prior felony offenses included the criminal

13    sale/conviction at issue in *U.S. v. Townsend* which was

14    referenced earlier, but Mr. Young essentially had two prior

15    felony drug convictions just like Mr. Rodriguez.

16              They are held responsible for the exact same

17    quantities of drugs in the presentence report.  And in fact,

18    were Mr. Rodriguez not a career offender, his otherwise

19    applicable guideline range would be lower than Mr. Young's.

20              As we set forth at the outset, his otherwise

21    applicable range would be offense level 21, criminal history

22    category III, which would be a guidelines range of 46 to 57

23    months.

24              So we don't think there is any reason, your Honor, any

25    real, valid reason, to impose any kind of sentencing disparity

1      between Mr. Rodriguez and Mr. Young.

2              In addition, your Honor --

3              THE COURT:  Was Mr. Young involved in coordinating

4      drug sales from a jail cell?

5              MR. MARVINNY:  I believe he was, your Honor.  If he

6      was not involved in coordinating drug sales, he was

7      nevertheless intimately involved in the ongoing conspiracy.

8              The government in their submission in opposition to

9      Mr. Young stated -- and I quote -- "Even once he was

10     incarcerated in June 2018, he continued to discuss the instant

11     narcotics conspiracy and its operation while serving his term

12     of imprisonment on his two prior felony convictions.

13             So he remained involved, your Honor.  I'm not here to

14     bag on Mr. Young.  Mr. Young had his equities.  I know,

15     your Honor, he continued to receive money, some of the profits,

16     from the drug conspiracy that was sent to him while he was on

17     Rikers Island.

18             He was out for at least some portion of the charged

19     conspiracy, albeit not a terribly long period.  But for some

20     period, he was out before he went into Rikers Island.  And he

21     continued to have detailed discussions with the coconspirators,

22     including Mr. Rodriguez and Ms. Patterson.  There is certainly

23     no evidence that he intended to leave the conspiracy behind

24     once he was released from Rikers Island.

25             So I don't think Mr. Young should be rewarded that he

1    went to prison and was unable to actually conduct the

2    hand-to-hand sales during that short period of time.  So,

3    again, the weights that they are assigned in the PSR are

4    identical.  Neither of them had a leadership role vis-à-vis the

5    other.

6            So, again, your Honor, while I'm not here to denounce

7    Mr. Young, I'm here to say that there is no real reason why

8    Mr. Rodriguez should get any longer sentence, certainly not a

9    significantly longer sentence.

10           The probation office, as your Honor knows, recommended

11   78 months.  That recommendation was based, at least in part, on

12   a misapprehension of the otherwise applicable guidelines range

13   which they believed was topped off at 71 months.

14           I think it's fair to conclude that if they had

15   believed that the otherwise applicable range was in fact 60

16   months as it is, they might have had an even lower sentencing

17   recommendation.  But certainly the probation office recognized

18   that a sentence nowhere near the career offender range was

19   appropriate for Mr. Rodriguez.

20           Your Honor, Mr. Rodriguez served on his two prior

21   felony drug offenses one year and six months respectively.  And

22   so we say this in our submission.  Even a five-year sentence

23   here would be five times longer than any previous prison term

24   he served and would certainly satisfy the principle of

25   incremental punishment and would certainly be a lengthy

1    sentence when compared to Mr. Rodriguez's prior offenses.

2          And that matters for several reasons:  It matters

3    because, again, the simple fact is it is an exponentially

4    longer sentencing than he's ever served, and it matters for the

5    deterrent effect that it will have on Mr. Rodriguez.

6          We talk a lot in our submission about how his federal

7    case has been a wake-up call, and it really has been,

8    your Honor.  Mr. Rodriguez wrote a letter to the Court.  Not

9    one word was edited by counsel.  Not one word was suggested by

10   counsel.

11         I think that letter demonstrates his intelligence and

12   his developing emotional maturity.  What I think is most

13   significant about that letter, your Honor, is Mr. Rodriguez

14   articulated that he understands the real harm he was causing to

15   his community by selling drugs.

16         This isn't someone who is simply upset that he got

17   caught.  This is someone who has come to realize that the

18   conduct he was engaging in was harmful, both to him and to his

19   community.  And so I think his letter speaks volumes about his

20   capability to turn his life around upon his release from

21   federal prison.

22         Mr. Rodriguez is not going to be eligible for any of

23   the additional reductions that came about because of the First

24   Step Act that other defendants in his situation might be

25   eligible for.  That's because his offense involved fentanyl,

1    and the First Step Act precludes additional sentencing

2    reductions in cases involving fentanyl.  So Mr. Rodriguez is

3    likely to serve 85/86 percent of his sentence.

4             Although I will say we have asked your Honor to

5    recommend the RDAP program, which if he were to successfully

6    complete, might result in some additional time off.

7             But a five-year sentence is a lengthy one, and it's a

8    serious one, your Honor.  Mr. Rodriguez is remorseful.  He

9    knows what he did was wrong.  He has a three-year-old daughter

10   at home that he is missing out on watching her grow up.  It's

11   his own fault.  It's his own actions that resulted from that,

12   but it is nevertheless something that is tearing him apart.

13            I could go on, your Honor, but for all of the reasons,

14   most significantly because a codefendant, who for all practical

15   purposes who is identically situated got 60 months,

16   Mr. Rodriguez should get that sentence as well, your Honor.

17            THE COURT:  Thank you.

18            Mr. Rodriguez, you have the right to speak.

19            Is there anything you want to say?

20            THE DEFENDANT:  Yes.  Can I please stand?

21            THE COURT:  Yes.  Sure.

22            THE DEFENDANT:  I would like to first apologize to

23   you, your Honor, for even wasting your time with this case,

24   although it is a very serious case, and I really do

25   understand -- I tell you this from my mouth to your ears.  I

1    understand the role and the harm that I've caused other

2    peoples' families, society, and my community.

3          This case and this charge and this whole situation is

4    a wake-up call.  You can give me 188.  You can give me 60.

5    Whatever you give me, I understand, and I'm up.  I'm awake.  I

6    know what I did was wrong.

7          I'm not making any excuses, and it is tearing me apart

8    that I'm not going to be part of my daughter's life, but I do

9    accept the fact that I took that risk and I took that

10   responsibility.  I have to accept that, that I took that risk

11   and I took that chance and I messed that up.  And I accept

12   that.

13         And I just want you to know that I'm sorry to you; to

14   my community; and most of all, my family and my child's mother

15   for leaving you alone to take care of our daughter by yourself.

16         Like I say, I'm remorseful, and I'm just sorry.  I

17   accept whatever you give me, period, that's it.  Thank you,

18   your Honor.

19         THE COURT:  Thank you.

20         Ms. Tarlow.

21         MS. TARLOW:  Yes, your Honor.  First we acknowledge,

22   of course, the defendant's family circumstances, the fact that

23   he has a young child, his own age.  We don't have too much more

24   to say other than what's set forth in our submissions.

25         I won't belabor the point, just to note for your Honor

 1   that this is an incredibly serious offense.  It involved a very

 2   dangerous substance, fentanyl, and a significant quantity.

 3          THE COURT:  Do you have any evidence that he knew

 4   there was fentanyl or anything that was that dangerous in the

 5   material?

 6          MS. TARLOW:  Your Honor, not necessarily specifically

 7   fentanyl.  But as we noted in our submission, the defendant in

 8   his conversations with the undercover officer actually bragged

 9   about the substance he was selling and described it as "some

10   death" to reflect --

11          THE COURT:  Excuse me.  Sudden death?

12          MS. TARLOW:  "Some death," your Honor, to describe the

13   potency, as if that were an attractive feature of just how

14   strong those drugs were.

15          THE COURT:  Not literally; right?

16          MS. TARLOW:  Your Honor, it is our understanding that

17   it was intended to refer to the literal strength, and that is a

18   way in which certain drugs are actually marketed is the fact

19   that they are incredibly strong.  So that is a selling point to

20   some individuals who purchase the drugs is that those drugs are

21   stronger than other drugs.

22          THE COURT:  Sure.  But that doesn't necessarily

23   mean -- and indeed it would not be a thing of marketing value

24   if it alluded to death in the normal sense.

25          MS. TARLOW:  To actual death, yes, your Honor.  But it

1   is our position that it --

2          THE COURT:  Only a certain limited subset of the

3   population.

4          MS. TARLOW:  Yes, your Honor.  It still is our

5   position that it refers to the relative strength and that it

6   shows that the defendant was aware that these were particularly

7   strong drugs.

8          That's also further evidenced by the fact that we have

9   recordings and other evidence that demonstrate that the

10  defendant was aware that a particular individual overdosed on

11  the substances that were provided to them; that the defendant

12  himself engaged in a transaction to a particular victim who

13  overdosed on those substances outside of his home.

14         And we know that, at least in part, from this jail

15  call recording in which Mr. Rodriguez's codefendant discussed

16  that occurring and discussed the fact that Mr. Rodriguez had

17  provided that information, had communicated that an individual

18  had overdosed after a transaction.

19         Your Honor, the defendant, Mr. Rodriguez, continued to

20  sell those substances to the undercover officers in this case

21  after an individual overdosed.  So we would submit that based

22  on all of those facts, he was aware of the potency of the drugs

23  that he was selling and he continued to distribute them.

24         THE COURT:  Okay.

25         Anything else?

1          MS. TARLOW:  Your Honor, just briefly with respect to

2     his criminal history, as we outlined in our submission, the

3     defendant does seem to have a repeated criminal history of

4     selling drugs, including heroin.  So that gives the government

5     some concern that a significant sentence is necessary in order

6     to deter the defendant from returning to this similar conduct.

7          THE COURT:  Okay.  Thank you.

8          Mr. Rodriguez, please stand for the imposition of

9     sentence.

10          It is the judgment of this Court that you be committed

11     to the custody of the Attorney General of the United States or

12     his designee for a term of imprisonment of 78 months, that you

13     thereafter serve a term of supervised release of four years,

14     and that you pay the mandatory special assessment of $100.

15          The term of supervised release shall be subject to the

16     mandatory and the standard conditions of supervision 1 through

17     12 in addition to the following special conditions:

18          First, you shall participate in an outpatient

19     substance abuse program approved by the U.S. Probation Office

20     which may include testing to determine whether you have

21     reverted to using drugs or alcohol.

22          I authorize the release of available drug treatment

23     evaluations and reports to the substance abuse treatment

24     provider as approved by the probation officer.

25          Second, you shall submit your person, vehicle, and

1    premises under your control to a search at a reasonable time

2    and in a reasonable manner on the basis that the probation

3    officer has reasonable belief that contraband or evidence of a

4    violation of the conditions of your release may be found.

5          The mandatory drug testing condition is suspended.  I

6    find that the conditions of supervised release contemplate drug

7    testing and that the mandatory drug testing condition isn't

8    necessary.

9          Now, this is a sentence substantially below the

10   guideline range, given my ruling.  It is a sentence above the

11   top of the bottom of the guideline range if my ruling were

12   incorrect on career offender.  It's a difficult case.  I think

13   the ruling ultimately though is not material.  I would impose

14   the same sentence with or without the career offender

15   enhancement.

16         First of all, there is considerable, if not perfect,

17   comparability between the defendant's behavior and Mr. Young.

18   So something well below the career offender guidelines range is

19   supported by the need to avoid unwarranted disparities.

20         Secondly, I take into account Mr. Rodriguez's family

21   circumstances.  He has a young child at home who he seems to be

22   devoted to, at least I hope that he is.

23         Thirdly, I think, given the defendant's record, the

24   188- to 235-month guideline range is simply higher than it

25   needs to be in order to accomplish the purposes of the

1    Sentencing Reform Act.  I think the sentence is about in the

2    right place with or without that career offender adjustment,

3    and I've done my best to accomplish that.

4         I advise you, Mr. Rodriguez, that to whatever extent

5    you haven't waived it, you have the right to appeal from the

6    judgment imposed in this sentence.

7         If you wish to appeal, you must file a written notice

8    of appeal with the clerk of the district court no later than 14

9    days after judgment is entered which could conceivably be as

10   early as today.

11        In the event you wish to appeal and you can't afford

12   to pay the fees necessary to do so, you have the right to apply

13   for permission to appeal as a poor person.  If that application

14   were granted, you would be permitted to appeal without payment

15   of the fees.  And if you can't afford a lawyer, a lawyer would

16   be appointed for you at government expense.

17        You may be seated.

18        Anything else, folks?

19        MS. TARLOW:  Your Honor, in an abundance of caution,

20   the government moves to dismiss any open counts.

21        THE COURT:  Granted.

22        MR. MARVINNY:  Your Honor, two requests, please.

23   Mr. Rodriguez has asked that your Honor recommend the

24   residential drug abuse prevention program, the RDAP program,

25   within the Bureau of Prisons.

1            THE COURT:  Did I do so in the *Young* case?

2            MR. MARVINNY:  You did.

3            THE COURT:  So recommended.

4            MR. MARVINNY:  Thank you.

5            Second, your Honor, Mr. Rodriguez has asked that you

6    recommend that he be designated as close to New York City or

7    New Jersey as possible to facilitate family visits.  His family

8    lives in Staten Island.  So those two locations are easiest.

9            THE COURT:  So recommended.

10            I hope you got the message this time, Mr. Rodriguez.

11    You're well on your way to wrecking your life.  And if you

12    don't turn it around, that's what's going to happen because

13    you'll be back if you don't.  So I wish you success in turning

14    it around.

15            Okay, folks.

16            (Adjourned)

17

18

19

20

21

22

23

24

25

# Exhibit J

IbjWferS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        17 Cr. 773 (JGK)

5   GREGORY FERRER,

6

7              Defendant.               Sentence

8   ------------------------------x
                                        New York, N.Y.
9                                       November 16, 2018
                                        2:30 p.m.
10

11  Before:

12
                    HON. JOHN G. KOELTL,
13
                                        District Judge
14
                         APPEARANCES
15

    GEOFFREY S. BERMAN
16       United States Attorney for the
         Southern District of New York
17  BY:  NI QIAN
         CECILIA E. VOGEL
18       Assistant United States Attorneys

19

    DAVID E. PATTON
20       Federal Defenders of New York, Inc.
         Attorney for Defendant
21  BY:  MARTIN S. COHEN
         DANIEL G. HABIB
22       Assistant Federal Defenders

23

24

25

IbjWferS

1          (Case called)

2          THE COURT:  Good afternoon, all.  Please be seated.

3          MS. QIAN:  Good afternoon, your Honor.  Ni Qian and

4    Cecilia Vogel, for the government.

5          MR. COHEN:  Good afternoon, your Honor.

6          THE COURT:  I'm sorry.  I thought Ms. Vogel would note

7    her appearance.

8          MS. VOGEL:  Oh.  Ms. Qian did note my appearance for

9    me.  Thank you, your Honor.

10          THE COURT:  OK.

11          MR. COHEN:  Good afternoon, your Honor.  Martin Cohen

12   and Daniel Habib, from the Federal Defenders, on behalf of

13   Gregory Ferrer.

14          THE COURT:  Good afternoon.  I note that the defendant

15   is present.

16          I've received the presentence report prepared May 7,

17   2018, revised June 5, 2018, together with the sentencing

18   recommendation and the addendum.  I've received the defense

19   submissions, dated September 17, October 5, October 16, and

20   another one on October 16.  I've received government

21   submissions dated October 11 and October 17, 2018.

22          I'll listen to all of the parties, as I regularly do,

23   checking to make sure that they've reviewed the presentence

24   report, the recommendation and the addendum, and that defense

25   counsel has discussed them with the defendant.

1            Before I do that, because there has been briefing and

2     argument over the correct application of the guidelines in this

3     case, I'm going to begin with an explanation of my conclusions

4     with respect to the guidelines sentencing range.  It certainly

5     doesn't prevent the parties from raising any issues with

6     respect to that, after I've explained my conclusions.  And of

7     course, even after I've determined the appropriate guidelines

8     sentencing range, I'm going to listen to all of the parties

9     before I determine what the appropriate sentence is in the

10    case, because the guidelines sentencing range is only a

11    starting point for a determination of the appropriate sentence

12    in the case.

13            There is a dispute between the parties as to the

14    proper calculation of the guidelines sentencing range.  The

15    government contends that the base offense level is 24, under

16    guideline Section 2K2.1(a)(2) and 4B1.2(b) of the current

17    guidelines because the defendant committed the current offense

18    subsequent to sustaining at least two felony convictions of a

19    "controlled substance offense."

20            I should note that the current version of the

21    guidelines should be used, which is the November 2018 version,

22    unless there is an *ex post facto* problem.  The parties have not

23    suggested that there is any difference among the possible

24    versions of the guidelines on the relevant issues.

25            The government points to at least two New York State

IbjWferS

felony convictions in 2008 as felony convictions of a
"controlled substance offense," two counts of criminal sale of
a controlled substance on school grounds and one conviction for
third degree sale of a controlled substance, presentence report
paragraphs 32, 33 and 35.  The government, therefore, agrees
with the presentence report that the total offense level is 21,
after subtracting three levels for acceptance of
responsibility, the criminal history category is 6 and the
guidelines sentencing range is 77 to 96 months.

        The defendant contends that offense level 24 is not
warranted because the defendant's prior convictions under New
York State law are not "controlled substance offenses" under
the categorical approach to the definition of "controlled
substance offense," and therefore, the appropriate guideline is
14, under 2K2.1(a)(6), and after a two-level credit for
acceptance of responsibility, the offense level is 12, the
criminal history category is VI and the guidelines sentencing
range is 30 to 37 months.

        The parties agree that the Court should look to the
definition of a controlled substance offense under New York
State law in 2008, the time of conviction, but the agreement
ends there.  The defendant says that the Court should determine
whether the definition of controlled substance offense under
New York State law in 2008 is broader than the definition of a
controlled substance offense under federal law today.  Because

IbjWferS

New York State law, in 2008, covered three substances --

geometric isomers of 3-methylfentanyl, naloxegol and

naldemedine -- that are not covered by the federal Controlled

Substance Act today, the defendant argues that the state law is

broader than the federal law, and therefore, a conviction for

those offenses under state law is not a controlled substance

offense under the controlling federal statute.

        The government argues that the state and federal

statutes must be compared at the time of conviction for the

state law offense, and in 2008, all three of the substances

relied on by the government -- I'm sorry.  Let me say that

again.

        The government argues that the state and federal

statutes must be compared at the time of conviction for the

state law offense, and in 2008, all three of the substances

relied on by the defendant were, in fact, controlled under

federal law.  The government argues, therefore, that the state

law was no broader than the federal law, and therefore, the

state law convictions qualified as controlled substance

offenses under the guidelines.

        In *United States v. Townsend*, 897 F.3d 66 (2d Cir.

2018), the Second Circuit Court of Appeals instructed that the

categorical approach is employed when determining whether the

defendant has committed prior controlled substance offenses, as

defined in Section 4B1.2(b) of the federal sentencing

IbjWferS

guidelines for purposes of setting a base offense level under
guideline 2K2.1A.  Thus, under *Townsend*, the Court is to
compare New York State's definition of "narcotic drug" with the
federal definition of "controlled substance," set out in the
Controlled Substances Act.  If the New York State definition is
broader than the federal definition -- that is, if the New York
State definition contains substances that the federal
definition does not -- then the state statutes of conviction do
not match the federal crimes, and guidelines Section
2K2.1(a)(2) cannot apply.

        In *Townsend*, the court looked to the New York State
statute at the time of conviction and found that it was broader
than the federal statute because it covered HCG, a substance
not covered by the federal Controlled Substances Act.
Therefore, a violation of the state statute did not qualify as
a "controlled substance offense" under the federal sentencing
guidelines.  However, while *Townsend* looked at the state
statute at the time of conviction, the court did not attempt to
explain whether there was any relevant difference in the
federal statute at the time of conviction for the controlled
substance offense and at the time of sentencing for the federal
offense.  That is the matching issue that is raised in this
case.

        The parties agree that the state and federal
definitions matched in 2008, when Mr. Ferrer was convicted of

IbjWferS

1    the state offenses, but the defendant points out that now, at

2    the time of Mr. Ferrer's sentencing, the New York State

3    definition contains three substances not in the federal

4    definition and, thus, is broader than the federal definition.

5    Whether Section 2K2.1(a)(2) applies to Mr. Ferrer, therefore,

6    depends on whether the state definition of a "narcotic drug" is

7    matched against the version of the federal statute that existed

8    at the time of conviction for the state offense, or whether it

9    must be matched against the current version of the federal

10   statute.

11        The defendant argues that because 18 U.S.C. Section

12   3553(a)(4)(A)(ii) and guideline 1B1.11(a) direct the Court to

13   apply the version of the guidelines manual in effect at the

14   time the defendant is sentenced, the Court must use the current

15   federal definition of controlled substance offense to see if it

16   matches the definition of "narcotic drug" that existed in New

17   York State law in 2008.  But there is nothing in the statute or

18   the guidelines that supports the defendant's argument.

19        The current version of the guidelines is being used,

20   and it provides for an offense level of 24 if the defendant is

21   convicted of being a felon in possession of a firearm after

22   having previously been convicted of two controlled substance

23   offenses.  There is nothing in the guidelines that suggests

24   that the Court should look at the New York State statute at the

25   time of the prior convictions and match it against the federal

IbjWferS

1   definition of controlled substances offenses.  Indeed, the

2   defendant's argument is inconsistent, because *Townsend* requires

3   the Court to look back at the New York State law at the time of

4   the prior controlled substance offense convictions, and there

5   is no explanation why the guidelines require the Court to look

6   back to the time of the prior convictions for the definition of

7   a narcotic offense under the state law and ignore the federal

8   law at the time to which it is being matched.

9           There is no case directly on point that is cited by

10  the parties.  The prior cases from the Court of Appeals, such

11  as *Pascual v. Holder*, 707 F.3d 403, 405 (2d Cir. 2013), found

12  that violations of the New York State statutes were controlled

13  substance offenses, but they did not deal with this specific

14  matching issue.  The closest case, and one which is persuasive,

15  is *Doe v. Sessions*, 886 F.3d 203 (2d Cir. 2018).  In that case,

16  the Second Circuit Court of Appeals held that for purposes of

17  determining whether a prior federal conviction was a controlled

18  substance offense that required removal under the Immigration

19  and Nationality Act, courts must look to the version of the

20  Controlled Substances Act in effect at the time of the

21  defendant's conviction.

22          In that case, the petitioner argued that in employing

23  the categorical approach, the court should determine whether

24  the offense of conviction matched the violation of the

25  Controlled Substances Act at the time of removal.  Because the

IbjWferS

1  Controlled Substances Act at the time of conviction covered

2  naloxegol, which was no longer covered by the Controlled

3  Substances Act at the time of removal, the petitioner argued

4  that the statute was broader at the time of conviction and

5  therefore was not a controlled offense at the time of removal.

6  In other words, the petitioner was arguing for the same

7  mismatch advocated by the defendant here.

8          The Court of Appeals rejected that proposition.  As

9  the court explained, "in employing the categorical approach to

10  determine whether state drug offenses constitute felonies

11  punishable under the Controlled Substances Act, the Supreme

12  Court, this court, and the BIA had previously assumed that an

13  alien's removability depends on whether a state drug schedule

14  sweeps more broadly than the Controlled Substances Act

15  schedules in force at the time of the alien's conviction, and

16  not at the time that his removal proceedings are initiated."

17  *Id.* at 208.  There is no reason why this holding should not be

18  applied in this case.  Substances are constantly added and

19  removed from the Controlled Substances Act.  When guidelines

20  Section 2K2.1(a)(2) applies to the defendant should not be

21  based on the fortuity of when the defendant is sentenced.

22          Moreover, applying the version of the state and

23  federal drug definitions in effect at the time of conviction

24  for the underlying state offense allows both the government and

25  the defendant to anticipate the sentencing consequences

IbjWferS

1    attached to a conviction.  While the defendant points out that

2    *Doe* is an immigration case and not an interpretation of the

3    guidelines, the categorical approach that was at issue in *Doe*

4    is the same categorical approach that is used across cases

5    dealing with immigration, the criminal code and the guidelines.

6    *Doe* and *Townsend* indicate that the Court must apply the New

7    York State definition of narcotic drug and the analogous

8    federal definition in the Controlled Substances Act in effect

9    at the time of Mr. Ferrer's 2008 convictions.

10          The parties do not dispute that these definitions are

11   a categorical match at that time.  Because the New York State

12   definition does not sweep more broadly than the federal

13   definition, the base offense level is 24, set out in Section

14   2K2.1(a)(2) of the guidelines, and applies to Mr. Ferrer.

15   Therefore, the offense level is 21, after a three-level

16   reduction for acceptance of responsibility, the criminal

17   history category is VI and the guidelines sentencing range is

18   77 to 96 months.

19          All right.

20          Yes, Mr. Cohen.

21          MR. COHEN:  Could I just have one moment, your Honor?

22          THE COURT:  Sure.

23          MR. COHEN:  Thank you, your Honor.

24          I just want to reiterate our objection as set forth in

25   our prior briefings and argument.  Thank you.

IbjWferS

| | |
|---|---|
| 1 | THE COURT:  I'm sorry.  Your prior briefing and? |
| 2 | MR. COHEN:  And the argument from last month to |
| 3 | preserve it. |
| 4 | THE COURT:  Oh, sure. |
| 5 | MR. COHEN:  Thank you, your Honor. |
| 6 | THE COURT:  Moving on to the next step, as I said, |
| 7 | Mr. Cohen, have you reviewed the presentence report, the |
| 8 | recommendation and the addendum and discussed them with |
| 9 | defendant? |
| 10 | MR. COHEN:  I have, your Honor.  We reviewed the |
| 11 | report with Mr. Ferrer.  We have no objections. |
| 12 | THE COURT:  No. |
| 13 | MR. COHEN:  Sorry. |
| 14 | THE COURT:  My next question is other than the |
| 15 | objection which you've already noted, do you have any |
| 16 | objections? |
| 17 | MR. COHEN:  No, your Honor. |
| 18 | THE COURT:  OK.  Now I'll listen to you for anything |
| 19 | that you would like to tell me in connection with sentence, any |
| 20 | statement you'd like to make on behalf of the defendant, |
| 21 | anything at all you would like to tell me. |
| 22 | MR. COHEN:  Thank you very much, your Honor. |
| 23 | I wanted to start by letting the Court know that |
| 24 | Mr. Ferrer's mother, Rosita Ferrer, is here today.  She's been |
| 25 | at every court appearance and has written to the Court and is |

IbjWferS

1    here to show her support.  It's also emblematic of the support

2    Mr. Ferrer has from his family and will have when he is

3    released.

4            Nothing in my remarks today, your Honor, or in any of

5    our submissions should be taken by the Court as an argument

6    that possessing a gun after having a prior felony conviction is

7    not a serious offense, regardless of whether the gun was loaded

8    or not.  In this case, it was unloaded, and I can represent to

9    the Court there's nothing in our papers about it, but there's a

10   videotape of Mr. Ferrer at the time, for the 15 minutes or so

11   before he was arrested and after, and there's nothing in his

12   conduct, beyond the fact that he had a gun in his pocket, that

13   suggests that he was doing anything or had any intention of

14   doing anything beyond standing outside of a store.

15           But regardless of the seriousness of the offense and

16   Mr. Ferrer's significant prior criminal history, 30 months is

17   sufficient in this case, for reasons that I've described in my

18   submission and I will argue this afternoon.

19           As we described in our letter to the Court, Mr. Ferrer

20   grew up in a very difficult neighborhood.  His father was

21   absent from his life.  His mother, Mrs. Ferrer, worked to

22   support everyone, and so she wasn't around that much.  She's

23   worked for the last, I think, 30 years for the city.

24           Your Honor, I don't want to belabor the point too

25   much, but there is an element that the Court should consider in

IbjWferS

terms of our societal failure in connection with Mr. Ferrer and
other folks.  I've been doing this for ten years, and I've done
a significant number of sentences for people who are charged
with possessing a gun after having a prior felony conviction,
and I know the Court has sentenced many of those, not just
mine, but other folks' for that offense.  The sad fact is that
if you look back at all of my sentencing submissions, as I
have, and you look at the biographical data for the folks who
are before the Court for that offense, they are depressingly
similar.  They are largely African-American young men, growing
up in very rough neighborhoods, whose fathers are not around.
There were very few opportunities for folks like Mr. Ferrer
when he was growing up.  The schools that they attended were
not well-set up to attend to their needs, and when they got
involved in the criminal justice system, the criminal justice
system wasn't there for them either.

       Mr. Ferrer, like many other folks, ended up spending
some time at Rikers Island.  The U.S. Attorney's Office in the
Southern District of New York joined a lawsuit against Rikers
Island, deploring the conditions there, the heavy use of
solitary confinement, the violence that's inherent there, and
it does nothing -- the way Mr. Ferrer and others were
treated -- to help them with settling into society and moving
forward.

       It doesn't mean, of course, that Mr. Ferrer isn't

IbjWferS

1    responsible for his conduct or his prior offenses of being

2    before the Court, but there is some element that the Court

3    should consider in terms of this vast failure on our part,

4    society's part, to help Mr. Ferrer and other folks like him,

5    and whether our response at this point, when Mr. Ferrer is 30

6    and back here before the Court, is a very extensive term of

7    incarceration for this offense, and whether there's an

8    alternative here that the Court should endorse, which is a

9    significant sentence; 30 months in prison is not insignificant.

10   It's longer than the longest sentence Mr. Ferrer has ever

11   served before, but it would allow Mr. Ferrer to come out in a

12   reasonable amount of time so that he can move forward with his

13   life.

14          We've described for the Court Mr. Ferrer's family now.

15   The Court has letters from his mom and from his sister,

16   describing what Mr. Ferrer was doing in the year before this

17   arrest: that he had stopped being involved in selling drugs;

18   that he had participated in a vocational program, the CEO

19   program, which he completed; that he got his OSHA certificate;

20   that he found work as a dishwasher; that he was an important

21   figure for his nephew; that he loves animals, cares for, has a

22   lot to teach his nephew and help him as he grows further.

23          And now, in addition to that, after the last year that

24   Mr. Ferrer's been in the MCC, he's been working with our office

25   to develop a plan for when he comes out.  We provided that to

IbjWferS

1    the Court.  He's intent on picking up where he left off and

2    going back to work.  The program that we have identified will

3    provide him with housing and vocational services, and we're

4    urging the Court not to delay that reentry by anything close to

5    the extensive guidelines that are called for under the

6    guidelines, as the Court has found them.

7          Two and a half years in a federal prison is a very

8    significant sentence.  We described for the Court what

9    Mr. Ferrer's individual experience has been like at the MCC.

10   There are mice, bugs, overcrowdedness -- if that's a word --

11   very few positive programs.  Mr. Ferrer had to wait nine months

12   or so before he could start working, and now he's working in

13   the kitchen.  It's good that he's working, but there, as in

14   when he's designated if he's lucky enough to get a job, he gets

15   paid 12 cents an hour.  That equates to $19.20 a month for 160

16   hours of work.

17         The Court can and should take into account the

18   punitive nature of confinement these days in the BOP.  The

19   government, when it advocates for a guidelines-range sentence

20   of whatever length it is, never alters its position based on

21   the facilities or the state of confinement.  But as the Court

22   well knows, positive programming, rehabilitative programming,

23   assisting with reentry in the future are not hallmarks of

24   federal custody these days.  The Department of Justice's

25   priority is on incarcerating and not on rehabilitating folks.

IbjWferS

1   Maybe that will change a little bit in the future, but it's

2   hard to see it changing a lot for someone like Mr. Ferrer,

3   because, for example, in the bill that is circulating through

4   Congress, the positive effects are probably not going to be

5   ones that Mr. Ferrer can benefit from because of the nature of

6   this offense.

7        Mr. Ferrer, as we described in our papers, needs

8   mental health treatment.  He won't get effective mental health

9   treatment in the federal Bureau of Prisons.  What will happen

10  is, if the Court sentences him to 30 months or something close,

11  Mr. Ferrer will get out; he'll be 32 or 33 years old, and he'll

12  have his family waiting for him and folks in our office ready

13  to help him and programs that are set up for him.  And if the

14  Court imposes a much more extensive sentence, then everything

15  is going to be much more difficult.  And the benefits of it are

16  abstract and hard to see past a certain point, because at some

17  point -- in our view, 30 months at that point -- there's going

18  to be sufficient punishment with a correlative sufficient

19  deterrence.  Mr. Ferrer does not need to be incapacitated for a

20  longer period than that.  The Court needs to provide effective

21  rehabilitative services, and he's not going to get them while

22  he's incarcerated.

23        Mr. Ferrer has a significant criminal history, but as

24  we've described in our submission, 11 of those criminal history

25  points are all for concurrent sentences that were imposed in

IbjWferS

1   2008, which suggests that the purpose of increasing someone's

2   sentence for recidivism is, in part, that they've received a

3   sentence and it hasn't deterred them and they've receive

4   another sentence.  That purpose is lessened when the sentences

5   are concurrent.  And in the end, the Court is sentencing him

6   for this offense.  Yes, having a firearm is a serious offense,

7   but Mr. Ferrer, again, had an unloaded gun.  He was not doing

8   anything with it.  That offense does not require a sentence in

9   the range of the guidelines as calculated by the Court.

10         And just for a moment to talk about the guidelines,

11  your Honor, the Court found that the guidelines were an offense

12  level of 24.

13         THE COURT:  21, after --

14         MR. COHEN:  I'm sorry.  Base offense level of 24.  We

15  would argue that the base offense level is 14, based on the

16  categorical approach and how that should be implemented.

17         As the Court said when we were here a month ago,

18  they're somewhat artificial calculations.  I think the Court's

19  term was "theory upon theory," the point being that were the

20  guidelines 30 to 37 months, as we had argued, for the same

21  Gregory Ferrer, with his same exact criminal history and same

22  contact background, the government would have argued that the

23  appropriate sentence is 30 to 37 months.  You can confirm that

24  with the government, but I spoke to Adam Hobson this morning,

25  the assistant on the case, and I asked him what his position

would be if the Court came down on our side.  And while he
didn't say what his position would be in terms of what the
argument would be, saying that there would be another assistant
there, what he did say was that if the guidelines had been 30
to 37 months, this is not a case where the government would
have taken the steps to ask for an above-guidelines sentence.
They do that rarely.  They need to go to their supervisors in
order to do that, and it's usually based on some aggravating
factor within the offense itself.  So with the same background,
the same offenses, if the guideline calculation had been 30 to
37 months, that would have been sufficient for the government.

THE COURT:  I don't determine sentences based upon
what is sufficient for the government.

MR. COHEN:  I understand that, your Honor, but the
point is that the guidelines often have, certainly for the
government and less so for courts, a very strong gravitational
pull.

Here, we're dealing with a very specific and unique
individual, and I want to urge the Court to not let the
gravitational pull of the guidelines in this case move it to
impose a sentence that is extensive or more extensive than the
one that we've requested.

I've spent a lot of time with Mr. Ferrer.  He's had a
tough life.  He's made some very serious mistakes.  As he wrote
to the Court, his most serious one is picking up this gun and

IbjWferS

1    putting it in his pocket and throwing away the progress that

2    he'd made or was starting to make.  But that should not have

3    him incarcerated for a very extensive period of time.

4            I urge the Court to impose a sentence of 30 months,

5    which will be sufficient to satisfy all the purposes of

6    sentencing in this case.

7            Thank you.

8            THE COURT:  All right.

9            Mr. Ferrer, have you reviewed the presentence report,

10   the recommendation and the addendum, and discussed them with

11   your lawyer?

12           THE DEFENDANT:  Yes.

13           THE COURT:  Other than your lawyer has already said,

14   do you have any objections?

15           THE DEFENDANT:  No.

16           THE COURT:  I'll listen to you for anything that you

17   would like to tell me in connection with sentence, any

18   statement you'd like to make, anything at all you'd like to

19   tell me.

20           THE DEFENDANT:  I would like to say, your Honor, that

21   I would like to apologize for the possession of firearm.  I'm

22   not the same person that I was last year.  I made changes in my

23   life.  I joined programs in MCC to better myself.  I just

24   regret, basically, the day I possessed the firearm, and I know

25   that it was a foolish thing to do, to walk around with a

IbjWferS

 1   firearm, and I just want to say I apologize.

 2           I want to also apologize to my mother, because I let

 3   you down once again, and I know you wouldn't be here, you'd be

 4   at work and you got to be here to show me some support.  And

 5   I'm basically ready to better myself when I get released and

 6   not come back to this place.

 7           That's about it.

 8           THE COURT:  OK.  Thank you, Mr. Ferrer.

 9           THE DEFENDANT:  You're welcome.

10           THE COURT:  Has the government reviewed the

11   presentence report, the recommendation, and the addendum?

12           MS. QIAN:  Yes, your Honor.

13           THE COURT:  Does the government have any objections?

14           MS. QIAN:  No, your Honor.

15           THE COURT:  I'll listen to you for anything you would

16   like to tell me in connection with sentence.

17           MS. QIAN:  Your Honor, the government wishes --

18           THE COURT:  Could you keep your voice up.

19           MS. QIAN:  Yes.

20           Your Honor, the government wishes to rest on its

21   submissions.

22           THE COURT:  I can't hear you.  I really can't.

23           MS. QIAN:  I apologize for that, your Honor.

24           The government wishes to rest on its submissions.

25           THE COURT:  OK.

IbjWferS

1          MS. QIAN:  Thank you.

2          THE COURT:  I'll place the presentence report, the

3     recommendation and the addendum in the record under seal.  I'll

4     place the parties' submissions to me also in the record under

5     seal.  The parties should assure that their submissions are in

6     the record not under seal after making sure they redact any

7     personal identifying information.

8          I adopt the findings of fact in the presentence

9     report.  I've already given my analysis of the guidelines, but

10    as I've already said, I conclude that under the current

11    guidelines, the total offense level is 21.  The criminal

12    history category is VI and the guidelines sentencing range is

13    77 to 96 months.

14         I appreciate that the guidelines are only advisory and

15    that the Court must consider the various sentencing factors in

16    18 U.S.C. Section 3553(a) and impose a sentence that is

17    sufficient, but no greater than necessary, to comply with the

18    purposes set forth in Section 3553(a)(2).

19         Before I go through the sentencing analysis, the

20    defense has made a point of the fact that the defendant's

21    mother is in the courtroom, and that certainly shows support

22    for the defendant.  Defense also makes the argument that the

23    defendant has had a difficult upbringing.  I want to make it

24    clear at the outset that there is nothing in the submissions

25    before me from which the defendant's mother should take away

1    any sense of personal responsibility.  What people do with

2    their lives are personal choices.  It's plain that the

3    defendant's mother has worked extraordinarily hard over the

4    years and is very supportive of the defendant, and the

5    defendant's mother should take some comfort in that and

6    certainly not take away from this process any sense of failed

7    personal responsibility.  People make their own choices and

8    lead their own lives, and it's plain that the defendant's

9    mother has tried extremely hard to support the defendant, as

10   the defendant himself said.

11          So we turn to the factors.

12          The offense is plainly serious, the possession of a

13   firearm by a convicted felon.  Moreover, the defendant has a

14   substantial criminal history.  He is in category VI, the

15   highest category.

16          There are some mitigating factors.  The criminal

17   history category plainly overstates the seriousness of the

18   defendant's criminal history.  The criminal history category is

19   the largest for any defendant, but the individual offenses that

20   constitute that category in this case don't come close to

21   placing the defendant in that category of defendants who could

22   be considered the most serious, most dangerous defendants who

23   come before the Court.  Eleven points of the criminal history

24   category are attributable to four convictions for which the

25   defendant was sentenced on the same day ten years ago and for

IbjWferS

 1   which the defendant received a maximum sentence of two years'

 2   imprisonment.  But it appears from the presentence report that

 3   the defendant appears to have been released on parole after a

 4   year and a half.

 5          The defendant was never sentenced to more than two

 6   years' imprisonment, although the defendant is in the highest

 7   criminal history category.  As a consequence, a substantial

 8   sentence, although less than the guideline sentencing range,

 9   together with a term of supervised release should accomplish

10   the goals of deterrence and protection of the public as well as

11   recognize the seriousness of the offense.

12          On balance, in this case, the Court intends to impose

13   a sentence of 30 months on Count One to be followed by a

14   three-year term of supervised release with the standard

15   conditions of supervised release in this district and those

16   recommended by the probation department.

17          The Court will also impose a condition of mental

18   health treatment.

19          The Court will not impose a fine because the defendant

20   lacks the ability to pay a fine, after taking into account the

21   presentence report.

22          The Court will not impose restitution because there is

23   no victim under 18 U.S.C. Section 3663.

24          The Court will impose a $100 special assessment.

25          The sentence is consistent with the factors in Section

1    3553(a) and is sufficient, but no greater than necessary, to

2    comply with the purposes of Section 3553(a)(2).

3              I've explained the reasons for the sentence.

4              Before I actually impose the sentence, I'll recognize

5    defense counsel for any statement.

6              MR. COHEN:  Thank you very much, your Honor.

7              I just want to briefly say that I very much appreciate

8    the Court's comments about Mr. Ferrer's mother and wanted to

9    make clear that nothing in my description of his background was

10   meant to suggest in any way that she hasn't done a fantastic

11   job trying to help and support Mr. Ferrer, and I expect will

12   continue to do so when he's released.

13             Thank you.

14             THE COURT:  Before I actually impose the sentence,

15   I'll recognize you, Mr. Ferrer, for anything you would like to

16   tell me.

17             THE DEFENDANT:  I would like to say thank you for your

18   decision, and I also would like to say thank you to Mr. Cohen,

19   thank you to Mr. Dante and thank you to Mrs. Veasley and thank

20   you to my new lawyer.

21             THE COURT:  All right.

22             Mr. Ferrer, please remember, when you're on supervised

23   release, any violations of supervised release come back to me,

24   and I have a very long memory.  You say you've changed.  The

25   conditions of supervised release are strict with respect to not

1  violating any federal, state or local laws, remaining drug

2  free.  If you violate any of those provisions, you're back

3  before me, and as I told you at the time that I took your plea,

4  if you violate the conditions of your supervised release, you

5  can be sentenced to prison for the term of your supervised

6  release without any credit for any time you had already spent

7  on supervised release, so a violation of supervised release can

8  have serious consequences for you.

9          OK.  Before I actually impose the sentence, I'll

10  recognize the government for anything the government wishes to

11  tell me.

12          MS. QIAN:  Nothing further, your Honor.

13          THE COURT:  All right.

14          Pursuant to the Sentencing Reform Act of 1984, it is

15  the judgment of this Court that the defendant, Gregory Ferrer,

16  is hereby committed to the custody of the Bureau of Prisons to

17  be imprisoned for a term of 30 months on Count One.

18          I recommend incarceration in the New York City area so

19  that defendant can be close to his family.

20          Upon release from imprisonment, the defendant shall be

21  placed on supervised release for a term of three years.

22          Within 72 hours of release from the custody of the

23  Bureau of Prisons, the defendant shall report in person to the

24  probation office in the district to which the defendant is

25  released.

IbjWferS

1       While on supervised release, the defendant shall

2   comply with the standard conditions of supervised release in

3   this district.

4       The defendant shall not commit another federal, state

5   or local crime.

6       The defendant shall not possess a firearm or

7   destructive device, as defined in 18 U.S.C. Section 921.

8       The defendant shall refrain from any unlawful use or

9   possession of a controlled substance.

10      The defendant shall submit to one drug test within 15

11  days of release from imprisonment and at least two periodic

12  drug tests thereafter, as directed by the probation officer.

13      The defendant shall cooperate in the collection of

14  DNA, as directed by the probation officer.

15      The defendant shall participate in an outpatient

16  treatment program approved by the United States Probation

17  Office, which program may include testing to determine whether

18  the defendant has reverted to the use of drugs or alcohol.

19      The defendant must contribute to the cost of services

20  rendered based on his ability to pay and the availability of

21  third-party payments.

22      The Court authorizes the release of available drug

23  treatment evaluations and reports, including the presentence

24  investigation report, to the substance abuse treatment

25  provider.

1          The defendant must submit his person, residence, place

2     of business, vehicle and any property or electronic devices

3     under his control to a search on the basis that the probation

4     officer has reasonable suspicion that contraband or evidence of

5     a violation of the conditions of his supervised release may be

6     found.  The search must be conducted at a reasonable time and

7     in a reasonable manner.  Failure to submit to a search may be

8     grounds for revocation.  The defendant must inform any other

9     residents that the premises may be subject to search pursuant

10    to this condition.

11         The defendant must participate in a mental health

12    treatment program, as directed by the probation officer.

13         It is further ordered that the defendant shall pay to

14    the United States a special assessment of $100, which shall be

15    due immediately.

16         I've already explained the reasons for the sentence.

17         Does either counsel know of any legal reason that the

18    sentence should not be imposed as I've so stated it?

19         MR. COHEN:  No, your Honor.

20         MS. QIAN:  No, your Honor.

21         THE COURT:  OK.  I'll order the sentence to be imposed

22    as I so stated for all the reasons that I've explained.

23         There's no waiver, correct?

24         MR. COHEN:  That's correct, your Honor.

25         THE COURT:  OK.

IbjWferS

1          Mr. Ferrer, you have the right to appeal the sentence.

2     The notice of appeal must be filed within 14 days after the

3     entry of the judgment of conviction.  The judgment of

4     conviction is entered promptly after the judge announces the

5     sentence, so you should discuss this issue promptly with your

6     lawyer.  If you cannot pay the cost of appeal, you have the

7     right to apply for leave to appeal *in forma pauperis*.  If you

8     request, the clerk will prepare and file a notice of appeal on

9     your behalf immediately.

10          Do you understand?

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  OK.

13          Open counts?

14          MS. QIAN:  None, your Honor.

15          THE COURT:  But as a matter of prudence, the

16     government asks that all open counts be dismissed, right?

17          MS. QIAN:  Yes, your Honor.

18          THE COURT:  And the defense agrees.

19          MR. COHEN:  Yes, your Honor.

20          THE COURT:  All open counts dismissed on the motion of

21     the government.

22          Anything further?

23          MR. COHEN:  Nothing from Mr. Ferrer.

24          Thank you very much, your Honor.

25          MS. QIAN:  Nothing for the government, your Honor.
            THE COURT:  OK.  Good afternoon, all.  (Adjourned)

# Exhibit K

06/03/2021

To Whom It May Concern, I am
Nadine Allen the mother of Dave
Minter, he is the youngest of my
three children. Dave has always been
a loving and caring child, he has always
done sports and dancing events in
school. He always helped around the
house and did his chore's. When he was
10 month's old he had gotten lead
poison and it was very high. When
he was in public school he was
diagnose with dyslexia and they
put him in special Education. He
started working summer youth at
14 to 18. He even sometimes

came to my job and wrapped
meat and swept floor and helped
stacked. He worked with his father
doing roofing, he worked cleaning
court houses at night, he worked
at a manhattan restuarant at night.
He worked delivering pizza too.
He has three children age 17, 13,
and 1. He loves his kids so very
much. He has spent time with his
17 year old the most because I had
custody of her two times. He lived
with his 13 years old for quite sometime
they do tell me all the time that they
miss him very much. I was just
diagnose with stage 3 breast cancer

and do miss My son with all My heart, as a mother you know how it is now being able to have your child around. He is not a bad person I just think sometimes these street are challenging, but he does want to be home to finish raising his children.

Thank you,
Nadine Allen 06-03-2[
~~~~~~~~~~~~~~~~~~~~

Bronx, N.Y. 10458

# Exhibit L

June 2...

To Whom it May Concern,

I am Dave Minter's father Morris Minter, My son is a loving and caring person to me and everyone he meets. I have had my own problems in and out of prison, and in and out of his life. I think sometimes it reflects his own life. I love my son very much and I know somehow he can turn his life around like I have done. Nothing has been more important to him than his family. He has the

support he needs and we are here
for him every step of the way.

Thank you
Lamour Mutt
347 468 0040

# Exhibit M

6 9.21

To whom it may Concern:

My name is Julia Fowler.
I live at ████████████
████████████ writing this letter
For Dave minter. I have
the pleasure of Knowing
Dave for over Twenty
years. D Ave have watched
my son many times. while
I worked. Mr Minter is
a very caring and loving
Person. He is always
willing to help Someone
in they time of need.
    IF you have any
questions Please feel free
to call me at 646.417.0781

                Sincerly yours
                Julia Fowler
                Julia Fowle

Exhibit N

Dave Minter is a really nice person I knew him since 2007 and he always helped me out he was always there for me he's actually one of my best friends He's a really nice person and he helps me at work he helps me at my house when I need things fixed he helps my mom out when she needs to go grocery shopping and he just does a lot for my family and I really do appreciate the person he  you can me at 718 219 7118

~Sara Brock

# Exhibit O

06-07-21

To whom it MaY ConCern, I
an a Friend of DAve Minter, he
is and always has been a good
Child, to his mother and father.
he is respectfull and always has bee
Polite, to Me and MY Familily

Thank You

Yeimy GARCIA

347-520-1188